COMPASSION IN DYING, a Washington nonprofit corporation; Jane Roe; John Doe; James Poe, Harold Glucksberg, M.D., Plaintiffs–Appellees,

v.

STATE OF WASHINGTON; Christine Gregoire, Attorney General of Washington, Defendants–Appellants.

No. 94–35534.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 7, 1994.

Filed March 9, 1995.

Order Granting Rehearing En Banc Aug. 1, 1995.

Argued and Submitted Oct. 26, 1995.

Decided March 6, 1996.

As Amended May 28, 1996.

---

Christine Gregoire, Attorney General, and William L. Williams, Senior Assistant Attorney General (argued), Olympia, Washington, for defendants-appellants.

Kathryn L. Tucker (argued), David J. Burman, Thomas L. Boeder, Kari Anne Smith, Perkins Coie, Seattle, Washington, for plaintiffs-appellees.

Wesley J. Smith, San Francisco, California, for amicus curiae Intern. Anti–Euthanasia Task Force.

Katrin E. Frank, Robert A. Free, Kathleen Wareham, MacDonald, Hoague & Bayless, Seattle, Washington, for amicus curiae Ten Surviving Family Members.

James Bopp, Jr., Thomas J. Marzen, Daniel Avila, John Altomare, Jane E.T. Brockman, National Legal Center for the Medically Dependent and Disabled, Inc., Indianapolis, Indiana, as amicus curiae.

John R. Reese, Robert A. Lewis, Page R. Barnes, Amy J. Metzler, Holly Morris, McCuthchen, Doyle, Brown & Enersen, San Francisco, California, for amicus curiae Americans for Death with Dignity.

Mary D. Clement, Junction City, Oregon, for amicus curiae Euthanasia Research & Guidance Organization.

Mark E. Chopko, Michael F. Moses, Washington, D.C., for amicus curiae United States Catholic Conference.

Paul Benjamin Linton, Clarke D. Forsythe, Americans United for Life, Chicago,

Illinois, for amici curiae, Washington State Legislators.

Barbara Allan Shickich, Joseph E. Shickich, Jr., Graham & James, LLP/Riddell Williams, P.S., Seattle, Washington, for amicus curiae Washington State Hospital Association and Catholic Health Association of the United States.

Catherine W. Smith, Edwards, Sieh, Hathaway, Smith & Goodfriend, P.S., Seattle, Washington, for amicus curiae Amici State Legislators.

Todd Maybrown, Allen, Hansen & Maybrown, Karen Boxx and Juli Farris, Keller Rohrback, Seattle, Washington, for amici curiae the American Civil Liberties Union of Washington, the Northwest Women's Law Center, Lambda Legal Defense and Education Fund, Inc., AIDS Action Council, the Northwest AIDS Foundation, the Seattle AIDS Support Group, the Gray Panthers Project Fund, the Older Women's League, the Seattle Chapter of the National Organization for Women, the American Humanist Association, the National Lawyers Guild, Local 6 of the Service Employees International Union, Temple De Hirsch Sinai, the Unitarian Universalist Association, the Seattle Chapter and the Pacific Northwest District Council of the Japanese American Citizens League.

Kirk B. Johnson, Michael L. Ile, David Orentlicher, Jack R. Bierig, Sidley & Austin, Chicago, Illinois, Paul E. Kalb, Sidley & Austin, Washington, D.C., for amicus curiae American Medical Association.

Before BROWNING, HUG, SCHROEDER, FLETCHER, PREGERSON, REINHARDT, BEEZER, WIGGINS, THOMPSON, FERNANDEZ, and KLEINFELD, Circuit Judges.

Opinion by Judge REINHARDT; Dissent by Judge BEEZER; Dissent by Judge FERNANDEZ; Dissent by Judge KLEINFELD.

REINHARDT, Circuit Judge:

## I.

This case raises an extraordinarily important and difficult issue. It compels us to address questions to which there are no easy or simple answers, at law or otherwise. It requires us to confront the most basic of human concerns—the mortality of self and loved ones—and to balance the interest in preserving human life against the desire to die peacefully and with dignity. People of good will can and do passionately disagree about the proper result, perhaps even more intensely than they part ways over the constitutionality of restricting a woman's right to have an abortion. Heated though the debate may be, we must determine whether and how the United States Constitution applies to the controversy before us, a controversy that may touch more people more profoundly than any other issue the courts will face in the foreseeable future.

Today, we are required to decide whether a person who is terminally ill has a constitutionally-protected liberty interest in hastening what might otherwise be a protracted, undignified, and extremely painful death. If such an interest exists, we must next decide whether or not the state of Washington may constitutionally restrict its exercise by banning a form of medical assistance that is frequently requested by terminally ill people who wish to die. We first conclude that there is a constitutionally-protected liberty interest in determining the time and manner of one's own death, an interest that must be weighed against the state's legitimate and countervailing interests, especially those that relate to the preservation of human life. After balancing the competing interests, we conclude by answering the narrow question before us: We hold that insofar as the Washington statute prohibits physicians from prescribing life-ending medication for use by terminally ill, competent adults who wish to hasten their own deaths, it violates the Due

Process Clause of the Fourteenth Amendment.

## II.

### Preliminary Matters and History of the Case

This is the first right-to-die case that this court or any other federal court of appeals has ever decided.[1] The plaintiffs are four physicians who treat terminally ill patients, three terminally ill patients, and a Washington non-profit organization called Compassion In Dying.[2] The four physicians—Dr. Harold Glucksberg, Dr. Thomas A. Preston, Dr. Abigail Halperin, and Dr. Peter Shalit—are respected doctors whose expertise is recognized by the state. All declare that they periodically treat terminally ill, competent adults who wish to hasten their deaths with help from their physicians. The doctors state that in their professional judgment they should provide that help but are deterred from doing so by a Washington statute that makes it a felony to knowingly aid another person to commit suicide.

Under the Washington statute, aiding a person who wishes to end his life constitutes a criminal act and subjects the aider to the possibility of a lengthy term of imprisonment, even if the recipient of the aid is a terminally ill, competent adult and the aider is a licensed physician who is providing medical assistance at the request of the patient. The Washington statute provides in pertinent part: "A person is guilty of promoting a suicide attempt when he knowingly causes *or aids* another person to attempt suicide." RCW 9A.36.060 (emphasis added). A violation of the statute constitutes a felony punishable by imprisonment for a maximum of five years and a fine of up to $10,000. RCW 9A.36.060(2) and 9A.20.020(1)(c).

On appeal, the four plaintiff-doctors asserted the rights of terminally ill, competent adult patients who wished to hasten their deaths with the help of their physicians so that they might die peacefully and with dignity. That group included the three patient-plaintiffs. The district court described the patient-plaintiffs, each of whom desired to obtain prescription drugs to hasten his death, as follows:

Jane Roe is a 69–year–old retired pediatrician who has suffered since 1988 from cancer which has now metastasized throughout her skeleton. Although she tried and benefitted temporarily from various treatments including chemotherapy and radiation, she is now in the terminal phase of her disease. In November 1993, her doctor referred her to hospice care. Only patients with a life expectancy of less than six months are eligible for such care.

Jane Roe has been almost completely bedridden since June of 1993 and experiences constant pain, which becomes especially sharp and severe when she moves. The only medical treatment available to her at this time is medication, which cannot fully alleviate her pain. In addition, she suffers from swollen legs, bed sores, poor appetite, nausea and vomiting, impaired vision, incontinence of bowel, and general weakness.

Jane Roe is mentally competent and wishes to hasten her death by taking prescribed drugs with the help of Plaintiff Compassion in Dying. In keeping with the requirements of that organization, she has made three requests for its members to provide her and her family with counseling, emotional support, and any necessary ancillary drug assistance at the time she takes the drugs.

---

1. The Second Circuit currently has before it a similar case: *Quill v. Vacco*, 80 F.3d 716 (2d Cir.1996). The district court in that case, *Quill v. Koppell*, 870 F.Supp. 78 (S.D.N.Y.1994), held that terminally ill, competent adult patients do not have a fundamental substantive due process right to physician-assisted suicide and that the New York statutes that prohibit assisted-suicide while permitting terminally ill patients to reject life-sustaining treatment do not violate the Equal Protection Clause.

2. Compassion In Dying provides information, counseling, and assistance to mentally competent, terminally ill adult patients considering hastening their deaths. It also provides similar services to the families of such patients. *Compassion In Dying v. State of Wash.*, 850 F.Supp. 1454, 1458 (W.D.Wash.1994).

John Doe is a 44–year–old artist dying of AIDS. Since his diagnosis in 1991, he has experienced two bouts of pneumonia, chronic, severe skin and sinus infections, grand mal seizures and extreme fatigue. He has already lost 70% of his vision to cytomegalovirus retinitis, a degenerative disease which will result in blindness and rob him of his ability to paint. His doctor has indicated that he is in the terminal phase of his illness.

John Doe is especially cognizant of the suffering imposed by a lingering terminal illness because he was the primary care-giver for his long-term companion who died of AIDS in June of 1991. He also observed his grandfather's death from diabetes preceded by multiple amputations as well as loss of vision and hearing. Mr. Doe is mentally competent, understands there is no cure for AIDS and wants his physician to prescribe drugs which he can use to hasten his death.

James Poe is a 69–year–old retired sales representative who suffers from emphysema, which causes him a constant sensation of suffocating. He is connected to an oxygen tank at all times, and takes morphine regularly to calm the panic reaction associated with his feeling of suffocation. Mr. Poe also suffers from heart failure related to his pulmonary disease which obstructs the flow of blood to his extremities and causes severe leg pain. There are no cures for his pulmonary and cardiac conditions, and he is in the terminal phase of his illness. Mr. Poe is mentally competent and wishes to commit suicide by taking physician-prescribed drugs.

*Compassion In Dying,* 850 F.Supp. at 1456–57.

The names of the patients are pseudonymous in order to protect their privacy. All three patients died after the case began. Two had died by the time the District Court issued its decision. *See Compassion In Dy-*

*ing v. State of Washington,* 850 F.Supp. 1454, 1456 n. 2 (W.D.Wash.1994). The other died prior to the date of the decision by the three-judge panel of this court. *Compassion In Dying v. State of Washington,* 49 F.3d 586, 588 (9th Cir.1995).

■ Since the District Court properly granted the physicians standing to assert the rights of their terminally ill patients in general, 850 F.Supp. at 1467, it is clear that this case was not rendered moot by the death of the three named patients. The physicians meet both Article III and jurisprudential standing requirements. *See Singleton v. Wulff,* 428 U.S. 106, 116–17, 96 S.Ct. 2868, 2875–76, 49 L.Ed.2d 826 (1976) (holding that doctors had standing to challenge—on behalf of women patients in general—a Missouri law banning Medicaid reimbursement for abortions that were not medically required). *See also Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973) (holding that physicians, asserting the rights of their patients, have standing to challenge the constitutionality of a criminal abortion statute even though "the record does not disclose that any one of them has been prosecuted, or threatened with prosecution, for violation of the State's abortion statutes"); *Planned Parenthood of Cent. Mo. v. Danforth,* 428 U.S. 52, 62, 96 S.Ct. 2831, 2837, 49 L.Ed.2d 788 (1976) (same). Although there is some ambiguity in *Bolton* as to whether the physicians were asserting their own rights or the rights of their patients, the Court in *Singleton,* after discussing *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), described *Bolton* as a case "where the Court also permitted physicians to assert the rights of their patients." [3]

The doctors in *Bolton* were held to have standing to assert their patients' rights even though the doctors had never been threatened with prosecution. The doctors here also meet the standing requirements because they run a severe risk of prosecution under

---

**3.** For purposes of this appeal, we do not distinguish between the two capacities in which the doctors sue. As we explain in the text immediately following, the doctors have standing to sue on their own behalf as well as on behalf of the patients. In both cases, the doctors are required to raise the patients' liberty interests. Regard-

less of the capacity in which the doctors sue, the result depends on the identical constitutional inquiry: May the provision of certain medical assistance to competent, terminally ill adult patients who wish to die be prohibited by state law in light of the patients' rights and interests protected by the Due Process Clause?

the Washington statute, which proscribes the very conduct in which they seek to engage. The state has never indicated that it would not prosecute doctors who violate that law. *See Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) (holding that plaintiff does not have to risk arrest or prosecution in order to have standing to challenge the constitutionality of a criminal statute). *See also Planned Parenthood of Cent. Mo.,* 428 U.S. at 62, 96 S.Ct. at 2837; *Bolton,* 410 U.S. at 188, 93 S.Ct. at 745 (saying that the "physician is the one against whom these criminal statutes directly operate" and that the "physician-appellants, therefore, assert a sufficiently direct threat of personal detriment.... [and] should not be required to await and undergo a criminal prosecution as the sole means of seeking relief").

We need not decide whether, the deaths of the three patient-plaintiffs would negate the ability of their lawyers to continue the challenge that those patients brought while they were still alive. *See Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911) (holding a case is not moot when the controversy is capable of repetition yet evading review). We note, however, that in invoking the capable-of-repetition-yet-evading-review doctrine in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d

147 (1973), the Court specifically relied, in part, on the fact that *other* women would become pregnant.[4] The Court said:

> [W]hen, as here, pregnancy is a significant fact in the litigation, the normal 266–day human gestation period is so short that the pregnancy will come to term before the usual appellate procedure is complete. If that termination makes a case moot, pregnancy litigation will seldom survive much beyond the trial stage, and appellate review will be effectively denied. *Our law should not be that rigid. Pregnancy often comes more than once to the same woman, and in the general population, if man is to survive, it will always be with us.*

*Roe,* 410 U.S. at 125, 93 S.Ct. at 713 (emphasis added). So, too, unfortunately, will terminal illness.[5]

The District Court in this case reached only claims asserted by two of the three categories of plaintiffs: the patients' claims that they had a right to receive medical assistance from their physicians and the claims that the physicians asserted on behalf of their patients. It did not address the claim asserted by Compassion In Dying. Nor, correlatively, did it reach the claim by the terminally ill patients that they had a

---

**4.** Cases after *Roe,* without mentioning *Roe,* have said that the capable-of-repetition-yet-evading-review doctrine applies when there is a reasonable expectation that the same party could be subject to the same action again. *Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982); *Sosna v. Iowa,* 419 U.S. 393, 400–402, 95 S.Ct. 553, 557–559, 42 L.Ed.2d 532 (1975). None of these cases, however, involved terminally ill persons. We would think that a distinction could reasonably be drawn between the terminally ill, *all* of whom *necessarily* will die prior to completion of the litigation, and those whose cases become moot for more mundane or less predictable reasons. In this connection, we note that the most common classification of terminally ill persons limits that group to individuals who are expected to die within six months. In any event we emphasize that even if the *Murphy–Sosna* interpretation of the capable-of-repetition-yet-evading-review requirement applies to cases involving terminally ill plaintiffs, this case would not be moot because the doctors have standing to challenge the Washington statute both on behalf of terminally ill patients and on their own behalf.

**5.** *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) is not to the contrary. In that case, Lyons claimed that Los Angeles police officers placed him in a chokehold without provocation and secured an injunction to keep LAPD officers from placing people in chokeholds except as necessary for self-defense. The Court reversed the injunction, saying that the lower court lacked jurisdiction to enter it because Lyons had not established that he was in real and immediate danger of being needlessly subjected to a chokehold again. The Court said that any future danger to Lyons was speculative because that danger would only materialize if Lyons again committed an act that caused the police to arrest him, and the police then again acted improperly or illegally. In this case, by contrast, there are unquestionably patients who are terminally ill and the danger to them and to their doctors is neither speculative nor dependent on illegal or improper actions by state actors.

right to receive assistance from organizations such as Compassion In Dying.

Like the District Court, we decide only claims brought by the terminally ill patients and the doctors.[6] We consider those claims to the extent that they relate to the provision of certain medical assistance to terminally ill persons by physicians or persons acting pursuant to their authorization or direction. The claims involving Compassion In Dying are not before us. The district court suggested that it would reach those additional claims at a later stage in the proceedings if Compassion In Dying so desired. We have jurisdiction over this appeal from partial summary judgment because the district court certified the appeal at the request of both parties under Federal Rule of Civil Procedure 54(b).

The plaintiffs do not challenge Washington statute RCW 9A.36.060 in its entirety. Specifically they do not object to the portion of the Washington statute that makes it unlawful for a person knowingly to *cause* another to commit suicide. Rather, they only challenge the statute's *"or aids"* provision. They challenge that provision both on its face and as applied to terminally ill, mentally competent adults who wish to hasten their own deaths with the help of medication prescribed by their doctors.[7] The plaintiffs contend that the provision impermissibly pre-

vents the exercise by terminally ill patients of a constitutionally-protected liberty interest in violation of the Due Process Clause of the Fourteenth Amendment, and also that it impermissibly distinguishes between similarly situated terminally ill patients in violation of the Equal Protection Clause.

In an extremely thoughtful opinion, Chief District Judge Barbara Rothstein held that "a competent, terminally ill adult has a constitutionally guaranteed right under the Fourteenth Amendment to commit physician-assisted suicide." 850 F.Supp. at 1462. Ruling on cross-motions for summary judgment, the District Court concluded that the Washington statute places an undue burden on the exercise of that constitutionally-protected liberty interest. *Id.* at 1465. The District Court held that the Washington law also violates the Equal Protection Clause because it impermissibly treats similarly situated groups of terminally ill patients differently. *Id.* at 1467. Although the scope of the relief the District Judge ordered is not clear, *id.* at 1456, 1459, 1462–1464, 1467, it appears that she declared the statute invalid only insofar as it applies to the prescription of medication to terminally ill competent adults who wish to hasten their deaths—or, to use the district court's precise terminology, only insofar as it applies to "physician-assisted suicide," *id.* at 1467.[8]

---

6. While the District Court did not reach the claims that the doctors asserted on their own behalf, as we explained *supra* note 3, those claims are properly before us, and, given the result we reach, they are necessarily resolved by our decision.

7. In their complaint, under Causes of Action, plaintiffs stated: "The Fourteenth Amendment protects the rights of terminally ill adults with no chance of recovery to make decisions about the end of their lives, including the right to choose to hasten inevitable death with suitable physician-prescribed drugs and thereby avoid pain and suffering."

8. Notwithstanding the District Court's declaration that the Washington statute is unconstitutional, the effect of its ruling is unclear. It is extremely unlikely that the district judge intended to strike down the entire statute, as the state asserts she did, in view of the fact that the appellants attacked only its "or aids" provision. This is particularly true because the "or aids" provision is clearly severable under Washington law. *See Brockett v. Spokane Arcades, Inc.*, 472

U.S. 491, 505, 105 S.Ct. 2794, 2802, 86 L.Ed.2d 394 (1985).

It is equally unclear whether the District Judge intended to strike the "or aids" provision on its face or as applied. *Compare Compassion In Dying*, 850 F.Supp. at 1456 *with id.* at 1459 *and id.* at 1462–64. Again, we think it unlikely that she intended to strike the entire provision for two reasons. First, the plaintiffs only argued that the assisted-suicide provision violated the constitutional rights of terminally ill, competent adults, and only offered evidence to that end. The parties did not address whether broader relief was permitted or required, and the District Court offered no explanation as to why a finding that the provision was unconstitutional as applied to the terminally ill would cause her to strike the provision on its face rather than as applied to the injured group. Second, as we noted previously, the District Court did not reach the claims raised by Compassion In Dying. *Id.* at 1467. As to Compassion In Dying, Judge Rothstein found only that summary judgment was not warranted "at this time." *Id.* at 1467–68. If the District Court had struck down the provision on its face,

On appeal, a three-judge panel of this court voted 2–1 to reverse the district court decision. *Compassion In Dying v. State of Washington,* 49 F.3d 586 (9th Cir.1995). The majority held that there is no due process liberty interest in physician-assisted suicide. It also concluded that the Washington statute does not violate the Equal Protection Clause. Accordingly, the majority held that the statute is not invalid facially or as applied. Judge Wright dissented and would have held that the statute is invalid as applied to terminally ill, mentally competent adults because it violates their privacy and equal protection rights. *Id.* at 594, 597 (Wright, J., dissenting). Because of the extraordinary importance of this case, we decided to rehear it en banc. *Compassion In Dying v. State of Wash.,* 62 F.3d 299 (9th Cir.1995).

We now affirm the District Court's decision and clarify the scope of the relief. We hold that the "or aids" provision of Washington statute RCW 9A.36.060, as applied to the prescription of life-ending medication for use by terminally ill, competent adult patients who wish to hasten their deaths, violates the Due Process Clause of the Fourteenth Amendment.[9] Accordingly, we need not resolve the question whether that provision, in conjunction with other Washington laws regulating the treatment of terminally ill patients,[10] also violates the Equal Protection Clause.

## III.

### Overview of Legal Analysis: Is There a Due Process Violation?

In order to answer the question whether the Washington statute violates the Due Process Clause insofar as it prohibits the provision of certain medical assistance to terminally ill, competent adults who wish to hasten their own deaths, we first determine whether there is a liberty interest in choosing the time and manner of one's death—a question sometimes phrased in common parlance as:

---

there would have been no purpose to its denying Compassion In Dying's summary judgment motion with a qualification that so clearly suggests that further proceedings might transpire. Nor would there have been any reason for it to have denied the doctors' motion on their own behalf in an equally non-final manner.

9. Declaring a statute unconstitutional as applied to members of a group is atypical but not uncommon. *See, e.g., Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985) (holding that state law permitting police officers to use deadly force to prevent the escape of felony suspects was unconstitutional as applied to suspects who pose no immediate threat to officers or others); *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (holding Wisconsin's mandatory attendance law unconstitutional but only as applied to Amish children who have graduated from eight grade. Although the Court did not explicitly use the term "as applied," it did explicitly affirm the judgment of the Wisconsin Supreme Court, *id.* at 207, 92 S.Ct. at 1529, which struck down the statute only as applied to Amish children who had graduated from the eighth grade. *Wisconsin v. Yoder,* 49 Wis.2d 430, 182 N.W.2d 539 (1971).

Because we are not deciding the facial validity of RCW 9A.36.060, there can be no question that the exacting test for adjudicating claims of facial invalidity announced in *United States v. Salerno,* 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), is inapplicable here. ("A facial challenge to a legislative Act is, of course, the most difficult

challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *Id.* at 745, 107 S.Ct. at 2100). For that reason alone, we would reject Washington's suggestion that we use the *Salerno* test for adjudicating plaintiffs' constitutional challenge.

Moreover, not only is there strong evidence that the Court does not generally apply the *Salerno* test, *see* Michael C. Dorf, *Facial Challenges to State and Federal Statutes,* 46 Stan.L.Rev. 235 (1994), but it is clear that it has applied a different test for judging the constitutionality of statutes restricting a woman's right to secure an abortion. *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 893–97, 112 S.Ct. 2791, 2829–30, 120 L.Ed.2d 674. Since the claimed liberty issue in this case is in many respects similar to the liberty issue involved in *Casey, see* discussion *infra* at pp. 813–814 and 803, we believe that the *Salerno* test would not in any event be the appropriate one for adjudicating a facial challenge to Washington's prohibition on assisted suicide.

10. The Washington Natural Death Act, RCW 70.122.010 *et seq.,* states:

adult persons have the fundamental right to control the decisions relating to the rendering of their own health care, including the decision to have life-sustaining treatment withheld or withdrawn, in instances of a terminal condition or permanent unconscious condition.... RCW 70.122.010.

Is there a right to die? Because we hold that there is, we must then determine whether prohibiting physicians from prescribing life-ending medication for use by terminally ill patients who wish to die violates the patients' due process rights.

▪ The mere recognition of a liberty interest does not mean that a state may not prohibit the exercise of that interest in particular circumstances, nor does it mean that a state may not adopt appropriate regulations governing its exercise. Rather, in cases like the one before us, the courts must apply a balancing test under which we weigh the individual's liberty interests against the relevant state interests in order to determine whether the state's actions are constitutionally permissible. As Chief Justice Rehnquist, writing for the Court, explained in *Cruzan v. Director, Missouri Dept. of Health,* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990), the only right-to-die case that the Court has heretofore considered:

> [D]etermining that a person has a "liberty interest" under the Due Process Clause does not end our inquiry; "whether respondent's constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests." *Youngberg v. Romeo,* 457 U.S. 307, 321, 102 S.Ct. 2452, 2461, 73 L.Ed.2d 28 (1982); *See also Mills v. Rogers,* 457 U.S. 291, 299, 102 S.Ct. 2442, 2448, 73 L.Ed.2d 16 (1982).

*Cruzan,* 497 U.S. at 279, 110 S.Ct. at 2851–52 (footnote omitted).

The Court has invoked a balancing test in a number of substantive due process cases, not just in the right-to-die context. For example, as the *Cruzan* Court noted, the Court applied a balancing test in *Youngberg* and *Mills,* liberty interest cases involving the right to refuse medical treatment. *Youngberg* addressed the rights of patients involuntarily committed to state mental institutions. The Court said: "In determining whether a substantive right protected by the Due Process Clause has been violated, it is necessary to balance the liberty of the individual and

the demands of organized society." *Youngberg,* 457 U.S. at 320, 102 S.Ct. at 2460 (internal citation and quotation omitted). *Mills* addressed the question of the right of mental patients to refuse treatment with antipsychotic drugs. There, the Court stated explicitly that the "state interests" are "to be balanced against an individual's liberty interests." 457 U.S. at 304, 102 S.Ct. at 2451. As the *Cruzan* Court also noted, the use of a balancing test is deeply rooted in our legal traditions. The Court has been applying a balancing test in substantive due process cases at least since 1905, when in *Jacobson v. Massachusetts,* 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905), "the Court balanced an individual's liberty interest in declining an unwanted smallpox vaccine against the State's interest in preventing disease." *Cruzan,* 497 U.S. at 278, 110 S.Ct. at 2851.

As Justice O'Connor explained in her concurring opinion in *Cruzan,* the ultimate question is whether sufficient justification exists for the intrusion by the government into the realm of a person's "liberty, dignity, and freedom." *Cruzan,* 497 U.S. at 287, 289, 110 S.Ct. at 2856, 2857 (O'Connor, J., concurring). If the balance favors the state, then the given statute—whether it regulates the exercise of a due process liberty interest or prohibits that exercise to some degree—is constitutional. If the balance favors the individual, then the statute—whatever its justifications—violates the individual's due process liberty rights and must be declared unconstitutional, either on its face or as applied. Here, we conclude unhesitatingly that the balance favors the individual's liberty interest.[11]

# IV.

## Is There a Liberty Interest?

Before beginning our inquiry into whether a liberty interest exists, we reiterate a few fundamental precepts that guide us. The first lies in the Court's cautionary note in *Roe v. Wade,* 410 U.S. 113, 116, 93 S.Ct. 705, 708, 35 L.Ed.2d 147 (1973):

---

11. For a brief discussion of the dissent's rejection by implication of the balancing test, see pp. 804–805 *infra.*

We forthwith acknowledge our awareness of the sensitive and emotional nature of the ... controversy, of the vigorous opposing views, even among physicians, and of the deep and seemingly absolute convictions that the subject inspires. One's philosophy, one's experiences, one's exposure to the raw edges of human existence, one's religious training, one's attitude toward life and family and their values, and the moral standards one establishes and seeks to observe, are all likely to influence and to color one's thinking and conclusions....

Like the *Roe* Court, we endeavor to conduct an objective analysis of a most emotionally-charged of topics. In doing so, we bear in mind the second Justice Harlan's admonition in his now-vindicated dissent in *Poe v. Ullman*, 367 U.S. 497, 543, 81 S.Ct. 1752, 1776–77, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting from dismissal on jurisdictional grounds):

[T]he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere in the Constitution. This 'liberty' is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on. It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints, ... and which also recognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgment.

Applying Justice Harlan's teaching, we must strive to resist the natural judicial impulse to limit our vision to that which can plainly be observed on the face of the document before us, or even that which we have previously had the wisdom to recognize.

Most important, we undertake our difficult task with a profound respect for the noble objectives of the Constitution, as described by Justice Brandeis in the second most famous dissent in American jurisprudence.[12] In *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), Justice Brandeis wrote, and his words have since been quoted in full in several opinions of the Court and in innumerable appellate court decisions:

The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfaction of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the government, the right to be let alone—the most comprehensive of rights, and the right most valued by civilized men.

*Id.* at 478, 48 S.Ct. at 572 (Brandeis, J., dissenting).

In examining whether a liberty interest exists in determining the time and manner of one's death, we begin with the compelling similarities between right-to-die cases and abortion cases. In the former as in the latter, the relative strength of the competing interests changes as physical, medical, or related circumstances vary. In right-to-die cases the outcome of the balancing test may differ at different points along the life cycle as a person's physical or medical condition deteriorates, just as in abortion cases the permissibility of restrictive state legislation may vary with the progression of the pregnancy.[13] Equally important, both types of

---

**12.** The most famous dissent, of course, was that of the first Justice Harlan in *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896).

**13.** Most of the liberty interests or rights that the Court recognized before *Roe* are static. One's liberty interest in marriage, procreation, family relationships, child rearing, intercourse for purposes other than procreation, and whether or not to bear or beget children, for instance, remains relatively constant, at least throughout one's adult years. Similarly the state's countervailing interests change little if at all. Abortion cases require a more dynamic mode of analysis, however. In *Roe*, the Court explained that the rela-

cases raise issues of life and death, and both arouse similar religious and moral concerns. Both also present basic questions about an individual's right of choice.

Historical evidence shows that both abortion and assisted suicide were for many years condemned, but that the efforts to prevent people from engaging in the condemned conduct were always at most only partially successful. Even when prohibited, abortions and assisted-suicides flourished in back alleys, in small street-side clinics, and in the privacy of the bedroom. Deprived of the right to medical assistance, many pregnant women and terminally ill adults ultimately took matters into their own hands, often with tragic consequences.

Because they present issues of such profound spiritual importance and because they so deeply affect individuals' right to determine their own destiny, the abortion and right-to-die cases have given rise to a highly emotional and divisive debate. In many respects, the legal arguments on both sides are similar, as are the constitutional principles at issue.

In deciding right-to-die cases, we are guided by the Court's approach to the abortion cases. *Casey* in particular provides a powerful precedent, for in that case the Court had the opportunity to evaluate its past decisions and to determine whether to adhere to its original judgment. Although *Casey* was influenced by the doctrine of *stare decisis*, the fundamental message of that case lies in its statements regarding the type of issue that confronts us here: "These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment." *Casey*, 505 U.S. at 851, 112 S.Ct. at 2807.

## A.

### Defining the Liberty Interest and Other Relevant Terms

The majority opinion of the three-judge panel that first heard this case on appeal

defined the claimed liberty interest as a "constitutional right to *aid* in killing oneself." *Compassion In Dying*, 49 F.3d at 591 (emphasis added). However, the subject we must initially examine is not nearly so limited. Properly analyzed, the first issue to be resolved is whether there is a liberty interest in determining the time and manner of one's death. We do not ask simply whether there is a liberty interest in receiving "aid in killing oneself" because such a narrow interest could not exist in the absence of a broader and more important underlying interest—the right to die. In short, it is the end and not the means that defines the liberty interest.

The broader approach we employ in defining the liberty interest is identical to the approach used by the Supreme Court in the abortion cases. In those cases, the Court initially determined whether a general liberty interest existed (an interest in having an abortion), not whether there was an interest in implementing that general liberty interest by a particular means (with medical assistance). Specifically, in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Court determined that women had a liberty interest in securing an abortion, not that women had a liberty interest in obtaining medical assistance for purpose of an abortion. The Court did so even though the Texas statute at issue did not prohibit a woman from inducing her own abortion; nor did it criminalize a woman's conduct in securing an abortion. Rather, the Texas statute, like the Washington statute here, prohibited the rendering of assistance; specifically, the Texas statute prohibited only *assisting* a woman to secure an abortion. *Roe*, 410 U.S. at 151–52, 93 S.Ct. at 725–26. The Court first determined that a woman had a constitutional right to choose an abortion. Only after it did so, did it proceed to the second step: to determine whether the state's prohibition on assistance unconstitutionally restricted the exercise of that liberty interest. Similarly, in *Planned Parenthood v. Casey*,

tive weight of a woman's liberty interest in terminating an unwanted pregnancy, compared to the state's interest in protecting life shifts dramatically during the course of a pregnancy. As a result, the extent to which state action is permissible shifts dramatically as well. *See also Planned Parenthood v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).

505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), the Court first reaffirmed, after extensive analysis, its earlier holding that women have a liberty interest in obtaining an abortion. In determining the *existence* of that liberty interest, the Court did not address the subject of spousal notification. As in *Roe,* only after affirming a woman's right to have an abortion, did the Court proceed to the second step: to examine whether the statutory provision requiring married women to notify their spouses prior to obtaining an abortion posed an undue burden on the exercise of that liberty interest. In this case, our analysis is necessarily the same. First we must determine whether there *is* a liberty interest in determining the time and manner of one's death; if so, we must then examine whether Washington's ban on assisted suicide unconstitutionally restricts the exercise of that liberty interest.

While some people refer to the liberty interest implicated in right-to-die cases as a liberty interest in committing suicide, we do not describe it that way. We use the broader and more accurate terms, "the right to die," "determining the time and manner of one's death," and "hastening one's death" for an important reason. The liberty interest we examine encompasses a whole range of acts that are generally not considered to constitute "suicide." Included within the liberty interest we examine, is for example, the act of refusing or terminating unwanted medical treatment. As we discuss later at pp. 821–822, a competent adult has a liberty interest in refusing to be connected to a respirator or in being disconnected from one, even if he is terminally ill and cannot live without mechanical assistance. The law does not classify the death of a patient that results from the granting of his wish to decline or discontinue treatment as "suicide." Nor does the law label the acts of those who help the patient carry out that wish, whether by physically disconnecting the respirator or by removing an intravenous tube, as assistance in suicide. Accordingly, we believe that the broader terms—"the right to die," "controlling the time and manner of one's death," and "hastening one's death"—more accurately describe the liberty interest at issue here. Moreover, as we discuss later, we have serious doubts that the terms "suicide" and "assisted suicide" are appropriate legal descriptions of the specific conduct at issue here. *See infra* 824.

There is one further definitional matter we should emphasize. Following our determination regarding the existence of a liberty interest in hastening one's death, we examine whether the Washington statute unconstitutionally infringes on that liberty interest. Throughout that examination, we use the term "physician-assisted suicide," a term that does not appear in the Washington statute but is frequently employed in legal and medical discussions involving the type of question before us. For purposes of this opinion, we use physician-assisted suicide as it is used by the parties and district court and as it is most frequently used: the prescribing of medication by a physician for the purpose of enabling a patient to end his life.[14] It is only that conduct that the plaintiffs urge be held constitutionally-protected in this case.[15]

## B.

### The Legal Standard

There is no litmus test for courts to apply when deciding whether or not a liberty interest exists under the Due Process Clause. Our decisions involve difficult judgments regarding the conscience, traditions, and fundamental tenets of our nation. We must sometimes apply those basic principles in light of

---

14. *See, e.g.,* Sarah Henry, The Battle Over Assisted–Suicide, Calif.Law., 1, 35 (defining physician-assisted death "as providing or prescribing medication to someone, knowing that that person intends to take a lethal dose of the medication").

15. We use the terms "assisted suicide" and "physician-assisted suicide" interchangeably throughout this opinion, although as we have noted, we have serious doubts as to the correctness or propriety of the terms, as they are generally used. We should note, however, that there is another commonly used term—"physician-aid-in-dying"—that is also relevant to our discussion. That term includes not only the prescribing of drugs ("assisted suicide") but also the *administration* of drugs by the physician. The issue of the constitutionality of prohibiting physicians from administering life-ending drugs to terminally ill persons is not before us for decision.

changing values based on shared experience. Other times we must apply them to new problems arising out of the development and use of new technologies. In all cases, our analysis of the applicability of the protections of the Constitution must be made in light of existing circumstances as well as our historic traditions.

Historically, the Court has classified "fundamental rights" as those that are "implicit in the concept of ordered liberty," *Palko v. Connecticut,* 302 U.S. 319, 325–26, 58 S.Ct. 149, 151–52, 82 L.Ed. 288 (1937). The Court reasserted this historic standard, along with an alternative description, in its highly controversial *Bowers v. Hardwick* opinion, 478 U.S. 186, 191–92, 106 S.Ct. 2841, 2844–45, 92 L.Ed.2d 140 (1986): [16]

> Striving to assure itself and the public that announcing rights not readily identifiable in the Constitution's text involves much more than the imposition of the Justices' own choice of values on the States and the Federal Government, the Court has sought to identify the nature of the rights qualifying for heightened judicial protection. In *Palko v. Connecticut,* 302 U.S. 319, 325, 326, 82 L.Ed. 288, 58 S.Ct. 149 [152] (1937), it was said that this category includes those fundamental liberties that are "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if [they] were sacrificed." A different description of fundamental liberties appeared in *Moore v. East Cleveland,* 431 U.S. 494, 503, 97 S.Ct. 1932, 1937, 52 L.Ed.2d 531 (1977) (opinion of POWELL, J.), where they are characterized as those liberties that are "deeply

rooted in this Nation's history and tradition." *Id.* at 503, 97 S.Ct. at 1938 (POWELL, J.).

In recent years, the Court has spoken more frequently of substantive due process *interests* than of *fundamental* due process *rights.* Compare *Thornburgh v. American Coll. of Obst.,* 476 U.S. 747, 772, 106 S.Ct. 2169, 2184, 90 L.Ed.2d 779 (1986) (describing "fundamental right" to abortion) and *Akron v. Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 420 n. 1, 103 S.Ct. 2481, 2487 n. 1, 76 L.Ed.2d 687 (1983) (same) *with Webster v. Reproductive Health Services,* 492 U.S. 490, 520, 109 S.Ct. 3040, 3057, 106 L.Ed.2d 410 (1989) (plurality opinion) (describing women's entitlement to an abortion as a "liberty interest protected by Due Process Clause"). *See also Cruzan,* 497 U.S. 261, 110 S.Ct. 2841. The Court has also recently expressed a strong reluctance to find new fundamental rights. *Collins v. City of Harker Heights, Tex.,* 503 U.S. 115, 123, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992).

The Court's evolving doctrinal approach to substantive due process claims is consistent with the basic truth enunciated by Justice Harlan and later endorsed by the Court in *Casey:* "the full scope of the liberty guaranteed by the Due Process Clause is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints ..." *Casey,* 505 U.S. at 848, 112 S.Ct. at 2806, citing *Poe v. Ullman,* 367 U.S. 497, 543, 81 S.Ct. 1752, 1776–77, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting from dismissal on jurisdictional grounds).[17] As Justice Harlan

---

**16.** The case was decided by a 5–4 vote, and Justice Powell subsequently announced on several occasions that he regretted that vote. "I think I probably made a mistake," Powell reportedly once said. Upon rereading the opinion a few months after it was issued, he reportedly remarked, "I thought the dissent had the better of the argument." David Cole, *Playing Pornography's Rule: The Regulation of Sexual Expression,* 143 U.Pa.L.Rev. 111, 176–77 (1994), *citing* Linda Greenhouse, When Second Thoughts in a Case Come Too Late, N.Y.Times, Nov. 5, 1990, at 14. The *Bowers* decision has been widely criticized by commentators. William N. Eskridge Jr. and Phillip P. Frickey, *The Supreme Court 1993—Forward: Law as Equilibrium,* 108 Harv.L.Rev. 26, 95 (1994) (criticizing *Bowers* for embodying

"segregationist" caste distinctions similar to those upheld in *Plessy v. Ferguson* ); Kendall Thomas, *The Eclipse of Reason: A Rhetorical Reading of Bowers v. Hardwick,* 79 Va.L.Rev. 1805, 1806 (1993) (saying *Bowers* represents a homophobic ideology); Lance Liebman, *A Tribute to Justice Byron A. White,* 107 Harv.L.Rev. 13, 19 (1993) (calling *Bowers* Justice White's worst opinion). The passage quoted in the text, however, is not controversial.

**17.** This passage appears in Part II of the joint opinion by Justices O'Connor, Kennedy, and Souter. In their concurring opinions, both Justice Stevens and Justice Blackmun joined in that part of the joint opinion. 505 U.S. at 920, 112

noted, some liberty interests are weightier than others. Under the Court's traditional jurisprudence, those classified as fundamental rights cannot be limited except to further a compelling and narrowly tailored state interest. *See Collins,* 503 U.S. at 123, 112 S.Ct. at 1068. Other important interests, such as the liberty interest in refusing unwanted medical treatment, are subject to a balancing test that is less restrictive, but nonetheless requires the state to overcome a substantial hurdle in justifying any significant impairment.

Recent cases, including *Cruzan,* suggest that the Court may be heading towards the formal adoption of the continuum approach, along with a balancing test, in substantive due process cases generally. If so, there would no longer be a two-tier or three-tier set of tests that depends on the classification of the right or interest as fundamental, important, or marginal. Instead, the more important the individual's right or interest, the more persuasive the justifications for infringement would have to be. We see the evolution in the Court's approach more as a recognition of the artificiality of the current classification system than as a fundamental change in the Court's practical approach to specific issues. So long as the liberty interest is an important one, the state must shoulder the burden of justifying any significant limitations it seeks to impose. However, we need not predict the Court's future course in order to decide the case before us. Here, as we have said, even under the Court's traditional mode of analysis, a balancing test is applicable.

Nothing in *Reno v. Flores,* 507 U.S. 292, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993), the insubstantial reed on which the dissent rests its case—even though the case was not cited by any of the parties or any of the eleven amici who filed briefs before this court— suggests anything to the contrary. In *Flores,* the Court simply declined to find a new fundamental right, and repeated its general reluctance to do so. *Id.* at 302, 113 S.Ct. at 1447. The Court did not, as the dissent implies, purport to establish a new classification system under which all liberty interests other than fundamental rights would be subject to rational basis review. Nor did *Flores* purport to overrule, or even hint at any desire to modify, the Court's ninety-year-old practice of using a balancing test in liberty interest cases that raise important issues of the type before us. In fact, *Flores* did not mention *Cruzan, Youngberg, Mills, Jacobson,* or any other balancing case.[18] While one might legitimately argue either that the liberty interest at issue here rises to the level of a fundamental right or that it is simply an important liberty interest that is subject to a balancing test, one point is absolutely clear: there can be no legitimate argument that rational basis review is applicable, and *nothing* in *Flores* suggests that it is.

Although in determining the existence of important rights or liberty interests, the Court examines our history and experience, it has stated on a number of occasions that the limits of the substantive reach of the Due Process Clause are not frozen at any point in time. In *Casey,* the Court said: "Neither the Bill of Rights nor the specific practices of States at the time of the adoption of the Fourteenth Amendment marks the outer limits of the substantive sphere of liberty which the Fourteenth Amendment protects." 505 U.S. at 848, 112 S.Ct. at 2805. Justice Frankfurter may have put it best when, writing for the Court in *Rochin v. California,* 342 U.S. 165, 171–72, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952), he declared, "To believe that this judicial exercise of judgment could be avoid-

S.Ct. at 2843. Thus Part II represents the views of five justices and so the Court. Unless otherwise *noted,* all passages cited from *Casey* represent the opinion of the Court and not merely a plurality of its members.

**18.** In one case in which the liberty interest was at a bare minimum because it involved the interest of uniformed police officers in their *appearance*—a matter in which the Court said that the citizenry at large had only *"some sort* of liberty interest" and suggested that uniformed police officers had far less even than that—the Court subjected departmental grooming regulations to rational basis review. *See Kelley v. Johnson,* 425 U.S. 238, 244, 248–249, 96 S.Ct. 1440, 1444, 1446–47, 47 L.Ed.2d 708 (1976). Subsequent to that decision, however, with liberty interests of more than minimal weight, the Court has consistently applied either strict scrutiny or a balancing test.

ed by freezing 'due process of law' at some fixed stage in time or thought is to suggest that the most important aspect of constitutional adjudication is a function for inanimate machines and not for judges...." Certainly, it would be difficult to imagine a more felicitous expression of the dynamism of constitutional interpretation. Thus, while historical analysis plays a useful role in any attempt to determine whether a claimed right or liberty interest exists, earlier legislative or judicial recognition of the right or interest is not a *sine qua non.*

In *Casey,* the Court made it clear that the fact that we have previously failed to acknowledge the existence of a particular liberty interest or even that we have previously prohibited its exercise is no barrier to recognizing its existence. In discussing a woman's liberty interest in securing an abortion, the *Casey* Court stated that pregnancy involves "suffering [that] is too intimate and personal for the State to insist, without more, upon its own vision of the woman's role, *however dominant that vision has been in the course*

*of our history and culture."* *Casey,* 505 U.S. at 852, 112 S.Ct. at 2807 (emphasis added).

■ In contrast to *Casey,* the majority opinion of the three-judge panel in the case now before us erroneously concluded that a historical analysis alone is sufficient basis for rejecting plaintiffs' claim to a substantive liberty interest or right. *Compassion In Dying,* 49 F.3d at 591. As explained below, we believe that the panel's historical account is misguided, but even if it were indisputably correct, historical evidence alone is not a sufficient basis for rejecting a claimed liberty interest.[19]

Were history our sole guide, the Virginia anti-miscegenation statute that the Court unanimously overturned in *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), as violative of substantive due process and the Equal Protection Clause, would still be in force because such anti-miscegenation laws were commonplace both when the United States was founded and when the Fourteenth Amendment was adopted.[20] The Court explicitly acknowl-

19. The district judge who heard the constitutional challenge to the New York Statute barring doctors from helping terminally ill, competent adults to hasten their deaths committed a similar error in concluding that plaintiffs' alleged failure to offer historical evidence was fatal to their claim. *Quill v. Koppell,* 870 F.Supp. 78, 83 (S.D.N.Y.1994) ("The trouble is that plaintiffs make no attempt to argue that physician assisted suicide, even in the case of terminally ill patients, has any historic recognition as a legal right.").

20. Had the Court applied a rigid, originalist view of constitutional interpretation, a married couple consisting of a black husband and a white wife (or vice-versa) would be unable to live in the state of Virginia today. Our nation's long history of outlawing racially-mixed marriages is traceable to the early colonial period. The first anti-miscegenation statute was passed in Maryland in 1661. Harvey M. Applebaum, *Miscegenation Statutes: A Constitutional and Social Problem,* 53 Geo.L.J. 49, 50 (1964).

As the nation grew, so did the number of states with miscegenation bans. Forty-one states enacted anti-miscegenation statutes at one time or another; all but three of these forty-one states had such statutes during the nineteenth centu·y. Applebaum, *supra,* at 50 & n. 9. During the t.·..·: surrounding the Congressional debates concerning the passage of the Fourteenth Amendment, all the slave states and most of the non-slave states had anti-miscegenation statutes. R. Carter Pittman, *The Fourteenth Amendment: Its Intend-*

ed *Effect on Anti–Miscegenation Laws,* 43 N.C.L.Rev. 92, 106 (1964).

The passage of the Fourteenth Amendment had little effect on the judiciary's view of the constitutionality of anti-miscegenation statutes. Even as late as the early 1960's, only a few years before the *Loving* decision, the courts continued to hold to the strong tradition prohibiting interracial marriages:

The courts of last resort of fifteen states have reached the question of their [anti-miscegenation statutes'] constitutionality and all but one have upheld them. In addition, the federal [district] courts and the one federal court of appeals that have been confronted with the statutes have sustained their constitutional validity.

Applebaum, *supra,* at 56 (footnotes omitted). *See also* James Trosino, *American Wedding: Same–Sex Marriage and the Miscegenation Analogy,* 73 B.U.L.Rev. 93, 104 (1993) ("In the 100 years following the ratification of the Fourteenth Amendment, only one state court overturned an anti-miscegenation law.").

The Supreme Court did not directly address the constitutionality of proscriptions against interracial marriage until its decision in *Loving.* It could have done so previously but chose to sidestep the issue. *See Pace v. Alabama,* 106 U.S. 583, 585, 1 S.Ct. 637, 638, 27 L.Ed. 207 (1883). At the time of the *Loving* decision, sixteen states still prohibited and punished interracial marriages. *Loving,* 388 U.S. at 6, 87 S.Ct. at 1821. Six of those states went so ·far as to include in

edged as much in *Casey*, 505 U.S. at 847, 112 S.Ct. at 2805, in rejecting the view that substantive due process protects rights or liberties only if they possess a historical pedigree. In *Casey*, the Court said:

> It is ... tempting ... to suppose that the Due Process Clause protects only those practices, defined at the most specific level, that were protected against government interference by other rules of law when the Fourteenth Amendment was ratified.... But such a view would be inconsistent with our law. It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter. We have vindicated this principle before. Marriage is mentioned nowhere in the Bill of Rights and interracial marriage was illegal in most States in the 19th century, but the Court was no doubt correct in finding it to be an aspect of liberty protected against state interference by the substantive component of the Due Process Clause in *Loving v. Virginia*, 388 U.S. 1, 12, 87 S.Ct. 1817, 1824, 18 L.Ed.2d 1010 (1967), (relying, in an opinion for eight Justices, on the Due Process Clause). Similar examples may be found in *Turner v. Safley*, 482 U.S. 78, 94–99, 107 S.Ct. 2254, 2265–67, 96 L.Ed.2d 64 (1987) [holding that prisoners have a constitutionally protected right to marry a civilian or other inmate]; in *Carey v. Population Services International*, 431 U.S. 678, 684, 686, 97 S.Ct. 2010, 2015–2017, 52 L.Ed.2d 675 (1977) [holding that the state cannot prohibit the sale of contraceptives to all minors or bar everyone but licensed pharmacists from selling contraceptives to adults]; in *Griswold v. Connecticut*, 381 U.S. 479, 481–82, 85 S.Ct. 1678, 1680–81, 14 L.Ed.2d 510 (1965) [holding that a Connecticut law forbidding the use of contraceptives uncon-

stitutionally intrudes on the right of marital privacy] ...

*Casey*, 505 U.S. at 847–48, 112 S.Ct. at 2805. Indeed, if historical evidence of accepted practices at the time the Fourteenth Amendment was enacted were dispositive, the Court would not only have decided *Loving* differently, but it would not have held that women have a right to have an abortion. As the dissent pointed out in *Roe*, more than three-quarters of the existing states (at least 28 out of 37 states), as well as eight territorial legislatures *restricted or prohibited abortions* in 1868 when the Fourteenth Amendment was adopted. *Roe*, 410 U.S. at 175–76 & n. 1, 93 S.Ct. at 737–39 & n. 1 (Rehnquist, J., dissenting).

## C.

### Historical Attitudes Toward Suicide

The majority opinion of the three-judge panel claimed that "a constitutional right to aid in killing oneself" was "unknown to the past." *Compassion In Dying*, 49 F.3d at 591. As we have pointed out at p. 803, our inquiry is not so narrow. Nor is our conclusion so facile. The relevant historical record is far more checkered than the majority would have us believe.

Like the Court in *Roe*, we begin with ancient attitudes.[21] In Greek and Roman times, far from being universally prohibited, suicide was often considered commendable in literature, mythology, and practice.

> The first of all literary suicides, that of Oedipus' mother, Jocasta, is made to seem praiseworthy, an honorable way out of an insufferable situation. Homer records self-murder without comment, as something natural and heroic. The legends bear him out. Aegeus threw himself into

---

their state constitutions a provision banning interracial marriages. 388 U.S. at 6 n. 5, 87 S.Ct. at 1821 n. 5.

The *Loving* Court declared anti-miscegenation statutes unconstitutional, saying that they violated both the Equal Protection Clause and the Due Process Clause. In so doing, the Court rejected three hundred years of tradition and overwhelming precedent to the contrary.

**21.** When the Court turns to history, it does not limit its inquiry to the practices at the time of the

founding or the time of the adoption of the Fourteenth Amendment. Rather, the Court also looks to British common law and beyond. In *Roe*, for example, Justice Blackmun, writing for the majority, went to great pains to show that abortion was practiced "in Greek times and in the Roman era" and also that abortion of a fetus before quickening was not a crime at English common law or in the early days of the American Republic. *Roe*, 410 U.S. at 130–140, 93 S.Ct. at 715–721.

the sea—which therefore bore his name—when he mistakenly thought his son Theseus had been slain by the Minotaur.

A. Alvarez, The Background, in *Suicide: The Philosophical Issues* 18 (M. Pabst Battin and David J. Mayor, eds. 1980). In Athens, as well as the Greek colonies of Marseilles and Ceos, magistrates kept a supply of hemlock for those who wished to end their lives. The magistrates even supplied those who wished to commit suicide with the means to do so.

> Whoever no longer wishes to live shall state his reasons to the Senate, and after having received permission shall abandon life. If your existence is hateful to you, die; if you are overwhelmed by fate, drink the hemlock. If you are bowed with grief, abandon life. Let the unhappy man recount his misfortune, let the magistrate supply him with the remedy, and his wretchedness will come to an end.[22]

While Socrates counseled his disciples against committing suicide, he willingly drank the hemlock as he was condemned to do, and his example inspired others to end their lives. *Id.* at 19. Plato, Socrates' most distinguished student, believed suicide was often justifiable.

> He suggested that if life itself became immoderate, then suicide became a rational, justifiable act. Painful disease, or intolerable constraint were sufficient reasons to depart. And this when religious superstitions faded was philosophic justification enough. *Id.*

Many contemporaries of Plato were even more inclined to find suicide a legitimate and acceptable act. In *Roe,* while surveying the attitudes of the Greeks toward abortion, the Court stated that "only the Pythagorean school of philosophers frowned on the related act of suicide," 410 U.S. at 131, 93 S.Ct. at 716; it then noted that the Pythagorean

school represented a distinctly minority view. *Id.*

The Stoics glorified suicide as an act of pure rational will.[23] Cato, who killed himself to avoid dishonor when Caesar crushed his military aspirations, was the most celebrated of the many suicides among the Stoics. Montaigne wrote of Cato: "This was a man chosen by nature to show the heights which can be attained by human steadfastness and constancy.... Such courage is above philosophy."

Like the Greeks, the Romans often considered suicide to be acceptable or even laudable.[24]

> To live nobly also meant to die nobly and at the right time. Everything depended on a dominant will and a rational choice.

> This attitude was reinforced by Roman law.... According to Justinian's *Digest,* suicide of a private citizen was not punishable if it was caused by "impatience of pain or sickness, or by another cause," or by "weariness of life ... lunacy, or fear of dishonor." Since this covered every rational cause, all that was left was the utterly irrational suicide "without cause," and that was punishable on the grounds that "whoever does not spare himself would much less spare another." In other words, it was punished because irrational, not because it was a crime. *Id.* at 22–23.

The Romans did sometimes punish suicide. Under Roman law, people convicted of crimes forfeited their property to the Emperor, thereby disinheriting their heirs. Roman law imposed a special penalty on people who were caught committing a crime and then committed suicide prior to conviction to avoid forfeiting the property. To protect the Emperor's interests, the property of people who committed suicide under such circumstances was forfeited, just as if they had been con-

---

22. Emile Durkheim, *Suicide: A Study in Sociology* 330 (John A. Spaulding & George Simpson trans., 1951) (citing Libanius).

23. Thomas J. Marzen, et al., *Suicide: A Constitutional Right,* 24 Duq.L.Rev. 1, 25 (1985) [hereinafter Marzen].

24. Other ancient peoples also viewed suicide with equanimity or acceptance. Hundreds of Jews killed themselves at Masada in order to avoid being captured by Roman legions. The ancient Sythians believed it was an honor to commit suicide when they became too frail for their nomadic way of life. The Vikings believed that the next greatest honor, after death in battle, was death by suicide. *Id.* at 14–17.

victed of the crime involved. Marzen at 57–58.

The early Christians saw death as an escape from the tribulations of a fallen existence and as the doorway to heaven.[25] "In other words, the more powerfully the Church instilled in believers the idea that this world was a vale of tears and sin and temptation, where they waited uneasily until death released them into eternal glory, the more irresistible the temptation to suicide became." Id. at 25. The Christian impulse to martyrdom reached its height with the Donatists, who were so eager to enter into martyrdom that they were eventually declared heretics. Gibbon, in the Decline and Fall of the Roman Empire, described them this way:

> They sometimes forced their way into courts of justice and compelled the affrighted judge to give orders for their execution. They frequently stopped travellers on the public highways and obliged them to inflict the stroke of martyrdom by promise of a reward, if they consented—and by the threat of instant death, if they refused to grant so singular a favour.[26]

St. Augustine said of the Donatists, "to kill themselves out of respect for martyrdom is their daily sport." Id. at 27. Prompted in large part by the utilitarian concern that the rage for suicide would deplete the ranks of Christians, St. Augustine argued that committing suicide was a "detestable and damnable wickedness" and was able to help turn the tide of public opinion. Id. Even staunch opponents of a constitutional right to suicide acknowledge that "there were many examples of Christian martyrs whose deaths bordered on suicide, and confusion regarding the distinction between suicide and martyrdom existed up until the time of St. Augustine (354–430 A.D.)." [27]

In 562 A.D., the Council of Braga denied funeral rites to anyone who killed himself. A little more than a century later, in 693 A.D., the Council of Toledo declared that anyone who attempted suicide should be excommunicated. Id. at 27–28. Once established, the Christian view that suicide was in all cases a sin and crime held sway for 1,000 years until philosophers, poets, and even some clergymen—Montesquieu, Voltaire, Diderot, Francis Bacon, David Hume, John Donne, Sir Thomas More, among others [28]—began to challenge the all-encompassing nature of the dominant ideology. In his book Utopia, Sir Thomas More, who was later canonized by the Roman Catholic Church, strongly supported the right of the terminally ill to commit suicide and also expressed approval of the practice of assisting those who wished to hasten their deaths.[29] Hume argued that a decision by a terminally ill patient to end his life was often laudable.[30] France even enacted a statute legalizing suicide in 1790, primarily as a result of the influence of the nation's leading philosophers.[31]

Suicide was a crime under the English common law, at least in limited circumstances, probably as early as the thirteenth century.[32] Bracton, incorporating Roman Law as set forth in Justinian's Digest, declared that if someone commits suicide to avoid conviction of a felony, his property

---

25. The stories of four suicides are noted in the Old Testament—Samson, Saul, Abimlech, and Achitophel—and none is treated as an act worthy of censure. In the New Testament, the suicide of Judas Iscariot is not treated as a further sin, rather as an act of repentance.

26. Edward Gibbon, I Decline and Fall of the Roman Empire 721 (Oliphant Smeaton ed.).

27. Marzen, supra note 23, at 26.

28. Thane Josef Messinger, A Gentle and Easy Death: From Ancient Greece to Beyond Cruzan Toward a Reasoned Legal Response to the Societal Dilemma of Euthanasia, 71 Denv.U.L.Rev. 175, 185–188 (1993).

29. Id. at 185, citing St. Thomas More, Utopia 55–56 (Edward Surtz ed., 1964).

30. Id. citing David Hume, Dialogues Concerning Natural Religion and the Posthumous Essays of the Immortality of the Soul and of Suicide 103–104 (Richard H. Popkin ed., 1980); Tom L. Beauchamp, Suicide in the Age of Reason 184 in Suicide and Euthanasia: Historical and Contemporary Themes (Barough A. Brody ed., 1989).

31. Messinger, supra note 28, at 188.

32. 2 H. de Bracton (c. 1250) reprinted in On the Laws and Customs of England 423 (S. Thorne trans., 1968).

escheats to his lords.[33] Bracton said "[i]t ought to be otherwise if he kills himself through madness or unwillingness to endure suffering." [34] Despite his general fidelity to Roman law, Bracton did introduce a key innovation: "[I]f a man slays himself in weariness of life or because he is unwilling to endure further bodily pain ... he may have a successor, but his movable goods [personal property] are confiscated. He does not lose his inheritance [real property], only his movable goods." [35] Bracton's innovation was incorporated into English common law, which has thus treated suicides resulting from the inability to "endure further bodily pain" with compassion and understanding ever since a common law scheme was firmly established.

Sir Edward Coke, in his *Third Institute* published in 1644, held that killing oneself was an offense and that someone who committed suicide should forfeit his movable property. But Coke listed an exception for someone who "by the rage of sickness or infirmity or otherwise," kills himself "while he is not of compos mentia," or sound mind.[36] In eighteenth century England, many and perhaps most juries compensated for the perceived unfairness of the law by concluding that anyone who killed himself was necessarily *not* of sound mind.[37] Thus, although, formally, suicide was long considered a crime under English common law, in practice it was a crime that was punished leniently, if at all, because juries frequently used their power to nullify the law.

The traditional English experience was also shaped by the taboos that have long colored our views of suicide and perhaps still do today. English common law reflected the ancient fear that the spirit of someone who ended his own life would return to haunt the living. Accordingly, the traditional practice was to bury the body at a crossroads—either so the suicide could not find his way home or so that the frequency of travelers would keep his spirit from rising.[38] As added insurance, a stake was driven through the body.

English attitudes toward suicide, including the tradition of ignominious burial, carried over to America [39] where they subsequently underwent a transformation. By 1798, six of the 13 original colonies had abolished all penalties for suicide either by statute or state constitution.[40] There is no evidence that any court ever imposed a punishment for suicide or attempted suicide under common law in post-revolutionary America.[41] By the time the Fourteenth Amendment was adopted in 1868, suicide was generally not punishable, and in only nine of the 37 states is it clear that there were statutes prohibiting assisting suicide.[42]

The majority of states have not criminalized suicide or attempted suicide since the turn of the century.[43] The New Jersey Supreme Court declared in 1901 that since suicide was not punishable it should not be considered a crime. "[A]ll will admit that in some cases it is ethically defensible," the court said, as when a woman kills herself to escape being raped or "when a man curtails

33. Marzen, *supra* note 23, at 58–59.

34. *Id.*

35. *Id.*

36. *Id.* at 61.

37. *Id.*

38. 4 William Blackstone, *Commentaries* 190 (noting that people who committed suicide were subject to "an ignominious burial in the highway, with a stake driven through the body").

39. This practice was continued in seventeenth century Virginia. In 1661, for instance, a jury found a man guilty of suicide and "caused him to be buried at the next cross path as the Law Requires with a stake driven though the middle of him in his grave." Marzen, *supra* note 23, at

64–65, *citing* A. Scott, *Criminal Law in Colonial Virginia* at 198–199 & n. 16 (1930).

40. Marzen, *supra* note 23, at 67.

41. Catherine D. Shaffer, Note, *Criminal Liability for Assisting Suicide,* 86 Colum.L.Rev. 348, 350 (1986).

42. Marzen, *supra* note 23, at 75. Nevertheless, extrapolating from incomplete historical evidence and drawing inferences from states' treatment of suicide and from later historical evidence, Marzen hypothesized that in 1868, "twenty-one of the thirty-seven states, and eighteen of the thirty ratifying states prohibited assisting suicide." *Id.* at 76.

43. Marzen, *supra* note 23, at 85.

weeks or months of agony of an incurable disease." *Campbell v. Supreme Conclave Improved Order Heptasophs,* 66 N.J.L. 274, 49 A. 550, 553 (1901).[44] Today, no state has a statute prohibiting suicide or attempted suicide; nor has any state had such a statute for at least 10 years.[45] A majority of states do, however, still have laws on the books against assisting suicide.[46]

## D.

### Current Societal Attitudes

Clearly the absence of a criminal sanction alone does not show societal approbation of a practice. Nor is there any evidence that Americans approve of suicide in general. In recent years, however, there has been increasingly widespread support for allowing the terminally ill to hasten their deaths and avoid painful, undignified, and inhumane endings to their lives. Most Americans simply do not appear to view such acts as constituting suicide, and there is much support in reason for that conclusion. *See infra* at p. 824.

Polls have repeatedly shown that a large majority of Americans—sometimes nearing 90%—fully endorse recent legal changes granting terminally ill patients, and some-

times their families, the prerogative to accelerate their death by refusing or terminating treatment.[47] Other polls indicate that a majority of Americans favor doctor-assisted suicide for the terminally ill. In April, 1990, the Roper Report found that 64% of Americans believed that the terminally ill should have the right to request and receive physician aid-in-dying.[48] Another national poll, conducted in October 1991, shows that "nearly two out of three Americans favor doctor-assisted suicide and euthanasia for terminally ill patients who request it." [49] A 1994 Harris poll found 73% of Americans favor legalizing physician-assisted suicide.[50] Three states have held referenda on proposals to allow physicians to help terminally ill, competent adults commit suicide with somewhat mixed results. In Oregon, voters approved the carefully-crafted referendum by a margin of 51 to 49 percent in November of 1994.[51] In Washington and California where the measures contained far fewer practical safeguards, they narrowly failed to pass, each drawing 46 percent of the vote.[52] As such referenda indicate, there is unquestionably growing popular support for permitting doctors to provide assistance to terminally ill patients who wish to hasten their deaths.[53]

Just as the mere absence of criminal statutes prohibiting suicide or attempted suicide

**44.** Cited by Marzen, *supra* note 23, at 84.

**45.** *Id.* at 350 (noting in 1986 that no state prohibits suicide or attempted suicide by statute).

**46.** Julia Pugliese, Note, *Don't Ask—Don't Tell: The Secret Practice of Physician–Assisted Suicide,* 44 Hastings L.J. 1291, 1295 (1993).

**47.** Sanford H. Kadish, *Letting Patients Die: Legal and Moral Reflections,* 80 Cal.L.Rev. 857, 860 & n. 16 (citing sources).

**48.** Robert Risley, *Voluntary Active Euthanasia: the Next Frontier, Impact on the Indigent,* 8 Issues In Law & Med. 361, 365 (1992).

**49.** Kadish, *supra* note 47, at 861 n. 22, *citing Euthanasia Favored in Poll,* N.Y. Times, Nov. 4, 1991, at A16.

**50.** David Cannella, *Physician–Assisted Suicide, Fight Rages in Several States: Issue Expected to Go to the Supreme Court,* The Arizona Republic, May 13, 1995. A Field poll conducted in California in March 1995 found that 70% of Californians agreed that the terminally ill should be able

to obtain medication from their doctors to end their lives. Henry, *supra* note 14, at 35.

**51.** The Oregon statute was enjoined by a federal district judge the day before it was to take effect. *See Lee v. State of Oregon,* 891 F.Supp. 1429 (D.Or.1995), discussed *infra* at pp. 837–838.

**52.** Cheryl K. Smith, *What About Legalized Assisted Suicide,* 8 Issues In Law & Med. 503, 503 (1993). Proposals to permit physician-assisted suicide have also been introduced in Iowa, Maine, Michigan, and New Hampshire. *Id.* at 503 nn. 3–6.

**53.** *See* Shaffer, *supra* note 41, at 367 n. 114, stating:

> The National Opinion Research Group asked in a survey: " 'When a person has a disease that cannot be cured, do you think that doctors should be allowed by law to end the patient's suffering by some painless means if the patient and his family request it.' " N.Y. Times, Sept. 23, 1984, § 1, at 1, col. 3. In 1947, 37% of the respondents said "yes." In 1973, a little over half agreed, and in 1983, 63% replied affirmatively. *Id.*

does not indicate societal approval so the mere presence of statutes criminalizing assisting in a suicide does not necessarily indicate societal disapproval. That is especially true when such laws are seldom, if ever, enforced. There is no reported American case of criminal punishment being meted out to a doctor for helping a patient hasten his own death.[54] The lack of enforcement of statutes prohibiting assisting a mentally competent, terminally ill adult to end his own life would appear to reflect widespread societal disaffection with such laws.[55]

Our attitudes toward suicide of the type at issue in this case are better understood in light of our unwritten history and of technological developments. Running beneath the official history of legal condemnation of physician-assisted suicide is a strong undercur-

rent of a time-honored but hidden practice of physicians helping terminally ill patients to hasten their deaths.[56] According to a survey by the American Society of Internal Medicine, one doctor in five said he had assisted in a patient's suicide.[57] Accounts of doctors who have helped their patients end their lives have appeared both in professional journals [58] and in the daily press.[59]

The debate over whether terminally ill patients should have a right to reject medical treatment or to receive aid from their physicians in hastening their deaths has taken on a new prominence as a result of a number of developments. Two hundred years ago when America was founded and more than one hundred years ago when the Fourteenth Amendment was adopted, Americans died

54. Franklin G. Miller et al, *Regulating Physician–Assisted Death*, 331 N.Eng.J.Med. 119, 119 (1994). Dr. Jack Kevorkian is currently facing criminal charges for helping several patients hasten their deaths. His case presents a number of peculiar factors that prevent us from drawing any particular inferences from the fact that local authorities in Michigan have made a number of efforts to obtain a conviction.

In a celebrated, though less complicated, recent example, a grand jury decided against indicting Dr. Timothy Quill, who admitted in the pages of the *New England Journal of Medicine* that he had intentionally prescribed the barbiturates that a terminally ill patient used to end her life. Pugliese, *supra* note 46, at 1298 n. 47. Quill's case was not exceptional. In 1973, a New York physician who administered a lethal injection to a comatose patient was acquitted of assisted suicide. In 1950, another doctor was acquitted after injecting a "fatal air embolism into the blood vessels of a carcinoma patient, who had repeatedly urged him to end her misery." *Id.* at 1298 nn. 45–46.

55. *See* Kadish, *supra* note 47, at 859 & n. 10, noting that no-fault divorce "came well after the widespread nullification of strict divorce requirements" and also that "the legitimation of plea bargaining followed ... decades of its widespread but officially denied practice."

56. *See generally* Pugliese, *supra* note 46. Some experts estimate that notwithstanding criminal sanctions, physicians may play a role in hastening the deaths of 6,000 terminally ill patients a day, many through the use of pain relieving drugs that accelerate death. Timothy E. Quill, et al., *Care of the Hopelessly Ill: Proposed Clinical Criteria for Physician–Assisted Suicide*, 327 New Eng.J.Med., 1380, 1381 (1992).

57. Note, *Physician–Assisted Suicide and the Right to Die with Assistance*, 105 Harv.L.Rev. 2021, 2021 n. 7 (1992) (citing Richard A. Knox, One in Five Doctors Say They Assisted in a Patient's Death, Survey Finds, Boston Globe, Feb. 28, 1992 at 5). According to the same survey, one doctor in four said he had been asked by a patient for assistance in ending his life. *See also* Lawrence K. Altman, More Physicians Broach Forbidden Subject of Euthanasia, N.Y. Times, Mar. 12, 1991, at C3.

Another poll of physicians showed that 10% of the respondents admitted to assisting a patient to end his life in some way. Doctors Who Help Patients Die; MD's Reveal a Secret Practice: Aiding Suicides, Mercy Killing, Newsday, Sept. 29, 1991 at 4 (reporting that 10% of respondents to poll by Physician's Management Magazine admitted to assisting suicide in some way). The figures are considerable higher in some subspecialties. According to a 1995 study of San Francisco Bay Area AIDS physicians, more than half of 188 doctors polled acknowledged having helped at least one patient to hasten his death. Henry, *supra* note 14, at 38.

58. *See, e.g.,* Ann Japenga, *Should You Help a Patient Die?* Hippocrates 39 (Nov./Dec.1994); Timothy E. Quill, *Death and Dignity: A Case of Individualized Decision Making*, 324 New Eng. J.Med. 691, 693 (1991); It's Over, Debbie, 259 J.Am.Med.Assoc. 272 (1988) (anonymous letter from doctor/author who administered a fatal dosage of morphine to a patient dying, painfully, of ovarian cancer, who asked for assistance).

59. *See, e.g.,* Andrew Malcolm, To Suffer a Prolonged Illness or Elect to Die: A Case Study, N.Y. Times, Dec. 16, 1984, § 1, at 1, (describing woman with Lou Gehrig's disease whose death was secretly arranged to occur on a couch at home).

from a slew of illness and infirmities that killed their victims quickly but today are almost never fatal in this nation—scarlet fever, cholera, measles, diarrhea, influenza, pneumonia, gastritis, to name a few. Other diseases that have not been conquered can now often be controlled for years, if not decades—diseases such as diabetes, muscular dystrophy, Parkinson's disease, cardiovascular disease, and certain types of cancer. As a result, Americans are living longer, and when they finally succumb to illness, lingering longer, either in great pain or in a stuporous, semi-comatose condition that results from the infusion of vast amounts of pain killing medications.[60] Despite the marvels of technology, Americans frequently die with less dignity than they did in the days when ravaging diseases typically ended their lives quickly. AIDS, which often subjects its victims to a horrifying and drawn-out demise, has also contributed to the growing number of terminally ill patients who die protracted and painful deaths.

One result has been a growing movement to restore humanity and dignity to the process by which Americans die.[61] The now recognized right to refuse or terminate treatment and the emergent right to receive medical assistance in hastening one's death are inevitable consequences of changes in the causes of death, advances in medical science, and the development of new technologies. Both the need and the capability to assist individuals end their lives in peace and dignity have increased exponentially.[62]

## E.
## Prior Court Decisions

Next we examine previous Court decisions that delineate the boundaries of substantive due process. We believe that a careful examination of these decisions demonstrates that there is a strong liberty interest in determining how and when one's life shall end, and that an explicit recognition of that interest follows naturally, indeed inevitably, from their reasoning.

The essence of the substantive component of the Due Process Clause is to limit the ability of the state to intrude into the most important matters of our lives, at least without substantial justification.[63] In a long line of cases, the Court has carved out certain key moments and decisions in individuals' lives and placed them beyond the general prohibitory authority of the state. The

60. As a result of medical advances, most Americans now die from slow acting ailments such as heart disease, cancer, and cerebrovascular disease. One in every two Americans dies of a disease diagnosed at least 29 months in advance; chronic conditions were the cause of more than 87% of the deaths in 1978. G. Steven Neeley, *Chaos In the "'Laboratory' of the States": The Mounting Urgency in The Call for Judicial Recognition of a Constitutional Right to Self–Directed Death*, 26 U.Tol.L.Rev. 81, * 3 (1994).

61. Most Americans used to die at home, in the comfort of familiar surroundings, with their loved ones around them. No longer. In 1939, only 37 percent of Americans died in hospitals or nursing homes. Cathaleen A. Roach, *Paradox and Pandora's Box: The Tragedy of Current Right–To–Die Jurisprudence*, 25 U.Mich.J.L.Ref. 133, 154 (1991). Today, by contrast, between 80 and 85 percent of Americans die in institutions. *Id. citing* President's Comm'n for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Deciding to Forego Life–Sustaining Treatment 17-18 (1983). About 70 percent of those who die in institutions do so after a decision to hasten their death by withholding or withdrawing medical treatment or technology. *Id. citing* Lisa Belkin, As Family Protests, Hospital Seeks an End to Woman's Life Support, N.Y. Times, Jan. 10, 1991, at A1.

62. As a sidenote, President Francois Mitterrand of France, acknowledged universally as one of the contemporary world's greatest leaders, recently decided to hasten his death, only a short time after his voluntary retirement from office. He did so, after consulting with his doctor, by ceasing to take the medication that had not only been keeping him alive, but had enabled him to perform most of life's important tasks. As his doctor told him would be the case, he died three days later. President Mitterrand's decision was widely publicized and his final act was generally considered an act of courage and dignity. *See* Scott Kraft, Forsaking Cancer Medication, Mitterrand Wrote Own Final Chapter, L.A. Times, Jan. 13, 1996.

63. When we refer to the Due Process Clause in this opinion, we refer to the due process clause of the Fourteenth Amendment, whether or not we include the reference to the specific numbered amendment. The due process clause of the Fifth Amendment, of course, provides *inter alia,* similar protection against comparable invasions by the federal government.

Court has recognized that the Fourteenth Amendment affords constitutional protection to personal decisions relating to marriage, *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), procreation, *Skinner v. Oklahoma*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), family relationships, *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), child rearing and education, *Pierce v. Society of Sisters*, 268 U.S. 510, 534–535, 45 S.Ct. 571, 573–574, 69 L.Ed. 1070 (1925), and intercourse for purposes other than procreation, *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). The Court has recognized the right of individuals to be free from government interference in deciding matters as personal as whether to bear or beget a child, *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), and whether to continue an unwanted pregnancy to term, *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).[64]

A common thread running through these cases is that they involve decisions that are highly personal and intimate, as well as of great importance to the individual.[65] Certainly, few decisions are more personal, intimate or important than the decision to end one's life, especially when the reason for doing so is to avoid excessive and protracted pain. Accordingly, we believe the cases from *Pierce* through *Roe* provide strong general support for our conclusion that a liberty interest in controlling the time and manner of one's death is protected by the Due Process Clause of the Fourteenth Amendment.

While the cases we have adverted to lend general support to our conclusion, we believe

that two relatively recent decisions of the Court, *Planned Parenthood v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) and *Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990), are fully persuasive, and leave little doubt as to the proper result.

F.

### Liberty Interest under Casey

In *Casey*, the Court surveyed its prior decisions affording "constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education", *id.* at 851, 112 S.Ct. at 2807 and then said:

> These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State.

*Id.* at 851, 112 S.Ct. at 2807. The district judge in this case found the Court's reasoning in *Casey* "highly instructive" and "almost prescriptive" for determining "what liberty interest may inhere in a terminally ill person's choice to commit suicide." *Compassion In Dying*, 850 F.Supp. at 1459. We agree.

Like the decision of whether or not to have an abortion, the decision how and when to die is one of "the most intimate and personal

**64.** The dissent points to language in *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937), referring to liberty interests that are such that "neither liberty nor justice would exist if they were sacrificed." That language, however, has never been applied literally. It would be difficult, if not impossible, for any fundamental right or liberty interest to meet such a standard. One could hardly argue for example that neither liberty nor justice would survive if contraceptives were banned, as they were for most of our history. Nor, indubitably, would even the most vigorous proponent of abortion rights argue that neither liberty nor justice existed in this nation prior to *Roe*.

**65.** In this respect, *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), would appear to be aberrant and to turn on the specific sexual act at issue. In *Bowers*, the Court held that the Constitution does not "confer[] a fundamental right upon homosexuals to engage in [homosexual] sodomy." 478 U.S. at 190, 106 S.Ct. at 2843. We do not believe that the *Bowers* holding controls the outcome here or is in any way inconsistent with our conclusion that there is a liberty interest in dying peacefully and with dignity. We also note, without surprise, that in the decade since *Bowers* was handed down the Court has never cited its central holding approvingly.

choices a person may make in a lifetime," a choice "central to personal dignity and autonomy." A competent terminally ill adult, having lived nearly the full measure of his life, has a strong liberty interest in choosing a dignified and humane death rather than being reduced at the end of his existence to a childlike state of helplessness, diapered, sedated, incontinent. How a person dies not only determines the nature of the final period of his existence, but in many cases, the enduring memories held by those who love him.

Prohibiting a terminally ill patient from hastening his death may have an even more profound impact on that person's life than forcing a woman to carry a pregnancy to term. The case of an AIDS patient treated by Dr. Peter Shalit, one of the physician-plaintiffs in this case, provides a compelling illustration. In his declaration, Dr. Shalit described his patient's death this way:

> One patient of mine, whom I will call Smith, a fictitious name, lingered in the hospital for weeks, his lower body so swollen from oozing Kaposi's lesions that he could not walk, his genitals so swollen that he required a catheter to drain his bladder, his fingers gangrenous from clotted arteries. Patient Smith's friends stopped visiting him because it gave them nightmares. Patient Smith's agonies could not be relieved by medication or by the excellent nursing care he received. Patient Smith begged for assistance in hastening his death. As his treating doctor, it was my professional opinion that patient Smith was mentally competent to make a choice with respect to shortening his period of suffering before inevitable death. I felt that I should accommodate his request. However, because of the statute, I was unable to assist him and he died after having been tortured for weeks by the end-phase of his disease.[66]

For such patients, wracked by pain and deprived of all pleasure, a state-enforced prohibition on hastening their deaths condemns them to unrelieved misery or torture. Surely, a person's decision whether to endure or avoid such an existence constitutes one of the most, if not the most, "intimate and personal choices a person may make in a life-time," a choice that is "central to personal dignity and autonomy." *Casey*, 505 U.S. at 851, 112 S.Ct. at 2807. Surely such a decision implicates a most vital liberty interest.

## G.
### Liberty Interest under Cruzan

In *Cruzan*, the Court considered whether or not there is a constitutionally-protected, due process liberty interest in terminating unwanted medical treatment. The Court said that an affirmative answer followed almost inevitably from its prior decisions holding that patients have a liberty interest in refusing to submit to specific medical procedures. Those cases include *Jacobson v. Massachusetts*, 197 U.S. 11, 24–30, 25 S.Ct. 358, 360–363, 49 L.Ed. 643 (1905), in which the Court balanced an individual's liberty interest in declining an unwanted small pox vaccine against the State's interest in preventing disease; *Washington v. Harper*, 494 U.S. 210, 229, 110 S.Ct. 1028, 1041, 108 L.Ed.2d 178 (1990), in which the Court said: "The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty"; and *Parham v. J.R.*, 442 U.S. 584, 600, 99 S.Ct. 2493, 2503, 61 L.Ed.2d 101 (1979), in which it said: "[A] child, in common with adults, has a substantial liberty interest in not being confined unnecessarily for medical treatment". Writing for a majority that included Justices O'Connor and Scalia, Chief Justice Rehnquist said that those cases helped answer the first critical question at issue in *Cruzan*, stating: "The principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be *inferred* from our prior decisions." *Cruzan*, 497 U.S. at 278, 110 S.Ct. at 2851 (emphasis added).[67]

---

66. Declaration of Peter Shalit, M.D., at 5–6.

67. In a passage that has caused confusion among commentators, the Chief Justice later said that the Court would assume the existence of a constitutionally protected *right* to reject life-sustaining delivery of food and water for purposes of deciding the controversy presented in *Cruzan*. The Court stated:

> Although we think the logic of the cases discussed above would embrace such a liberty

In her concurrence, Justice O'Connor explained that the majority opinion held (implicitly or otherwise) that a liberty interest in refusing medical treatment extends to all types of medical treatment from dialysis or artificial respirators to the provision of food and water by tube or other artificial means. As Justice O'Connor said: "I *agree* that a protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions, and that the refusal of artificial delivery of food and water is encompassed in that liberty interest." *Cruzan,* 497 U.S. 261, 287, 287, 110 S.Ct. 2841, 2856 (O'Connor, J., concurring) (emphasis added).

Justice O'Connor further concluded that under the majority's opinion, "[r]equiring a competent adult to endure such procedures against her will burdens the patient's liberty, dignity, and freedom to determine the course of her own treatment." *Id.* at 289, 110 S.Ct. at 2857 (O'Connor, J., concurring). In the

majority opinion itself, Chief Justice Rehnquist made a similar assertion, writing:

> *The choice between life and death is a deeply personal decision of obvious and overwhelming finality.* We believe Missouri may legitimately seek to safeguard the personal element of this choice through the imposition of heightened evidentiary requirements. *It cannot be disputed that the Due Process Clause protects* an interest in life as well as *an interest in refusing life-sustaining medical treatment.*

*Cruzan,* 497 U.S. at 281, 110 S.Ct. at 2852–53 (emphasis added).

 These passages make it clear that *Cruzan* stands for the proposition that there is a due process liberty interest in rejecting unwanted medical treatment, including the provision of food and water by artificial means.[68] Moreover, the Court majority

interest, the dramatic consequences involved in refusal of such treatment would inform the inquiry as to whether the deprivation of that interest is constitutionally permissible. But for purposes of this case, we *assume* that the United States Constitution would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition.

*Cruzan,* 497 U.S. at 279, 110 S.Ct. at 2852 (emphasis added). The passage is not inconsistent with, nor does it undermine, the Court's earlier statement that a due process liberty *interest* may be inferred from its prior holdings. Rather, the Court found a liberty *interest* and assumed a liberty *right.* That is, the Court recognized that an overall deprivation of the liberty interest would not be permissible and then assumed for purposes of deciding the ultimate issue before it that in the circumstances presented by *Cruzan* the interest resulted in a constitutional right and the state could not prohibit its exercise. *Cruzan,* 497 U.S. at 279, 110 S.Ct. at 2851. The ultimate question before the Court was whether or not Missouri could constitutionally require clear and convincing evidence of a comatose patient's previously stated wish not to be kept alive by artificial provision of food and water. The Court answered that question in the affirmative.

**68.** Justice Scalia, despite explicitly joining the majority opinion appears to assert that a person has no liberty interest in rejecting forced nourishment, at least when doing so is tantamount, in his opinion, to committing suicide. *Cruzan,* 497 U.S. at 293–94, 110 S.Ct. at 2859–60 (Scalia, J., concurring). We have two comments in response to that assertion. First, we interpret Justice Scalia's statement as setting forth his view

on a somewhat different point—one that the Court explicitly did not decide—when, whether, and under what circumstances Nancy Cruzan's exercise of a liberty interest could be prohibited by the state. Second, if we are wrong and Justice Scalia intended his statement to reflect an opposite view of the majority opinion to that stated by Justice O'Connor, his expression of his individual view cannot serve to change the opinion itself. In our view, Justice O'Connor's interpretation of the opinion is correct. Moreover, Justice Brennan, in a dissent joined by Justices Marshall and Blackmun, concluded that Nancy Cruzan has "a fundamental right to be free from unwanted artificial nutrition and hydration," *id.* at 302, 110 S.Ct. at 2864, as did Justice Stevens in his dissent, *id.* at 343, 110 S.Ct. at 2885. Thus, at least eight of the justices recognized a strong due process liberty interest in rejecting unwanted medical treatment, including the artificial provision of food and water.

Even if, however, the majority opinion had only recognized a liberty interest in refusing unwanted medical treatment without deciding whether or not that liberty interest encompasses the rejection of the artificial provision of food and water, five justices (Justice O'Connor, in her concurrence, and the four dissenting justices) still clearly found a liberty interest in rejecting the artificial provision of food and water. The Supreme Court has previously recognized that concurring and dissenting justices can constitute a controlling majority on a particular issue, at least where that view does not conflict with the holding of the majority. Here, there is no conflict of any kind with the majority opinion. *Marks v. United States,* 430 U.S. 188, 194 n. 8, 97 S.Ct. 990, 994 n. 8, 51 L.Ed.2d 260 (1977).

clearly recognized that granting the request to remove the tubes through which Cruzan received artificial nutrition and hydration would lead inexorably to her death. *Cruzan,* 497 U.S. at 267–68, 283, 110 S.Ct. at 2846, 2853.[69] Accordingly, we conclude that *Cruzan,* by recognizing a liberty interest that includes the refusal of artificial provision of life-sustaining food and water, necessarily recognizes a liberty interest in hastening one's own death.[70]

## H.

### Summary

*Casey* and *Cruzan* provide persuasive evidence that the Constitution encompasses a due process liberty interest in controlling the time and manner of one's death—that there is, in short, a constitutionally recognized "right to die." Our conclusion is strongly influenced by, but not limited to, the plight of mentally competent, terminally ill adults. We are influenced as well by the plight of others, such as those whose existence is reduced to a vegetative state or a permanent and irreversible state of unconsciousness. *See* note 68 *supra.*

Our conclusion that there is a liberty interest in determining the time and manner of one's death does not mean that there is a concomitant right to exercise that interest in all circumstances or to do so free from state regulation. To the contrary, we explicitly recognize that some prohibitory and regulatory state action is fully consistent with constitutional principles.

In short, finding a liberty interest constitutes a critical first step toward answering the question before us. The determination that must now be made is whether the state's attempt to curtail the exercise of that interest is constitutionally justified.

## V.

### Relevant Factors and Interests

 To determine whether a state action that impairs a liberty interest violates an individual's substantive due process rights we must identify the factors relevant to the case at hand, assess the state's interests and the individual's liberty interest in light of those factors, and then weigh and balance the competing interests. The relevant factors generally include: 1) the importance of the various state interests, both in general and in the factual context of the case; 2) the manner in which those interests are furthered by the state law or regulation; 3) the importance of the liberty interest, both in itself and in the context in which it is being exercised; 4) the extent to which that interest is burdened by the challenged state action; and, 5) the consequences of upholding or overturning the statute or regulation.

### A.

### The State's Interests

We analyze the factors in turn, and begin by considering the first: the importance of the state's interests. We identify six related state interests involved in the controversy before us: 1) the state's general interest in preserving life; 2) the state's more specific interest in preventing suicide; 3) the state's interest in avoiding the involvement of third parties and in precluding the use of arbitrary, unfair, or undue influence; 4) the state's interest in protecting family members and loved ones; 5) the state's interest in protecting the integrity of the medical profession; and, 6) the state's interest in avoiding adverse consequences that might ensue if

---

**69.** It is also clear that the proposition recognized by *Cruzan* is one of general applicability and not limited to the terminally ill. *Id.* at 278, 110 S.Ct. at 2851. Indeed, Nancy Cruzan was not terminally ill, and as the Court noted, "[m]edical experts testified that she could live another thirty years." *Cruzan,* 497 U.S. at 266 n. 1, 110 S.Ct. at 2845 n. 1. Thus, the Court *could not* have resolved the case as it did by finding a liberty interest only in the terminally ill.

**70.** Prior to the Court's decision in *Cruzan,* more than 15 states specifically prohibited implementing an advance directive that would have led to the termination of artificial nutrition and hydration. Alan Meisel, *The Right to Die* 369 & n. 63 (1989). A few years after *Cruzan,* however, only a few states still prohibited the termination of nutrition and hydration as part of a living will, a prohibition that is probably unconstitutional under *Cruzan.* Alan Meisel, *The Right to Die; 1994 Cumulative Supplement No. 2* 395–99 (1994).

the statutory provision at issue is declared unconstitutional.[71]

## 1. Preserving Life

■ The state may assert an unqualified interest in preserving life in general. As the Court said in *Cruzan*, "we think a State may properly decline to make judgments about the 'quality' of life that a particular individual may enjoy, and simply assert an unqualified interest in the preservation of human life ..." *Cruzan*, 497 U.S. at 282, 110 S.Ct. at 2853. Thus, the state may assert its interest in preserving life in all cases, including those of terminally ill, competent adults who wish to hasten their deaths.

Although the state's interest in preserving life may be unqualified, and may be asserted regardless of the quality of the life or lives at issue, that interest is not always controlling.[72] Nor is it of the same strength in each case. To the contrary, its *strength* is dependent on relevant circumstances, including the medical condition and the wishes of the person whose life is at stake.

Most tellingly, the state of Washington has already decided that its interest in preserving life should ordinarily give way—at least in the case of competent, terminally ill adults who are dependent on medical treatment—to the wishes of the patients. In its Natural Death Act, RCW 70.122.020 *et seq.*, Washington permits adults to have "life-sustaining treatment withheld or withdrawn in instances of a terminal condition or permanent unconsciousness." RCW 70.122.010.[73] In adopting the statute, the Washington legislature necessarily determined that the state's interest in preserving life is not so weighty that it ought to thwart the informed desire of a terminally ill, competent adult to refuse medical treatment.

Not only does Washington law acknowledge that terminally ill and permanently unconscious adults have a right to refuse life-sustaining treatment, the statute includes specific legislative findings that appear to recognize that a due process liberty interest underlies that right. The statute states:

> The legislature finds that adult persons have the fundamental right to control the decisions relating to the rendering of their own medical care, including the decision to have life-sustaining procedures withheld or withdrawn in instances of terminal condition.

71. The majority of the three-judge panel identified five state interests. First, "[t]he interest in not having physicians in the role of killers of their patients." Second, "[t]he interest in not subjecting the elderly and even the not-elderly but infirm to psychological pressure to consent to their own deaths." Third, "[t]he interest in protecting the poor and minorities from exploitation." Fourth, "[t]he interest in protecting all of the handicapped from societal indifference and apathy." Fifth, "[a]n interest in preventing abuse similar to what has occurred in the Netherlands where, since 1984, legal guidelines have tacitly allowed assisted suicide or euthanasia in response to a repeated request from a suffering, competent patient." *Compassion In Dying*, 49 F.3d at 592–93. The district court, by contrast, employing more dispassionate and traditional terms, identified two somewhat broader state interests: preventing suicide and preventing undue influence and abuse. *Compassion In Dying*, 850 F.Supp. at 1464–65.

In two substituted judgment cases about halting the life-sustaining treatment of patients who were in or almost in a vegetative state, the Washington Supreme Court listed four possible countervailing state interests: 1) the preservation of life; 2) the protection of the interests of innocent third parties; 3) the prevention of suicide; and 4) the maintenance of the integrity of the medical

profession. *In re Guardianship of Grant*, 109 Wash.2d 545, 747 P.2d 445, 451 (Wash.1987); *In re Colyer*, 99 Wash.2d 114, 660 P.2d 738, 743 (Wash.1983).

In *Superintendent of Belchertown State School v. Saikewicz*, 373 Mass. 728, 370 N.E.2d 417 (1977), one of several state supreme court cases discussed in *Cruzan*, the state court found four state interests: preservation of life, protection of the interests of innocent third parties, the prevention of suicide, and the maintenance of the ethical integrity of the medical profession. *Cruzan*, 497 U.S. at 271, 110 S.Ct. at 2847.

72. Were it otherwise no state could administer capital punishment; similarly, the draft, as well as the defense budget, would be unconstitutional.

73. The statute, enacted in 1979, includes the following definition of terminal condition:

"Terminal condition" means an incurable and irreversible condition caused by injury, disease, or illness, that, within reasonable medical judgment will cause death within a reasonable period of time in accordance with accepted medical standards, and where the application of life-sustaining treatment serves only to prolong the process of dying. RCW 70.122.020(9).

The legislature further finds that modern medical technology has made possible the artificial prolongation of human life beyond natural limits.

The legislature further finds that, in the interest of protecting individual autonomy, such prolongation of life for persons with a terminal condition may cause loss of patient dignity, and unnecessary pain and suffering, while providing nothing medically necessary or beneficial to the patient. RCW 70.122.010.[74]

The Washington statute permits competent adults to reject life-sustaining medical treatment in advance by means of living wills and durable powers of attorney. RCW 70.122.010–030. Even in cases in which the Washington Natural Death Act does not authorize surrogate decision-making, the Washington Supreme Court has found that legal guardians may sometimes have life-sustaining treatment discontinued. *In re Guardianship of Grant,* 109 Wash.2d 545, 747·P.2d 445 (Wash.1987); *In re Colyer,* 99 Wash.2d 114, 660 P.2d 738 (Wash.1983).[75]

There is nothing unusual about Washington's recognition that the state's interest in preserving life is not always of the same force and that in some cases at least other considerations may outweigh the state's.[76] More than 40 other states have adopted living will statutes that permit competent adults to declare by advance directive that they do not wish to be kept alive by medical treatment in the latter stages of a terminal illness.[77] Like Washington, many states also

**74.** Other states have recognized liberty interests similar to those recognized by Washington. *See e.g.* Ala.Code § 22–8A–2 (1995) (stating that adults have a "fundamental right" to control decisions relating to the rendering of their own medical care even when no longer able to participate actively in those decisions); Alaska Stat. § 18.12.100 (1995) (recognizing that some medical procedures "serve only to prolong the dying process"); Cal. Health & Safety Code § 7185.5 (West 1996) (finding that adults have "fundamental right" to control decisions affecting their medical care and recognizing that continued, unwanted medical treatment "violate[s] patient dignity and cause[s] unnecessary pain and suffering, while providing nothing medically necessary or beneficial to the person"); Ga.Code Ann. § 31–32–1 (1995) (protecting patient autonomy from loss of dignity and unnecessary pain and suffering); 19 Haw.Rev.Stat. § 327D–1 (recognizing that "artificial prolongation of life for persons with a terminal condition ... secure[s] only a precarious and burdensome existence"); La.Rev.Stat.Ann. § 40:1299.58.1 (West 1995) (stating that unwanted artificial prolongation causes a "loss of individual and personal dignity and secure[s] only a precarious and burdensome existence while providing nothing medically necessary or beneficial"); Nev.Rev.Stat. § 449.570 (1991) (recognizing unwanted treatment only prolongs dying process); Utah Code Ann. § 75–2–1102 (1995) (finding that all persons should be entitled "to die with a maximum of dignity and a minimum of pain").

**75.** A "living will" permits a competent adult to direct in advance that under certain specific circumstances future life-sustaining treatment should be withheld or terminated. A "durable power of attorney" for health care decisions allows a competent adult to designate someone else to make future medical decisions for him should he lose the capacity to make them himself. In cases in which an incompetent individual has not completed a living will or executed a durable power of attorney, some states permit the courts to appoint a guardian to make medical decisions on his behalf.

**76.** In *Grant,* the Washington Supreme Court said that the state's interest in preserving life "weakens considerably, however, if treatment will merely postpone death for a person with a terminal and incurable condition." 747 P.2d at 451; In *Colyer,* the Washington Supreme Court held that the state's interest in preserving life "weakens, however, in situations where continued treatment only serves to prolong a life inflicted with an incurable condition." 660 P.2d at 743.

**77.** The following list comes from Alan Meisel, *The Right to Die* § 11.12 (1989 & 1994 Supp. No.2):

Ala.Code § 22–8A–3(6) (1984); Alaska Stat. § 18.12.100(7) (1986); Ark.Stat.Ann. § 20–17–201(9) (Supp.1987); Cal.Health & Safety Code § 7186(j) (West Supp.1992); Colo.Rev.Stat. § 15–18–103(10) (1987 & Supp.1992); Conn. Gen.Stat.Ann. § 19a–570(3) (West Supp.1993); Del.Code Ann. tit. 16, § 2501(e) (1983); D.C.Code Ann. § 6–2421(6) (Supp.1987); Fla. Stat.Ann. § 765.101(17) (West Supp.1993); Ga.Code Ann. § 31–32–2(13) (1991 & Supp. 1992); Haw.Rev.Stat.Ann. § 327D–2 (1991); Ill.Ann.Stat. ch. 110, para. 702(h) (Smith–Hurd Supp.1988); Ind.Code Ann. § 16–8–11–9 (Burns Supp.1988); Iowa Code Ann. § 144A.2(8) (West 1989 & Supp.); La.Rev.Stat. Ann. § 40:1299.58.2(9) (West 1992); Me.Rev. Sta.Ann. tit. 18–A, § 5–701(b)(9) (West Supp. 1991); Md.Health–Gen.Code Ann. § 5–601(g) (1990); Minn.Stat.Ann. § 145B.02(8) (West Supp.1993); Miss.Code Ann. § 41–41–113 (Supp.1987); Mo.Ann.Stat. § 459.010(6) (Vernon Supp.1993); Mont.Stat.Ann. § 50–9–102(14) (1991); Neb.Rev.Stat. § 20–403(11)

permit competent adults to determine in advance that they do not wish any medical treatment should they become permanently and irreversibly unconscious.[78] Also, like Washington, many states allow patients to delegate decision-making power to a surrogate through a durable power of attorney, health care proxy, or similar device, or permit courts to appoint surrogate decision-makers.[79] Finally, Congress favors permitting adult patients to refuse life-sustaining treatment by advance directive and requires hospitals receiving federal financial support to notify adult patients of their rights to execute such instruments upon admission.[80]

(Supp.1992); Nev.Rev.Stat.Ann. § 449.590 (Michie Supp.1991); N.H.Rev.Stat.Ann. § 137–H:2(VI) (Supp.1992); N.J.Stat [sic] Ann. § 26:2H–55 (West Supp.1992) ("A determination of a specific life expectancy is not required as a precondition for a diagnosis of a 'terminal condition,' but a prognosis of a life expectancy of six months or less, with or without the provision of life-sustaining treatment, based upon reasonable medical certainly, shall be deemed to constitute a terminal condition."); N.M.Stat.Ann. § 24–7–2(f) (1986); N.D.Cent. Code § 23–06.4–02.7 (Supp.1989); Ohio Rev. Code Ann. § 2133.01(AA) (Anderson 1991); Okla.Stat.Ann. tit. 63, § 3101.3(12) (West Supp.1993); Or.Rev.Stat.Ann. § 127.605(6) (1990); 20 Pa.Cons.Stat.Ann. § 5403 (Supp.); R.I.Gen.Laws § 23–4.11–2(h) (Supp.1992); S.C.Code Ann. § 44–77–20(4) (Law.Co-op. Supp.1988); Tenn.Code Ann. § 32–11–103(9) (Supp.1991); Tex. Health & Safety Code Ann. § 672.003(9) (West 1992); Utah Code Ann. § 75–2(10) (Michie Supp.1993); Vt.Stat.Ann. tit. 18, § 5252(5) (1987); Va.Code Ann. § 54.1–2982 (Michie Supp.1992); Wash.Rev. Code Ann. § 70.122.020(9) (West Supp.); W.Va.Code § 16–30–2(6) (1985); Wis.Stat.Ann. § 154.01(8) (West 1989 & Supp.1992); Wyo. Stat. § 35–22–101(a)(ix) (1988 & Supp.1992); see also Uniform Rights of the Terminally Ill Act, § 1(9), 9B U.L.A. 96, 98 (Supp.1992).

**78.** Meisel, *supra* note 77, (1989 & 1994 Supp. No. 2) § 11.12 notes that the Uniform Rights of the Terminally Ill Act permits the foregoing of treatment when the patient is in a persistent vegetative state. Meisel also states:

An increasing number of states now define *terminal condition* to include permanent or persistent vegetative state and/or irreversible coma. *See, e.g.,* Conn.Gen.Stat.Ann. § 19a–570(3) (West Supp.1993); Fla.Stat.Ann. § 765.101(17)(b) (West Supp.1993); Iowa Code Ann. § 144A/2(8) (West 1989 & Supp.) (state of permanent unconsciousness); La. Rev.Stat.Ann. § 40:1299.58.2(7) (West 1992); Neb.Rev.Stat. § 20–403(11) (Supp.1992); Nev. Rev.Stat.Ann. § 449.590 (Michie 1991); Ohio Rev. Code Ann. § 2133.01(U) (Anderson Supp. 1991); R.I.Gen.Laws § 23.411–2(h) (Supp. 1992); Tenn.Code Ann. § 32–11–103(9) (Supp.1991); Va.Code Ann. § 54.1–2982 (Michie Supp.1992). Other statutes reach the same result by defining *qualified patient* as one who is in a terminal condition or a persistent vegetative state. *See, e.g.,* Cal.Health & Safety Code § 7186(h) (West Supp.1992);

Colo.Rev.Stat. § 15–18–103(9) (1987 & Supp. 1992); Iowa Code Ann. § 144A.2(7) (West 1989 & Supp.); Me.Rev.Stat.Ann. titl. 18A, § 5 701(b)(7) (West Supp.1991); Neb.Rev. Stat. § 20–403(9) (Supp.1992); Nev.Rev.Stat. Ann. § 449.585 (Michie Supp.1991); N.H.Rev. Stat.Ann. § 137–H:2(V) (Supp.1992); Ohio Rev.Code Ann. § 2133.01(Z) (Anderson Supp. 1991); Okla.Stat.Ann. titl. 63, § 3101.3(10) (West Supp.1993); Or.Rev.Stat.Ann. § 127.605(5) (1990); 20 Pa.Cons.Stat.Ann. § 5403 (Supp.); Tex. Health & Safety Code Ann. § 672.002(8) (West 1992); Wash.Rev. Code Ann. § 70.122.020(8) (West Supp.); Wis. Stat.Ann. § 154.01(6) (West 1989 & 1992 Supp.). The amended Hawaii statute, however, achieves this result by deleting the definition of "qualified patient" and adding a definition of "permanent loss of the ability to communicate concerning medical treatment decisions" which includes being in a persistent vegetative state or a deep coma or having a permanent loss of the capacity to participate in medical treatment decisions. *See* Haw.Rev. Stat.Ann. § 327D–2 (1991). Still other statutes reach the same result by including a separate definition of *persistent vegetative state* or *permanent unconsciousness. See, e.g.,* Conn. Gen.Stat.Ann. § 19a–570(4) (West Supp.1993); Ga.Code Ann. § 31–32–2(9) (1991 & Supp. 1992); Me.Rev.Stat.Ann. titl. 18A, § 5–701(b)(10) (West Supp.1991); Md.Health–Gen. code Ann. § 5–601(0); Neb.Rev.Stat. § 20–403(6) (Supp.1992); N.H.Rev.Stat.Ann. § 137–H:2(VII) (Supp.1992); N.J.Stat.Ann. § 26:2H–55 (West Supp.1992); Okla.Stat.Ann. tit. 63, § 3101.3(7) (West Supp.1993) (defines *persistently unconscious*); 20 Pa.Cons.Stat. Ann. § 5403 (Supp.); S.C.Code Ann. § 44–77–20(7) (Law.Co-op Supp.1991); Utah Code Ann. § 75–2–1103(8) (Michie Supp.1993); Va. Code Ann. § 54.1–2982 (Michie Supp.1992); Wash.Rev.Code Ann. § 70.122.020(6) (West Supp.) (permanent unconscious condition); Wis.Stat.Ann. § 154.01(5m) (West 1989 & Supp.1992); Wyo.Stat. § 35–22–101(a)(v) (1988 & Supp.1992) ("irreversible coma").

*Id.*

**79.** Meisel, *supra* note 77, *1994 Cumulative Supplement No. 2,* §§ 10A.1–10A.2.

**80.** The Federal Patient Self–Determination Act, passed in 1990, requires all health care providers receiving Medicaid or Medicare to inform all competent adult patients, even those admitted for

As the laws in state after state demonstrate, even though the protection of life is one of the state's most important functions, the state's interest is dramatically diminished if the person it seeks to protect is terminally ill or permanently comatose and has expressed a wish that he be permitted to die without further medical treatment (or if a duly appointed representative has done so on his behalf). When patients are no longer able to pursue liberty or happiness and do not wish to pursue life, the state's interest in forcing them to remain alive is clearly less compelling. Thus, while the state may still seek to prolong the lives of terminally ill or comatose patients or, more likely, to enact regulations that will safeguard the manner in which decisions to hasten death are made, the strength of the state's interest is substantially reduced in such circumstances.

## 2. Preventing Suicide

### a.

While the state's general commitment to the preservation of life clearly encompasses the prevention of suicide, the state has an even more particular interest in deterring the taking of one's own life. The fact that neither Washington nor any other state currently bans suicide, or attempted suicide, does not mean that the state does not have a valid and important interest in preventing or discouraging that act.

During the course of this litigation, the state has relied on its interest in the prevention of suicide as its primary justification for its statute.[81] The state points to statistics concerning the rate of suicide among various age groups, particularly the young. *Compassion In Dying*, 850 F.Supp. at 1464. As the state notes, in 1991, suicide was the second leading cause of death after accidents for the age groups 15–19, 20–24, and 25–34 and one of the top five causes of death for age groups 35–44 and 45–54.[82] These figures are indeed distressing.

Although suicide by teenagers and young adults is especially tragic, the state has a clear interest in preventing anyone, no matter what age, from taking his own life in a fit of desperation, depression, or loneliness or as a result of any other problem, physical or psychological, which can be significantly ameliorated. Studies show that many suicides are committed by people who are suffering from treatable mental disorders. Most if not all states provide for the involuntary commitment of such persons if they are likely to physically harm themselves. For similar reasons, at least a dozen states allow the use of nondeadly force to prevent suicide attempts.[83]

While the state has a legitimate interest in preventing suicides in general, that interest, like the state's interest in preserving life, is substantially diminished in the case of terminally ill, competent adults who wish to die.[84] One of the heartaches of suicide is the senseless loss of a life ended prematurely. In the

---

the simplest of procedures, about state laws on advance directives and to record any advance directives the patient might have. Omnibus Budget Reconciliation Act of 1990, Pub.L. No. 101–508, § 4206, 104 Stat. 1388–115 (codified at 42 U.S.C.A. § 1395cc(f)) (West 1992 & Supp. 1995)).

**81.** For that reason, we include in this section an analysis, a large portion of which could just as appropriately have been included in the preceding section, treating the state's interest in preserving life.

**82.** Washington State Dep't of Health, *Washington State Annual Summary of Vital Statistics 1991* (October, 1992).

**83.** *See* Alaska Stat. § 11.81.430(a)(4) 1983; Ark. Code Ann. § 5–2–605(4) (1987); Colo.Rev.Stat.

§ 18–1–703(1)(d) (1986); Haw.Rev.Stat. § 703–308(1) (1985); Ky.Rev.Stat. § 503.100(1)(a) (1985); Mo.Ann.Stat. § 563.016(5) (Vernon 1979); N.H.Rev.Stat. § 627:6(vi); N.J.Stat.Ann. § 2C:3–7(e) (West 1982); N.Y.Penal § 35.10(4) (McKinney 1987); Or.Rev. § 161.209 (Repl. 1983); 18 Pa.Cons.Stat.Ann. § 508(d) (Purdon 1983); Wis.Stat.Ann. § 939.48(5) (West 1982).

**84.** For an extended discussion of the arguments for and against legalizing physicians-assisted suicide, see generally The New York State Task Force on Life and the Law, *When Death is Sought: Assisted Suicide and Euthanasia in the Medical Context* (May 1994) and Michigan Commission On Death and Dying, *Final Report,* (June 1994). The New York States Task Force recommended retaining that state's prohibition on assisted suicide; the Michigan Commission recommended decriminalizing physician-assisted suicide under some circumstances.

case of a terminally ill adult who ends his life in the final stages of an incurable and painful degenerative disease, in order to avoid debilitating pain and a humiliating death, the decision to commit suicide is not senseless, and death does not come too early.[85] Unlike "the depressed twenty-one year old, the romantically devastated twenty-eight year old, the alcoholic forty-year old," *Compassion In Dying*, 49 F.3d at 590–91, or many others who may be inclined to commit suicide, a terminally ill competent adult cannot be cured. While some people who contemplate suicide can be restored to a state of physical and mental well-being, terminally ill adults who wish to die can only be maintained in a debilitated and deteriorating state, unable to enjoy the presence of family or friends. Not only is the state's interest in preventing such individuals from hastening their deaths of comparatively little weight, but its insistence on frustrating their wishes seems cruel indeed.[86] As Kent said in *King Lear*, when signs of life were seen in the dying monarch:

> Vex not his ghost: O! let him pass; he hate him That would upon the rack of this tough world Stretch him out longer.[87]

### b.

The state has explicitly recognized that its interests are frequently insufficient to override the wishes of competent, terminally ill adult patients who desire to bring their lives to an end with the assistance of a physician. Step by step, the state has acknowledged that terminally ill persons are entitled in a whole variety of circumstances to hasten their deaths, and that in such cases their

physicians may assist in the process. Until relatively recently, while physicians routinely helped patients to hasten their deaths, they did so discreetly because almost all such assistance was illegal. However, beginning about twenty years ago a series of dramatic changes took place. Each provoked the type of division and debate that surrounds the issue before us today. Each time the state's interests were ultimately subordinated to the liberty interests of the individual, in part as a result of legal actions and in part as a result of a growing recognition by the medical community and society at large that a more enlightened approach was essential.

The first major breakthrough occurred when the terminally ill were permitted to reject medical treatment.[88] The line was drawn initially at extraordinary medical treatment because the distinction between ordinary and extraordinary treatment appeared to some to offer the courts an objective, scientific standard that would enable them to recognize the right to refuse certain medical treatment without also recognizing a right to suicide or euthanasia.[89] That distinction, however, quickly proved unworkable, and after a while, terminally ill patients were allowed to reject *both* extraordinary and ordinary treatment. For a while, *rejection* of treatment, often through "do not resuscitate" orders, was permitted, but *termination* was not. This dividing line, which rested on the illusory distinction between commission and omission (or active and passive), also appeared for a short time to offer a natural point of repose for doctors, patients and the law. However, it, too, quickly

---

85. Many terminally ill patients would probably identify with Marcus Aurelius, a Roman emperor and stoic philosopher, who wrote: "It is a shame when the soul is first to give way in this life, and the body does not give way." Marcus Aurelius, *Meditations*, In Marcus Aurelius and His Times 61 (G. Long trans., 1973).

86. While recognizing the state's general interest in preventing suicide, the district court in this case said that it did not apply in the case of terminally ill, competent adults who wished to hasten their deaths. The court said:

> As to them, preventing suicide simply means prolonging a dying person's suffering, an aim in which the State can have no interest. In other words, the State's legitimate interest in

preventing suicide is not abrogated by allowing mentally competent terminally ill patients to freely and voluntarily commit physician-assisted suicide.

*Compassion In Dying*, 850 F.Supp. at 1464.

87. *King Lear*, act V. sc. iii, ll. 314–316, cited in Richard Posner, *Age and Old Age* 239 & n. 11 (1995).

88. *See, e.g., Satz v. Perlmutter*, 362 So.2d 160 (Fla.Dist.Ct.App.1978), *aff'd*, 379 So.2d 359 (Fla. 1980).

89. Lawrence H. Tribe, *Governmental Control Over the Body: Decisions About Death and Dying*, American Constitutional Law § 15–11 (2d ed.1988).

proved untenable, and ultimately patients were allowed both to *refuse* and to *terminate* medical treatment,[90] ordinary as well as extraordinary. Today, many states also allow the terminally ill to order their physicians to discontinue not just traditional medical treatment but the artificial provision of life-sustaining food and water, thus permitting the patients to die by self-starvation. Equally important, today, doctors are generally permitted to administer death-inducing medication, as long as they can point to a concomitant pain-relieving purpose.

In light of these drastic changes regarding acceptable medical practices, opponents of physician-assisted suicide must now explain precisely what it is about the physician's conduct in assisted suicide cases that distinguishes it from the conduct that the state has explicitly authorized. The state responds by urging that physician-assisted suicide is different in kind, not degree, from the type of physician-life-ending conduct that is now authorized, for three separate reasons. It argues that "assisted suicide": 1) requires doctors to play an active role; 2) causes deaths that would not result from the patient's underlying disease; and 3) requires doctors to provide the causal agent of patients' deaths.

The distinctions suggested by the state do not individually or collectively serve to distinguish the medical practices society currently accepts. The first distinction—the line between commission and omission—is a distinction without a difference now that patients are permitted not only to decline all medical treatment, but to instruct their doctors to *terminate* whatever treatment, artificial or otherwise, they are receiving. In disconnecting a respirator, or authorizing its disconnection, a doctor is unquestionably *committing* an act; he is taking an *active* role in bringing about the patient's death. In fact, there can be no doubt that in such instances the doctor intends that, as the result of his action, the patient will die an earlier death than he otherwise would.

Similarly, drawing a distinction on the basis of whether the patient's death results from an underlying disease no longer has any legitimacy. While the distinction may once have seemed tenable, at least from a metaphysical standpoint, it was not based on a valid or practical legal foundation and was therefore quickly abandoned. When Nancy Cruzan's feeding and hydration tube was removed, she did not die of an underlying disease. Rather, she was allowed to starve to death.[91] In fact, Ms. Cruzan was not even terminally ill at the time, but had a life expectancy of 30 years.[92] Similarly, when a doctor provides a conscious patient with med-

**90.** *See* Alan Meisel, *The Right to Die* § 4.4 "Withholding and Withdrawing Treatment" (1989). *See also In Re Conroy,* 98 N.J. 321, 486 A.2d 1209, 1234 (N.J.1985) (noting that "from a policy standpoint, it might well be unwise to forbid persons from discontinuing a treatment under circumstances in which the treatment could permissibly be withheld. Such a rule could discourage families and doctors from even attempting certain types of care and could thereby force them into hasty and premature decisions to allow a patient to die.").

**91.** As the Missouri Supreme Court starkly put it:

This is also a case in which euphemisms readily find their way to the fore, perhaps to soften the reality of what is really at stake. But this is not a case in which we are asked to let someone die. Nancy is not dead. Nor is she terminally ill. *This is a case in which we are asked to allow the medical profession to make Nancy die by starvation and dehydration.*

*Cruzan By Cruzan v. Harmon,* 760 S.W.2d 408, 412 (1988) (emphasis added). The facts corroborate the Missouri Supreme Court's assertion. Nancy Cruzan was kept alive through artificial

feeding for nearly eight years. After the United States Supreme Court remanded the case, a Missouri court determined that she had expressed a clear wish before her accident not to be kept alive by artificial means and ordered a halt to the artificial feeding. She died twelve days later. Cathaleen A. Roach, *Paradox and Pandora's Box: The Tragedy of Current Right–To–Die Jurisprudence,* 25 U.Mich.J.L.Ref. 133, 138 (1991), citing *Cruzan v. Mouton* Estate No. CV384–9P (Mo.Cir. Ct. Dec. 14, 1990). As the Missouri Supreme Court told us would be the case, it was the discontinuance of the provision of food and water, not Cruzan's accident almost eight years earlier, that caused her death. Thus, Nancy Cruzan did not die from an underlying illness, but from deliberate self-starvation.

**92.** The removal of the gastronomy tube, which was clearly the precipitating cause of her death, is not considered to be the legal cause only because a judicial judgment has been made that removing the feeding tube is permissible. *See* Note, *Physician–Assisted Suicide and the Right to Die With Assistance,* 105 Harv.L.Rev. 2021, 2029–31 (1992).

ication to ease his discomfort while he starves himself to death—a practice that is not only legal but has been urged as an alternative to assisted suicide [93]—the patient does not die of any underlying ailment. To the contrary, the doctor is helping the patient end his life by providing medication that makes it possible for the patient to achieve suicide by starvation.

Nor is the state's third and final distinction valid. Contrary to the state's assertion, given current medical practices and current medical ethics, it is not possible to distinguish prohibited from permissible medical conduct on the basis of whether the medication provided by the doctor will cause the patient's death. As part of the tradition of administering comfort care, doctors have been supplying the causal agent of patients' deaths for decades. Physicians routinely and openly provide medication to terminally ill patients with the knowledge that it will have a "double effect"—reduce the patient's pain and hasten his death.[94] Such medical treatment is accepted by the medical profession as meeting its highest ethical standards.[95] It commonly takes the form of putting a patient on an intravenous morphine drip, with full knowledge that, while such treatment will alleviate his pain, it will also indubitably hasten his death.[96] There can be no doubt, therefore, that the actual cause of the patient's death is the drug administered by the physician or by a person acting under his supervision or direction. Thus, the causation argument is simply "another bridge crossed" in the journey to vindicate the liberty interests of the terminally ill, and the state's third distinction has no more force than the other two.

c.

We acknowledge that in some respects a recognition of the legitimacy of physician-assisted suicide would constitute an additional step beyond what the courts have previ-

---

93. *See* James L. Bernat, M.D., et al., Commentary, *Patient Refusal of Hydration and Nutrition: An Alternative to Physician–Assisted Suicide or Voluntary Active Euthanasia* 153 Archives Internal Med. 2723 (1993).

94. *Decisions Near the End of Life*, a report by the Council on Ethical and Judicial Affairs of the American Medical Association, provides an informative discussion of "double effect." An abridged version of the report, published in the Journal of American Medicine described the Council's conclusions this way:

> The Council stated in its 1988 report that "the administration of a drug necessary to ease the pain of a patient who is terminally ill and suffering excruciating pain may be appropriate medical treatment even though the effect of the drug may shorten life." The Council maintains this position and further emphasizes that a competent patient must be the one who decides whether the relief from pain and suffering is worth the danger of hastening death. The principle of respect for patient autonomy and self-determination requires that patients decide about such treatment.

Council on Ethical and Judicial Affairs, American Medical Association, 54 *Decisions Near the End of Life*, 267 The Journal of the American Medical Association (April 22–29 1992).

95. Timothy E. Quill, M.D., *Death and Dignity: Making Choices and Taking Charge* 107–108 (1993). The term "double effect" originates in Roman Catholic moral theology, which holds that it is sometimes morally justifiable to cause evil in the pursuit of good. *See* May, Double

Effect, in Encyclopedia of Bioethics 316 (W. Reich ed. 1978).

> *See also* Report of the Council on Ethical and Judicial Affairs of the American Medical Association, 10 Issues L. & Med. 91 (1994). In its report, the Council said:
>
> > The intent of palliative treatment is to relieve pain and suffering, not to end the patient's life, but the patient's death is a possible side effect of the treatment. It is ethically acceptable for a physician to *gradually increase* the appropriate medication for a patient, realizing that the medication may depress respiration and cause death.

*Id.* at 92 (emphasis added). The euphemistic use of "possible" and "may" may salve the conscience of the AMA, but it does not change the realities of the practice of medicine or the legal consequences that would normally flow from the commission of an act one has reason to believe will likely result in the death of another. In the case of "double effect" we excuse the act or, to put it more accurately, we find the act acceptable, not because the doctors sugarcoat the facts in order to permit society to say that they couldn't really *know* the consequences of their action, but because the act is medically and ethically appropriate even though the result—the patient's death—is both foreseeable and intended.

96. Analgesics, most notably morphine, when applied in sufficient doses, will bring about a patient's death because they serve to repress respiration.

ously approved. We also acknowledge that judicial acceptance of physician-assisted suicide would cause many sincere persons with strong moral or religious convictions great distress. Nevertheless, we do not believe that the state's interest in preventing that additional step is significantly greater than its interest in preventing the other forms of life-ending medical conduct that doctors now engage in regularly. More specifically, we see little, if any, difference for constitutional or ethical purposes between providing medication with a double effect and providing medication with a single effect, as long as one of the known effects in each case is to hasten the end of the patient's life. Similarly, we see no ethical or constitutionally cognizable difference between a doctor's pulling the plug on a respirator and his prescribing drugs which will permit a terminally ill patient to end his own life. In fact, some might argue that pulling the plug is a more culpable and aggressive act on the doctor's part and provides more reason for criminal prosecution. To us, what matters most is that the death of the patient is the intended result as surely in one case as in the other. In sum, we find the state's interests in preventing suicide do not make its interests substantially stronger here than in cases involving other forms of death-hastening medical intervention. To the extent that a difference exists, we conclude that it is one of degree and not of kind.

#### d.

Moreover, we are doubtful that deaths resulting from terminally ill patients taking medication prescribed by their doctors should be classified as "suicide." Certainly, we see little basis for such a classification when deaths that result from patients' decisions to terminate life support systems or to refuse life-sustaining food and water, for example, are not. We believe that there is a strong argument that a decision by a terminally ill patient to hasten by medical means a death that is already in process, should not be classified as suicide. Thus, notwithstanding the generally accepted use of the term "physician-assisted suicide," we have serious doubt that the state's interest in preventing suicide is even implicated in this case.

#### e.

■ In addition to the state's purported interest in preventing suicide, it has an additional interest in preventing deaths that occur as a result of errors in medical or legal judgment. We acknowledge that it is sometimes impossible to predict with certainty the duration of a terminally ill patient's remaining existence, just as it is sometimes impossible to say for certain whether a borderline individual is or is not mentally competent.[97] However, we believe that sufficient safeguards can and will be developed by the state and medical profession, see infra p. 833, to ensure that the possibility of error will ordinarily be remote. Finally, although life and death decisions are of the gravest order, should an error actually occur it is likely to benefit the individual by permitting a victim of unmanageable pain and suffering to end his life peacefully and with dignity at the time he deems most desirable.[98]

97. *See generally* Harold G. Koenig, *Legalizing Physician–Assisted Suicide: Some Thoughts and Concerns,* 37 J.Fam.Prac. 171 (1993).

98. There is some evidence that the state's efforts to prohibit assisted suicide in hopes of deterring suicide is at least partially counter-productive. As a result of the state's ban, some terminally ill adults probably commit suicide although they otherwise might not have done so and others probably commit suicide sooner than they would have done so.

In his recent book, Judge Richard Posner suggests that "permitting physician-assisted suicide ... [in] cases of physical incapacity might actually *reduce* the number of suicides and *postpone* the suicides that occur." Posner, *infra* note 87, at

224. Judge Posner concludes that assuring such individuals that they would be able to end their lives later if they wished to, even if they became totally physically incapacitated, would deter them from committing suicide now and would also give such people a renewed peace of mind. He says that some of those individuals would eventually commit suicide but others would decide never to do so. *Id.* 243–253.

The suicide of Nobel Prize winning physicist Percy Bridgman, recounted in one of the amicus briefs, graphically illustrates the point. Dr. Bridgman, 79, was in the final stages of cancer when he shot himself on August 20, 1961, leaving a suicide note that said: "It is not decent for society to make a man do this to himself. Proba-

### 3. Avoiding the Involvement of Third Parties, and Precluding the Use of Arbitrary, Unfair, or Undue Influence

#### a.

 A state may properly assert an interest in prohibiting even altruistic assistance to a person contemplating suicide on the grounds that allowing others to help may increase the incidence of suicide, undercut society's commitment to the sanctity of life, and, adversely affect the person providing the assistance. In addition, joint action is generally considered more serious than action by a single person. While we recognize that these concerns are legitimate, the most important—the first two—diminish in importance to the same extent that the state's interest in preventing the act itself diminishes. All are at their minimums when the assistance is provided by or under the supervision or direction of a doctor and the recipient is a terminally ill patient.

 In upholding Washington's statute, the majority of the three-judge panel relied heavily on the state's interest in preventing the exercise of undue, arbitrary or unfair influences over the individual's decision to end his life. *Compassion In Dying*, 49 F.3d at 592–93. We agree that this is an important interest, but for entirely different reasons than the majority suggests. One of the majority's prime arguments is that the statute is necessary to protect "the poor and minorities from exploitation," 49 F.3d at 592—in other words, to protect the disadvantaged from becoming the victims of assisted suicide. This rationale simply recycles one of the more disingenuous and fallacious arguments raised in opposition to the legalization of abortion.[99] It is equally meretricious here. In fact, as with abortion, there is far more reason to raise the opposite concern: the

concern that the poor and the minorities, who have historically received the least adequate health care, will not be afforded a fair opportunity to obtain the medical assistance to which they are entitled—the assistance that would allow them to end their lives with a measure of dignity. The argument that disadvantaged persons will receive *more* medical services than the remainder of the population in one, and only one, area—assisted suicide—is ludicrous on its face. So, too, is the argument that the poor and the minorities will rush to volunteer for physician-assisted suicide because of their inability to secure adequate medical treatment.

Our analysis is similar regarding the argument relating to the handicapped. Again, the opponents of physician-assisted suicide urge a variation of the discredited anti-abortion argument. Despite the dire predictions, the disabled were not pressured into seeking abortions. Nor is it likely that the disabled will be pressured into committing physician-assisted suicide. Organizations representing the physically impaired are sufficiently active politically and sufficiently vigilant that they would soon put a halt to any effort to employ assisted suicide in a manner that affected their clients unfairly. There are other more subtle concerns, however, advanced by some representatives of the physically impaired, including the fear that certain physical disabilities will erroneously be deemed to make life "valueless." While we recognize the legitimacy of these concerns, we also recognize that seriously impaired individuals will, along with non-impaired individuals, be the beneficiaries of the liberty interest asserted here—and that if they are not afforded the option to control their own fate, they like many others will be compelled, against their will, to endure unusual and protracted suffering.

---

bly this is the last day I will be able to do it myself." Sherman B. Nuland, *How We Die*, 152–53 (1993).

**99.** The argument there was that the poor and the minorities would either be persuaded to have too many abortions or would be forced to have them against their will: The fact is that the poor and the minorities have been disproportionately deprived of the opportunity to have abortions, not only because they cannot afford such operations, but because in numerous instances restrictive

legislation, sponsored by those who oppose abortion rights, prohibits the use of public funds to pay for them. *See, e.g.*, 42 U.S.C. § 300a–6 (prohibiting the use of Title X grants in programs in which abortions are performed or abortion counseling is offered); *Planned Parenthood Affiliates of Cal. v. Swoap*, 173 Cal.App.3d 1187, 219 Cal. Rptr. 664 (Cal.Ct.App.1985) (holding that section of state budget act containing restrictive language regarding use of family planning funds for abortion-related services violated the state constitution).

The resolution that would be best for all, of course, would be to ensure that the practice of assisted suicide is conducted fairly and well, and that adequate safeguards sufficient to avoid the feared abuses are adopted and enforced.

### b.

There is a far more serious concern regarding third parties that we must consider—one not even mentioned by the majority in the panel opinion. That concern is the fear that infirm, elderly persons will come under undue pressure to end their lives from callous, financially burdened, or self-interested relatives, or others who have influence over them. The risk of undue influence is real—and it exists today. Persons with a stake in the outcome may now pressure the terminally ill to reject or decline life-saving treatment or take other steps likely to hasten their demise. Surrogates may make unfeeling life and death decisions for their incompetent relatives. This concern deserves serious consideration, as it did when the decision was made some time ago to permit the termination of life-support systems and the withdrawal or withholding of other forms of medical treatment, and when it was decided to recognize living wills, durable powers of attorney, and the right of courts to appoint substitute decision-makers. While we do not minimize the concern, the temptation to exert undue pressure is ordinarily tempered to a substantial degree in the case of the terminally ill by the knowledge that the person will die shortly in any event. Given the possibility of undue influence that already exists, the recognition of the right to physician-assisted suicide would not increase that risk unduly. In fact, the direct involvement of an impartial and professional third party in the decision-making process would more likely provide an important safeguard against such abuse.

We also realize that terminally ill patients may well feel pressured to hasten their deaths, not because of improper conduct by their loved ones, but rather for an opposite reason—out of concern for the economic welfare of their loved ones. Faced with the prospect of astronomical medical bills, terminally ill patients might decide that it is better for them to die before their health care expenses consume the life savings they planned to leave for their families, or, worse yet, burden their families with debts they may never be able to satisfy. While state regulations can help ensure that patients do not make rash, uninformed, or ill considered decisions, we are reluctant to say that, in a society in which the costs of protracted health care can be so exorbitant, it is improper for competent, terminally ill adults to take the economic welfare of their families and loved ones into consideration.

Throughout its analysis, the dissent relies heavily on Professor Kamisar, a long-time, outspoken, and nationally-recognized opponent of assisted-suicide. Following Professor Kamisar's lead, our dissenting colleagues suggest that the nation's priorities are misplaced because some of the problems we address result from the "lack of universal access to medical care." Dissent at 852. We would be inclined to agree that the country's refusal to provide universal health care, and the concomitant suffering so many Americans are forced to undergo, demonstrates a serious flaw in our national values. One answer, of course, is that concerns over the absence of decent medical coverage in this country should be addressed to Congress, which, if it recognizes the values the dissenters and others espouse, will surely enact the sorely-needed, health-care legislation it has up to now rejected. As members of the judicial branch, however, we are compelled to stand aside from that battle. On the other hand, we are certainly not obligated to pile injury upon injury by holding that all of our citizens may be subjected to the prospect of needless pain, suffering, and degradation at the end of their lives, either because of our concern over Congress' failure to provide government-insured health care or alternatively in order to satisfy the moral or religious precepts of a portion of the population.

### c.

We are also aware of the concern that doctors become hardened to the inevitability of death and to the plight of terminally ill

patients, and that they will treat requests to die in a routine and impersonal manner, rather than affording the careful, thorough, individualized attention that each request deserves. The day of the family doctor who made house calls and knew the frailties and strengths of each family member is long gone. So, too, in the main, is the intense personal interest that doctors used to take in their patients' welfare and activities. Doctors like the rest of society face constantly increasing pressures, and may not always have the patience to deal with the elderly, some of whom can be both difficult and troublesome. Nevertheless, there are many doctors who specialize in geriatric care and there are many more who are not specialists but who treat elderly patients with great compassion and sensitivity. We believe that most, if not all, doctors would not assist a terminally ill patient to hasten his death as long as there were any reasonable chance of alleviating the patient's suffering or enabling him to live under tolerable conditions. We also believe that physicians would not assist a patient to end his life if there were any significant doubt about the patient's true wishes. To do so would be contrary to the physicians' fundamental training, their conservative nature, and the ethics of their profession. In any case, since doctors are highly-regulated professionals, it should not be difficult for the state or the profession itself to establish rules and procedures that will ensure that the occasional negligent or careless recommendation by a licensed physician will not result in an uninformed or erroneous decision by the patient or his family.

Having said all this, we do not dismiss the legitimate concerns that exist regarding undue influence. While steps can be taken to minimize the danger substantially, the concerns cannot be wholly eliminated. Accordingly, they are of more than minimal weight

and, in balancing the competing interests, we treat them seriously.

### 4. Effect on Children, Other Family Members, and Loved Ones

The state clearly has a legitimate interest in safeguarding the interests of innocent third parties such as minor children and other family members dependent on persons who wish to commit suicide. That state interest, however, is of almost negligible weight when the patient is terminally ill and his death is imminent and inevitable. The state cannot help a minor child or any other innocent third party by forcing a terminally ill patient to die a more protracted and painful death. In fact, witnessing a loved one suffer a slow and agonizing death as a result of state compulsion is more likely to harm than further the interests of innocent third parties.[100]

### 5. Protecting the Integrity of the Medical Profession

The state has a legitimate interest in assuring the integrity of the medical profession, an interest that includes prohibiting physicians from engaging in conduct that is at odds with their role as healers.[101] We do not believe that the integrity of the medical profession would be threatened in any way by the vindication of the liberty interest at issue here. Rather, it is the existence of a statute that criminalizes the provision of medical assistance to patients in need that could create conflicts with the doctors' professional obligations and make covert criminals out of honorable, dedicated, and compassionate individuals.

The assertion that the legalization of physician-assisted suicide will erode the commitment of doctors to help their patients

---

**100.** According to its protocol, Compassion In Dying will not assist terminally ill patients unless the patient has obtained the approval of family members or others with whom the patient has a close personal relationship. While we do not reach Compassion In Dying's claim or consider the merits of the safeguards it has devised, we note that a similar requirement by the state would raise constitutional concerns. We in no way suggest, however, that a private organization is not free to adopt higher standards than

the state is permitted to impose in order to advance its interests or those of its clients.

**101.** *Cf. Middlesex County Ethics Committee v. Garden State Bar Ass'n*, 457 U.S. 423, 434, 102 S.Ct. 2515, 2522, 73 L.Ed.2d 116 (1982) (noting that state has important interest in "maintaining and assuring the professional conduct of professional attorneys it licenses").

rests both on an ignorance of what numbers of doctors have been doing for a considerable time and on a misunderstanding of the proper function of a physician. As we have previously noted, doctors have been discreetly helping terminally ill patients hasten their deaths for decades and probably centuries, while acknowledging privately that there was no other medical purpose to their actions. They have done so with the tacit approval of a substantial percentage of both the public and the medical profession, and without in any way diluting their commitment to their patients.

In addition, as we also noted earlier, doctors may now openly take actions that will result in the deaths of their patients. They may terminate life-support systems, withdraw life-sustaining gastronomy tubes, otherwise terminate or withhold all other forms of medical treatment, and, may even administer lethal doses of drugs with full knowledge of their "double effect." [102] Given the similarity between what doctors are now permitted to do and what the plaintiffs assert they should be permitted to do, we see no risk at all to the integrity of the profession. This is a conclusion that is shared by a growing number of doctors who openly support physician-assisted suicide and proclaim it to be fully compatible with the physicians' calling and with their commitment and obligation to help the sick.[103] Many more doctors support physician-assisted suicide but without openly advocating a change in the legal treatment of the practice. A recent study of Oregon physicians found that 60% of those who responded believed that physician-assisted suicide should be legal.[104] A recent study of attitudes among physicians in Michigan, where the state legislature adopted a law banning assisted-suicide as a result of Dr. Jack Kevorkian's activities, found that only 17.2% of the physicians who responded favored a law prohibiting assisted-suicide. Almost all the rest supported one of three options: legalizing physician-assisted suicide (38.9%); permitting the medical profession to regulate the practice (16.1%); or leaving decisions about physician-assisted suicide to the doctor-patient relationship (16.6%).[105] Thus over 70% of the Michigan doctors answering

**102.** The American Medical Association devotes a considerable portion of the amicus brief it filed in this case to arguing that doctors who give medication with knowledge that it will have a double effect, including hastening death, should not be deemed to have violated Washington's assisted suicide law. The organization struggles mightily, albeit unsuccessfully, to distinguish for legal purposes between the administration of medication for a dual and a single effect. Nevertheless, we agree with the AMA's point—the administration of dual effect medication, with informed consent, does not constitute a criminal act. However, if, as the AMA contends, *administering* medicine that will result in death is lawful, we cannot comprehend the logic of its equivocal conclusion that *prescribing* life-ending medication for the patient at his request can constitute a crime, at least "at this time." (If the patient's consent has not been obtained for dual effect treatment, there would of course be even less justification for the AMA's fallacious distinction.) The line the AMA seeks to draw conflicts with reason as well as with the proper constitutional approach. The key factor in both dual effect and physician-assisted suicide cases is that it is the terminally ill patient's voluntary and informed wish that the doctor assist him to die through medical treatment. Were we to agree with those who would label some of the current medical practices engaged in at life's end as killing a patient or "euthanasia," we would put the AMA-sanctioned dual effect practice on that side of the line long before we would include the act of prescribing medication that is to be self-administered. It is the glaring inconsistency in the AMA's position that is undoubtedly responsible in part for the dissent's rejection of the AMA's plea to hold lawful the "dual effect" practice. *See* Dissent at 841.

**103.** For a recent example, see Francis Moore, M.D., Easing Life's End: Doctors, Patients and the Final Medical Dilemma, Harv. Mag. at 46, 47 Aug. 1995 ("It is my credo that assisting people to leave the dwelling place of their body when it is no longer habitable is becoming an obligation of the medical profession").

The Oregon AMA refrained from taking a position on a successful ballot initiative to legalize physician assisted suicide because its membership was sharply divided on whether to back or oppose the measure. Melinda A. Lee & Susan W. Tolle, *Oregon's Assisted Suicide Vote: the Silver Lining*, 124 Annals of Internal Med. 267 (1996).

**104.** Melinda Lee, et al., *Legalizing Assisted Suicide—Views of Physicians in Oregon*, 334 New Eng.J.Med. 310 (1996).

**105.** Jerald G. Bachman, *Attitudes of Michigan Physicians and the Public Toward Legalizing Physician–Assisted Suicide and Voluntary Euthanasia*, 334 New Eng.J.Med. 303, 305 fig. 1 (1996).

the poll appear to believe that professional ethics do not preclude doctors from engaging in acts that today are classified as "assisted suicide." Even among those doctors who oppose assisted suicide medical ethics do not lie at the heart of the objections. The "most important personal characteristic" separating those doctors from their colleagues is a strong religious identification.[106]

Whether or not a patient can be cured, the doctor has an obligation to attempt to alleviate his pain and suffering. If it is impossible to cure the patient or retard the advance of his disease, then the doctor's primary duty is to make the patient as comfortable as possible. When performing that task, the doctor is performing a proper medical function, even though he knows that his patient's death is a necessary and inevitable consequence of his actions.[107]

As noted earlier, the American Medical Association filed an amicus brief urging that we uphold the practice of administering medicine with a dual effect. At the same time, it takes the position that physician-assisted suicide should not be legalized, at least as of this time.[108] Twenty years ago, the AMA contended that performing abortions violated the Hippocratic Oath; today, it claims that assisting terminally ill patients to hasten their death does likewise. Clearly, the Hip-

pocratic Oath can have no greater import in deciding the constitutionality of physician assisted-suicide than it did in determining whether women had a constitutional right to have an abortion. In *Roe*, the Court cited a scholar's conclusion that the Hippocratic Oath "originated in a group representing only a small segment of Greek opinion and that it certainly was not accepted by all ancient physicians." The Court stressed the Oath's "rigidity" and was not deterred by its prohibitory language regarding abortion.[109] As *Roe* shows, a literalist reading of the Hippocratic Oath does not represent the best or final word on medical or legal controversies today.[110] Were we to adhere to the rigid language of the oath, not only would doctors be barred from performing abortions or helping terminally ill patients hasten their deaths, but according to a once-accepted interpretation, they would also be prohibited from performing any type of surgery at all,[111] a position that would now be recognized as preposterous by even the most tradition-bound AMA members. More important, regardless of the AMA or its position, experience shows that most doctors can readily adapt to a changing legal climate. Once the Court held that a woman has a constitutional right to have an abortion, doctors began per-

---

106. *Id.* at 308.

107. The state also has an interest in furthering the progress of medical science. Some argue that the relentless search for new and better treatments for the terminally ill might be undermined by permitting physicians to help terminally ill patients hasten their deaths. We put no stock in this argument. As is shown by the experience of countless patients suffering from cancer and AIDS, most patients are not willing to give up hope until they have exhausted all possibilities provided by established treatments and in addition have tried any available experimental ones. We are certain that there will be neither a shortage of patients willing to volunteer for controlled studies of new medications and treatments nor of researchers equally willing to develop new forms and manners of treatment.

108. In its amicus brief in this case, the AMA attached a Journal of American Medicine article, reporting the conclusion of the AMA's Council on Ethical and Judicial Affairs. The article concluded this way: "the societal risk of involving physicians in medical interventions to cause patients' death is too great in this culture to condone

euthanasia or physician-assisted suicide *at this time*" (emphasis added).

109. In one of the two translations quoted by the *Roe* Court, the Oath says:

I will neither give a deadly drug to anybody if asked for it, nor will I make a suggestion to this effect. Similarly I will not give a woman an abortive remedy.

*Roe*, 410 U.S. at 131, 93 S.Ct. at 716.

110. We note that even in ancient times many physicians did not interpret the oath literally. As three commentators said, "It is well established that Greek and Roman physicians, even those who were Hippocratic, often supplied their patients with the means to commit suicide, despite the injunction against assistance in suicide embodied in the Hippocratic oath." Rebecca C. Morgan et al., The Issue of Personal Choice: The Competent Incurable Patient and the Right to Commit Suicide, 57 Missouri L.Rev. 3, 46 (1992).

111. Peter A. Ubel, *Assisted Suicide and the Case of Dr. Quill and Diane*, 8 Issues In Law & Med. 487, 497 (1993).

forming abortions routinely and the ethical integrity of the medical profession remained undiminished. Similarly, following the recognition of a constitutional right to assisted suicide, we believe that doctors would engage in the permitted practice when appropriate, and that the integrity of the medical profession would survive without blemish.

Recognizing the right to "assisted-suicide" would not require doctors to do anything contrary to their individual principles. A physician whose moral or religious beliefs would prevent him from assisting a patient to hasten his death would be free to follow the dictates of his conscience. Those doctors who believe that terminally ill, competent, adult patients should be permitted to choose the time and manner of their death would be able to help them do so. We believe that extending a choice to doctors as well as to patients would help protect the integrity of the medical profession without compromising the rights or principles of individual doctors and without sacrificing the welfare of their patients.[112]

### 6. Fear of Adverse Consequences

We now consider the state's final concern. Those opposed to permitting physician-assisted suicide often point to a concern that could be subsumed under the state's general interest in preserving life, but which for clar-ity's sake we treat separately. The argument is a purely pragmatic one that causes many people deep concern: permitting physician-assisted suicide would "open Pandora's Box."[113]

Once we recognize a liberty interest in hastening one's death, the argument goes, that interest will sweep away all restrictions in its wake. It will only be a matter of time, the argument continues, before courts will sanction putting people to death, not because they are desperately ill and want to die, but because they are deemed to pose an unjustifiable burden on society.[114] Known as a slippery slope argument or what one commentator has called the "thin edge of the wedge" argument,[115] the opponents of assisted-suicide conjure up a parade of horribles and insist that the only way to halt the downward spiral is to stop it before it starts. *See Compassion In Dying*, 49 F.3d at 590–91 (providing list of horribles).

This same nihilistic argument can be offered against any constitutionally-protected right or interest. Both before and after women were found to have a right to have an abortion, critics contended that legalizing that medical procedure would lead to its widespread use as a substitute for other forms of birth control or as a means of racial genocide. Inflammatory contentions regard-

112. Patients who are concerned about the possibility that they will suffer an unwanted agonizing death because of a doctor's unwillingness to provide them with the medication they need would have the opportunity to select a doctor whose view of the physician's role comports with theirs. See Michigan Commission on Death and Dying, Final Report (June 1994), which reprints Model Statute Supporting Aid–In–Dying, including § 1.11, providing mechanism for the transfer of patients in case a physician refuses to provide aid-in-dying.

113. *See generally* Yale Kamisar, *When Is there A Constitutional "Right To Die"? When Is There No Constitutional Right to Live?* 25 Geo.L.Rev. 1203 (1991).

114. The dissent cites the experience in the Netherlands, where physician-aid-in-dying is allowed in some circumstances, to buttress both its claims that physician-assisted suicide cannot be adequately regulated and that approval of that limited practice will inevitably lead to the administration of death-inducing drugs without the pa-tient's consent. Dissent at 853, 857. We note that the reports on relevant medical practices in the Netherlands are so mixed that it is difficult to draw any conclusions from them. *See, e.g.*, Maurice A.M., de Wachter, *Euthanasia in the Netherlands; Dying Well? A Colloquy on Euthanasia and Assisted Suicide*, The Hastings Center Report (1992) (describing sharply divergent appraisals of Dutch practices). We also note, that even if it were clear what lessons to draw from the Dutch experience, it would be far from clear how to apply those lessons to the United States. As two commentators have said: "One must be wary, however, of inferences drawn from the Netherlands and applied to the United States. Cultural, legal, psychological, and other variables make generalizations problematic, even in the Netherlands itself." T. Howard Stone & William J. Winslade, *Physician–Assisted Suicide and Euthanasia in the United States*, 16 J.Legal.Med. 481 (1995).

115. Eugenie Anne Gifford, *Artes Moriendi: Active Euthanasia and the Art of Dying*, 40 UCLA L.Rev. 1545, 1566 (1993), citing Glanville Williams.

ing ways in which the recognition of the right would lead to the ruination of the country did not, however, deter the Supreme Court from first recognizing and then two decades later reaffirming a constitutionally-protected liberty interest in terminating an unwanted pregnancy. In fact, the Court has *never* refused to recognize a substantive due process liberty right or interest merely because there were difficulties in determining when and how to limit its exercise or because others might someday attempt to use it improperly.

Recognition of any right creates the possibility of abuse. The slippery slope fears of *Roe*'s opponents have, of course, not materialized. The legalization of abortion has not undermined our commitment to life generally; nor, as some predicted, has it led to widespread infanticide. Similarly, there is no reason to believe that legalizing assisted suicide will lead to the horrific consequences its opponents suggest.

The slippery slope argument also comes in a second and closely related form. This version of the argument states that a due process interest in hastening one's death, even if the exercise of that interest is initially limited to the terminally ill, will prove infinitely expansive because it will be impossible to define the term "terminally ill." *See Compassion In Dying*, 49 F.3d at 593. (After all, all of us are terminal in some sense of the word, are we not?). *See id.* The argument rests on two false premises. First it presupposes a need for greater precision than is required in constitutional law.[116] Second, it assumes that the terms "terminal illness" or "terminal condition" cannot be defined, even though those terms have in fact been defined repeatedly. They have, for example, been defined in a model statute, The Uniform Rights of the Terminally Ill Act,[117] and in more than 40 state natural death statutes,[118] including

Washington's. The model statute and some of the state statutes have defined the term without reference to a fixed time period; others have taken the opposite approach, defining terminal to mean that death is likely to ensue within six months. As we have noted earlier, the Washington Act, like some others, includes persons who are permanently unconscious, that is in an irreversible coma or a persistent vegetative state. RCW 70.122.020(6). While defining the term "terminally ill" is not free from difficulty, the experience of the states has proved that the class of the terminally ill is neither indefinable nor undefined. Indeed, all of the persons described in the various statutes would appear to fall within an appropriate definition of the term. In any event, it is apparent that purported definitional difficulties that have repeatedly been surmounted provide no legitimate reason for refusing to recognize a liberty interest in hastening one's death.

We do not dispute the dissent's contention that the prescription of lethal medication by physicians for use by terminally ill patients who wish to die does not constitute a clear point of demarcation between permissible and impermissible medical conduct. We agree that it may be difficult to make a principled distinction between physician-assisted suicide and the provision to terminally ill patients of other forms of life-ending medical assistance, such as the administration of drugs by a physician. We recognize that in some instances, the patient may be unable to self-administer the drugs and that administration by the physician, or a person acting under his direction or control, may be the only way the patient may be able to receive them.[119] The question whether that type of physician conduct may be constitutionally prohibited must be answered directly in future cases, and not in this one. We would be

---

**116.** *See, e.g., United States v. Vuitch*, 402 U.S. 62, 71–72, 91 S.Ct. 1294, 1298–99, 28 L.Ed.2d 601 (1971) (holding that an abortion statute barring abortions not performed to protect the mother's *health* was not unconstitutionally vague).

**117.** 9B U.L.A. 96, 98 (Supp.1992). According to the model act, a patient is in a terminal condition if the medical condition is incurable and irreversible, that is, without administering life-sustaining treatment the condition, will, in the opin-

ion of the attending physician, result in death in a relatively short time. Alan Meisel, *The Right to Die: 1994 Cumulative Supplement No. 2* 366 (1994).

**118.** *See* statutes cited *supra* note 77.

**119.** When the physician rather than the patient administers the drug, the act is ordinarily classified as physician-aid-in-dying.

less than candid, however, if we did not acknowledge that for present purposes we view the critical line in right-to-die cases as the one between the voluntary and involuntary termination of an individual's life. In the first case—volitional death—the physician is aiding or assisting a patient who wishes to exercise a liberty interest, and in the other—involuntary death—another person acting on his own behalf, or, in some instances society's, is determining that an individual's life should no longer continue.[120] We consider it less important who administers the medication than who determines whether the terminally ill person's life shall end. In any event, here we decide only the issue before us—the constitutionality of prohibiting doctors from prescribing medication for use by terminally ill patients who wish to hasten their death.

## B.

### The Means by Which the State Furthers Its Interests

In applying the balancing test, we must take into account not only the strength of the state's interests but also the means by which the state has chosen to further those interests.

### 1. Prohibition—A Total Ban for the Terminally Ill

■■■ Washington's statute prohibiting assisted suicide has a drastic impact on the terminally ill. By prohibiting physician assistance, it bars what for many terminally ill patients is the only palatable, and only practical, way to end their lives. Physically frail, confined to wheelchairs or beds, many termi-

nally ill patients do not have the means or ability to kill themselves in the multitude of ways that healthy individuals can. Often, for example, they cannot even secure the medication or devices they would need to carry out their wishes.

Some terminally ill patients stockpile prescription medicine, which they can use to end their lives when they decide the time is right. The successful use of the stockpile technique generally depends, however, on the assistance of a physician, whether tacit or unknowing (although it is *possible* to end one's life with over-the-counter medication). Even if the terminally ill patients are able to accumulate sufficient drugs, given the pain killers and other medication they are taking, most of them would lack the knowledge to determine what dose of any given drug or drugs they must take, or in what combination. Miscalculation can be tragic. It can lead to an even more painful and lingering death. Alternatively, if the medication reduces respiration enough to restrict the flow of oxygen to the brain but not enough to cause death, it can result in the patient's falling into a comatose or vegetative state.

Thus for many terminally ill patients, the Washington statute is effectively a prohibition. While technically it only prohibits one means of exercising a liberty interest, practically it prohibits the exercise of that interest as effectively as prohibiting doctors from performing abortions prevented women from having abortions in the days before *Roe*.[121]

### 2. Regulation—A Permissible Means of Promoting State Interests

State laws or regulations governing physician-assisted suicide are both necessary and

---

**120.** In the latter case, "involuntary death," when the motive is benign or altruistic, we classify the act as "euthanasia." There is, however, no universally accepted meaning for that term. Some commentators distinguish between active and passive euthanasia, for example, while others do not. We define euthanasia as the act or practice of painlessly putting to death persons suffering from incurable and distressing disease, as an act of mercy, but *not* at the person's request. The issue of euthanasia is not implicated here. While we place euthanasia, as we define it, on the opposite side of the constitutional line we draw for purposes of this case, we do not intimate any view as to the constitutional or legal implications

of the practice. Finally, we should make it clear that a decision of a duly appointed surrogate decision maker is for all legal purposes the decision of the patient himself.

**121.** *See also Carey v. Population Services International,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977). Building on its decision in *Griswold* that the state could not ban the sale of contraceptives, the Court held in *Carey,* that the state could not prohibit adults from securing contraceptives through the most readily available channels by prohibiting everyone but licensed pharmacists from distributing them.

desirable to ensure against errors and abuse, and to protect legitimate state interests. Any of several model statutes might serve as an example of how these legitimate and important concerns can be addressed effectively.[122]

By adopting appropriate, reasonable, and properly drawn safeguards Washington could ensure that people who choose to have their doctors prescribe lethal doses of medication are truly competent and meet all of the requisite standards. Without endorsing the constitutionality of any particular procedural safeguards, we note that the state might, for example, require: witnesses to ensure voluntariness; reasonable, though short, waiting periods to prevent rash decisions; second medical opinions to confirm a patient's terminal status and also to confirm that the patient has been receiving proper treatment, including adequate comfort care; psychological examinations to ensure that the patient is not suffering from momentary or treatable depression; reporting procedures that will aid in the avoidance of abuse. Alternatively, such safeguards could be adopted by interested medical associations and other organizations involved in the provision of health care, so long as they meet the state's needs and concerns.[123]

While there is always room for error in any human endeavor, we believe that sufficient protections can and will be developed by the various states, with the assistance of the medical profession and health care industry, to ensure that the possibility of error will be remote. We do not expect that, in this nation, the development of appropriate statutes and regulations will be taken lightly by any of the interested parties, or that those charged with their enforcement will fail to perform their duties properly.

In treating a prohibition differently from a regulation, we are following the approach that the Court took in the only right-to-die case to come before it. In *Cruzan*, the Court recognized that the states had a legitimate role to play in regulating the process of refusing or terminating life-sustaining medical treatment even if they could not prohibit the making of decisions that met applicable state standards. The Court explicitly recognized that states did not have to refrain from acting, but rather could adopt appropriate regulations to further their legitimate interests. Missouri's requirement for clear and convincing evidence of a patient's wishes was a regulation designed to reduce the risk of erroneous decisions. The Court upheld that regulation, a requirement that, of course, had far less impact on the exercise of the due process liberty interest than the de facto prohibition at issue here.

To those who argue that courts should refrain from declaring that the terminally ill have a constitutional right to physician-assisted suicide and that we should leave such matters to the individual states, we reply that where important liberty interests are at stake it is not the proper role of the state to adopt statutes totally prohibiting their exercise. Rather, the state should enact regulatory measures that ensure that the exercise of those interests is properly circumscribed and that all necessary safeguards have been provided. In the case of abortions and in the case of the withdrawal of life-sustaining medical treatment, the Court permitted states to enact appropriate regulations that would further its legitimate interests. In this case, like the others, the guiding principle is found in the words of Justice O'Connor. "[T]he more challenging task of crafting appropriate procedures for safeguarding ... [terminally ill patients'] liberty interests is entrusted to the 'laboratory' of the states in the first instance." *Cruzan* 497 U.S. at 287, 292, 110 S.Ct. at 2856, 2859 (O'Connor, J., concurring) (internal citation omitted).[124]

---

122. *See,* for instance, the procedural safeguards included in Oregon's Death With Dignity Act, described in Lee, *supra* note 104, or the Michigan Model Statute Supporting Aid–In–Dying, appended to the Final Report of the Michigan Commission on Death and Dying, *supra,* note 84.

123. We do not suggest that all of these safeguards are either necessary or desirable singular-

ly or collectively. That is essentially a matter for the states to determine. In doing so, they would of course consider the practical implications of the various potential procedural safeguards before deciding which, if any, to adopt.

124. For an opposing view, see Posner, *supra* note 87, at 260–61. Posner argues that while laws banning assisted suicide (as applied to the termi-

## C.

### The Strength of the Liberty Interest

Earlier in the opinion we described the liberty interest at issue here and explained its importance. We also explained that the strength of that interest is dependent on a number of factors, especially the individual's physical condition. We noted that an individual's liberty interest in hastening his death is at its low point when that person is young and healthy, because forcing a robust individual to continue living does not, at least absent extraordinary circumstances, subject him to "pain ... [and] suffering that is too intimate and personal for the State to insist on...." *Casey*, 505 U.S. at 852, 112 S.Ct. at 2807. As we also made clear, when a mentally competent adult is terminally ill, and wishes, free of any coercion, to hasten his death because his remaining days are an unmitigated torture, that person's liberty interest is at its height. For such a person, being forced to live is indeed being subjected to "pain ... [and] suffering that is too intimate and personal for the State to insist on...." *Id.*

## D.

### The Burden on the Liberty Interest

We have also previously discussed at some length the nature and extent of the burden that the Washington statute imposes on the liberty interest. Here, we need only mention some of the specific evidence introduced by the plaintiffs and refer to some of our earlier analysis. The plaintiffs offered considerable specific testimony involving individual pa-

tients that strongly supports their claims that the Washington statute frequently presents an insuperable obstacle to terminally ill persons who wish to hasten their deaths by peaceful means. The testimony produced by the plaintiffs shows that many terminally ill patients who wish to die with dignity are forced to resort to gruesome alternatives because of the unavailability of physician assistance. One such patient, a 34–year–old man dying from AIDS and lymphoma, asked his physician for drugs to hasten his inevitable death after enduring four excruciatingly painful months because he did not wish to die in a hospital in a drug-induced stupor. His doctor, Dr. Harold Glucksberg, one of the physician plaintiffs in this case, refused because he feared prosecution under Washington Statute RCW 9A.36.060. Denied medical assistance, the patient ended his life by jumping from the West Seattle bridge and plummeting to his death.[125] Fortunately, he did not survive the plunge and require permanent hospitalization in an even more exacerbated state of pain.

Deprived of physician assistance, another terminally ill patient took his own life by withholding his insulin and letting himself die of insulin shock.[126] Like many terminally ill patients, one individual killed himself in a secretive and lonely fashion, in order to spare his family from possible criminal charges; as a result he was deprived of a chance to die in a dignified manner with his loved ones at his side. The man's daughter described her father's death this way:

When he realized that my family was going to be away for a day, he wrote us a beautiful letter, went down to his basement, and

---

nally ill) violate Millsian principles and should, as a matter of policy, be repealed, the decision as to whether to do so should be made at the state level by voters and legislators. His reasoning for leaving the question to the states is based in part on his belief that moral values are sometimes coterminous with state boundaries, and that a national rule would be premature. He uses as an example the case of abortion, suggesting that *Roe v. Wade* wrongfully preempted the ability of individual states to resolve that issue properly.

One problem with allowing each state to decide whether to *prohibit* the exercise of a liberty interest is the human suffering that results from a patchwork-quilt pattern of prohibitory legislation. Permitting assisted suicide in one state but

prohibiting it in a neighboring one can easily lead to entangled legal battles in which the dying patient or his family tries to obtain approval for his transfer to the more permissive state. The unseemly legal struggle that ensues turns out all too often to have been academic, since by the time the matter is resolved, the patient has suffered the distressing fate he sought to avoid.

**125.** *Compassion In Dying*, 850 F.Supp. at 1458, and Declaration of Harold Glucksberg, M.D., at 5–6.

**126.** Brief of Amicus Curiae of Ten Surviving Family Members in Support of Physician–Assisted "Suicide" at 4–5.

shot himself with his 12 gauge shot gun. He was 84 ... My son-in-law then had the unfortunate and unpleasant task of cleaning my father's splattered brains off the basement walls.[127]

The plaintiffs also produced testimony showing that some terminally ill patients who try to kill themselves are unsuccessful, maiming instead of killing themselves, or that they succeed only after subjecting themselves to needless, excruciating pain.[128] One such terminally ill patient, a mentally competent woman in her 80s suffering from metastatic breast cancer, sought medication to hasten her death from her primary care physician, Dr. Abigail Halperin, one of the physician plaintiffs in this case. Although Dr. Halperin believed, in her professional judgment, that she should accommodate her patient's wishes, she did not do so because she feared prosecution under Washington statute RCW 9A.36.060. The patient acted on her own to hasten her death by placing a plastic bag over her head, securing it so no more air could enter. She suffocated to death, an end that was certainly more painful and inhumane than the death she would have experienced had she been given the prescriptions she sought.[129]

Next, the plaintiffs produced testimony showing that many terminally ill patients are physically or psychologically unable to take their lives by the violent means that are almost always their only alternatives in the absence of assistance from a physician. One man declared that his terminally ill wife "wanted to die but we did not know how to do it. We could not ask her doctors ... She feared over-the-counter pills, hearing of all the cases where the person woke up a vegetable. Carbon monoxide was out since she wanted the dignity of dying in her own bed, surrounded by the things she loved." [130] Another woman told how her father, "to whom dignity was very important, lay dying, diapered, moaning in pain, begging to die." [131]

Following the approach of the Court in *Casey*, 505 U.S. at 891, 112 S.Ct. at 2828, we note that there is also an extensive body of legal,[132] medical,[133] and sociological literature,[134] lending support to the conclusion that a prohibition on physician assistance imposes an onerous burden on terminally ill, competent adults who wish to hasten their deaths. That conclusion is further buttressed by extensive anecdotal evidence compiled in newspapers [135] and

127. *Id.* at 7

128. *See* Declaration of John P. Geyman, M.D., ER at 205–206.

129. *Compassion In Dying*, 850 F.Supp. at 1458, and Declaration of Abigail Halperin, M.D., at 4–5.

130. Brief of Amicus Curiae of Ten Surviving Family Members in Support of Physician–Assisted "Suicide" at 6.

131. *Id.*

132. Ronald Dworkin, *Life's Dominion: An Argument About Abortion, Euthanasia, And Individual Freedom* 179–217 ("Dying And Living") (1993); Robert A. Sedler, *The Constitution and Hastening Inevitable Death*, Hastings Center Rep. 676 (1993).

133. Lonny Shavelson, M.D., *A Chosen Death: The Dying Confront Assisted Suicide* (1995); Timothy E. Quill, M.D., *Death and Dignity: Making Choices and Taking Charge* 98–120 ("Limitations of comfort Care") (1993); Franklin G. Miller, et al., *Regulating Physician–Assisted Death*, 331 New Eng.J.Med. 119 (1994); Howard Brody,

*Assisted Death: A Compassionate Response to Medical Failure*, 327 N.Engl.J.Med. 1384 (1992).

134. Russel D. Ogden, *Euthanasia, Assisted Suicide & AIDS* (1994).

Derek Humphrey's *Final Exit: The Practicalities of Self–Deliverance and Assisted Suicide for the Dying*, which shot to the top of the New York Times best seller list for 18 weeks when it was released in 1991, provides graphic practical advice for how terminally ill patients can kill themselves and for how family members can assist them. Chapter titles include the following: Bizarre Ways to Die, Self Starvation, Storing Drugs, and Self–Deliverance Via the Plastic Bag.

135. In North Carolina, for example, an elderly woman helped her 81–year–old sister, who had a painful, degenerative heart condition, kill herself after her sister begged repeatedly for assistance in ending her life. The woman "hooked vacuum cleaner hose to the end of the exhaust pipe of the family car, gave her sister the other end of the hose, said good-bye, and left, closing the garage door." Shaffer at 360 n. 79.

A 67–year–old retired engineer helped his wife of 42 years who was suffering from cancer to

magazines.[136] Although the statute at issue does not totally prohibit the exercise of the liberty interest by all who possess it, it does effectively prohibit its exercise by almost all of the terminally ill. In fact, as applied, the ban on the liberty interest is close to complete; for, there are few terminally ill persons who do not obtain illicit help from someone in the course of their efforts to hasten their deaths.

There is an additional burden on loved ones and family members that is often overlooked. Some terminally ill persons enlist their children, parents, or others who care for them deeply, in an agonizing, brutal and damaging endeavor, criminalized by the state, to end their pain and suffering. The loving and dedicated persons who agree to help—even if they are fortunate enough to avoid prosecution, and almost all are—will likely suffer pain and guilt for the rest of their lives. Those who decline to assist may always wonder whether they should have tried to save their parent or mate from enduring, unnecessary and protracted agony. This burden would be substantially alleviated if doctors were authorized to assist terminally ill persons to end their lives and to supervise and direct others in the implementation of that process.

### E. The Consequences of Upholding or Overturning the Statutory Provision

In various earlier sections of this opinion, we have discussed most of the consequences of upholding or overturning the Washington statutory provision at issue, because in this case those consequences are best considered as part of the discussion of the specific factors or interests. The one remaining consequence of significance is easy to identify: Whatever the outcome here, a host of painful and agonizing issues involving the right to die will continue to confront the courts. More important, these problems will continue to plague growing numbers of Americans of advanced age as well as their families, dependents, and loved ones. The issue is truly one which deserves the most thorough, careful, and objective attention from all segments of society.

### VI.

### Application of the Balancing Test and Holding

Weighing and then balancing a constitutionally-protected interest against the state's countervailing interests, while bearing in mind the various consequences of the decision, is quintessentially a judicial role. Despite all of the efforts of generations of courts to categorize and objectify, to create multi-part tests and identify weights to be attached to the various factors, in the end balancing entails the exercise of judicial judgment rather than the application of scientific or mathematical formulae. No legislative body can perform the task for us. Nor can any computer. In the end, mindful of our constitutional obligations, including the limitations imposed on us by that document, we must rely on our judgment, guided by the facts and the law as we perceive them.

As we have explained, in this case neither the liberty interest in choosing the time and manner of death nor the state's countervailing interests are static. The magnitude of each depends on objective circumstances and generally varies inversely with the other. The liberty interest in hastening death is at its strongest when the state's interest in

commit suicide by preparing an overdose of sedatives, sitting with her as she took them, and then helping place a plastic bag over her head. Under Florida statutes, the man faced a 15–year maximum penalty. *Id.* at n. 79.

*See also* Dudley Clendinen, When Death is a Blessing and Life Is Not, N.Y. Times, at A15, Feb. 5, 1996; Clyde H. Farnsworth, Bungled AIDS Suicides Often Increase the Suffering, N.Y. Times, June 14, 1994, at B9; Clyde H. Farnsworth, Woman Who Lost a Right–to–Die Case in Canada Commits Suicide, N.Y. Times, Feb. 15, 1994, at A13; AP, Right to Die Fails; Rancher

Kills Self, St. Petersburg Times, Nov. 22, 1991, at A8 (describing a California man suffering from leukemia and diabetes who arranged to end his life with help from his physician but killed himself with a shotgun blast to his head after a California initiative legalizing assisted suicide failed at the polls).

**136.** Andrew Solomon, A Death of One's Own, The New Yorker, May 22, 1995, at 54; Lisa Belkin, There's No Simple Suicide, N.Y. Times Mag., Nov. 14, 1992, § 6 at 48–55, 63, 74–75.

protecting life and preventing suicide is at its weakest, and vice-versa.

The liberty interest at issue here is an important one and in, the case of the terminally ill, is at its peak. Conversely, the state interests, while equally important in the abstract, are for the most part at a low point here. We recognize that in the case of life and death decisions the state has a particularly strong interest in avoiding undue influence and other forms of abuse. Here, that concern is ameliorated in large measure because of the mandatory involvement in the decision-making process of physicians, who have a strong bias in favor of preserving life, and because the process itself can be carefully regulated and rigorous safeguards adopted. Under these circumstances, we believe that the possibility of abuse, even when considered along with the other state interests, does not outweigh the liberty interest at issue.

The state has chosen to pursue its interests by means of what for terminally ill patients is effectively a total prohibition, even though its most important interests could be adequately served by a far less burdensome measure. The consequences of rejecting the as-applied challenge would be disastrous for the terminally ill, while the adverse consequences for the state would be of a far lesser order. This, too, weighs in favor of upholding the liberty interest.

We consider the state's interests in preventing assisted suicide as being different only in degree and not in kind from its interests in prohibiting a number of other medical practices that lead directly to a terminally ill patient's death. Moreover, we do not consider those interests to be significantly greater in the case of assisted suicide than they are in the case of those other medical practices, if indeed they are greater at all. However, even if the difference were one of kind and not degree, our result would be no different. For no matter now much weight we could legitimately afford the state's inter-

est in preventing suicide, that weight, when combined with the weight we give all the other state's interests, is insufficient to outweigh the terminally ill individual's interest in deciding whether to end his agony and suffering by hastening the time of his death with medication prescribed by his physician. The individual's interest in making that vital decision is compelling indeed, for no decision is more painful, delicate, personal, important, or final than the decision how and when one's life shall end. If broad general state policies can be used to deprive a terminally ill individual of the right to make that choice, it is hard to envision where the exercise of arbitrary and intrusive power by the state can be halted. In this case, the state has wide power to regulate, but it may not *ban* the exercise of the liberty interest, and that is the practical effect of the program before us. Accordingly, after examining one final legal authority, we hold that the "or aids" provision of Washington statute RCW 9A.36.06 is unconstitutional as applied to terminally ill competent adults who wish to hasten their deaths with medication prescribed by their physicians.[137]

## A.

### One Possible Obstacle

The final legal obstacle we examine is an opinion of the District Court of Oregon issued after the panel decision in this case. In *Lee v. State of Oregon,* 891 F.Supp. 1429, 1438 (D.Or.1995), Chief Judge Hogan held that the Oregon Death With Dignity Act, a voter initiative that permits doctors to prescribe medications for terminally ill patients for use in ending their lives, violates the Equal Protection Clause of the Fourteenth Amendment because it deprives terminally ill persons of a *benefit* that is afforded to the non-terminally ill. The *benefit* that the Oregon District Court thought the terminally ill were being deprived of is an Oregon statutory *prohibition* making it a crime for anyone,

---

137. While in balancing the competing interests we employ the approach the Court set forth in *Cruzan,* the outcome would be the same *a fortiori* were we to use the "undue burden" test that the District Court employed. *Compassion In Dying,* 850 F.Supp. at 1462–64. There can be no doubt

whatsoever that Washington's ban on assisted suicide places a "substantial obstacle" in the path of terminally ill, competent adults who wish to choose the time and manner of their deaths. *Casey* at 875, 112 S.Ct. at 2820.

including doctors, to assist any person, including terminally ill patients, to end their lives, by providing medical assistance or otherwise. The Oregon District Court's reasoning conflicts squarely with the reasoning of this opinion and with the legal conclusions we have reached. Here, we determine that a statute that prohibits doctors from aiding terminally ill persons to hasten their deaths by providing them with prescription medications unconstitutionally *burdens* the liberty interests of the terminally ill. The *benefit* we conclude the terminally ill are entitled to receive in this case—the right to physician-assisted suicide—is precisely what Judge Hogan determined to be a *burden* and thus unlawful. In short, *Lee* treats a *burden* as a *benefit* and a *benefit* as a *burden.* In doing so, Judge Hogan clearly erred. *Lee* not only does not aid us in reaching our decision, it's reasoning is directly contrary to our holding.[138]

## B.

### Is There An Equal Protection Violation?

In the case before us, Chief Judge Rothstein struck down the "or aids" provision of the Washington statute as it applies to the terminally ill, not only on due process grounds but also on the ground that it violates the Equal Protection Clause. Because we are convinced that her first reason is correct, we need not consider the second. One constitutional violation is enough to support the judgment that we reach here.[139]

## VII.

### Conclusion

We hold that a liberty interest exists in the choice of how and when one dies, and that the provision of the Washington statute banning assisted suicide, as applied to competent, terminally ill adults who wish to hasten their deaths by obtaining medication prescribed by their doctors, violates the Due Process Clause.[140] We recognize that this decision is a most difficult and controversial one, and that it leaves unresolved a large number of equally troublesome issues that will require resolution in the years ahead. We also recognize that other able and dedicated jurists, construing the Constitution as they believe it must be construed, may disagree not only with the result we reach but with our method of constitutional analysis. Given the nature of the judicial process and the complexity of the task of determining the rights and interests comprehended by the Constitution, good faith disagreements within the judiciary should not surprise or disturb anyone who follows the development of the law. For these reasons, we express our hope

138. We note, incidentally, that if *Lee*'s equal protection analysis were correct, we could not examine the as-applied due process violation we examine here, or arrive at the limited holding we do. A ruling in favor of the terminally ill that was not equally applicable to all other persons would, under *Lee*, violate the Equal Protection Clause. Thus *Lee* would require us to determine whether the entire "or aids" provision of the statute is unconstitutional on its face. Because the rationale on which *Lee* was decided was clearly erroneous, we need not undertake that task.

139. Unlike *Lee*'s highly irregular equal protection holding—that no rational basis exists for a state's allowing the *terminally ill* to receive medical assistance that will enable them to hasten their deaths while preventing the *young and healthy* from receiving similar medical assistance—the equal protection argument relied on by Chief Judge Rothstein is not insubstantial. Judge Rothstein based her equal protection determination on the difference in the statutory treatment afforded 1) those terminally ill persons who are being kept alive through medical treatment (including the use of artificial medical devices) whose deaths can be brought about by the withdrawal of that treatment and 2) those terminally ill people who have no means of accelerating their deaths unless their doctor provides them with medical assistance. She concluded that it was unconstitutional to permit doctors to take actions that would permit the first group of terminally ill persons to die in comfort while preventing doctors from providing such services to the second group.

140. We would add that those whose services are essential to help the terminally ill patient obtain and take that medication and who act under the supervision or direction of a physician are necessarily covered by our ruling. That includes the pharmacist who fills the prescription; the health care worker who facilitates the process; the family member or loved one who opens the bottle, places the pills in the patient's hand, advises him how many pills to take, and provides the necessary tea, water or other liquids; or the persons who help the patient to his death bed and provide the love and comfort so essential to a peaceful death.

that whatever debate may accompany the future exploration of the issues we have touched on today will be conducted in an objective, rational, and constructive manner that will increase, not diminish, respect for the Constitution.

There is one final point we must emphasize. Some argue strongly that decisions regarding matters affecting life or death should not be made by the courts. Essentially, we agree with that proposition. In this case, by permitting the *individual* to exercise the right to *choose* we are following the constitutional mandate to take such decisions out of the hands of the government, both state and federal, and to put them where they rightly belong, in the hands of the people. We are allowing individuals to make the decisions that so profoundly affect their very existence—and precluding the state from intruding excessively into that critical realm. The Constitution and the courts stand as a bulwark between individual freedom and arbitrary and intrusive governmental power. Under our constitutional system, neither the state nor the majority of the people in a state can impose its will upon the individual in a matter so highly "central to personal dignity and autonomy," *Casey*, 505 U.S. at 851, 112 S.Ct. at 2807. Those who believe strongly that death must come without physician assistance are free to follow that creed, be they doctors or patients. They are not free, however, to force their views, their religious convictions, or their philosophies on all the other members of a democratic society, and to compel those whose values differ with theirs to die painful, protracted, and agonizing deaths.

AFFIRMED.

BEEZER, Circuit Judge, Dissenting:

Wash.Laws 1975, 1st Ex.Sess., ch. 260, § 9A.36.060 says:

PROMOTING A SUICIDE ATTEMPT.

(1) A person is guilty of promoting a suicide attempt when he knowingly causes or aids another person to attempt suicide.

(2) Promoting a suicide attempt is a Class C felony.

This law is codified as RCW 9A.36.060. A Class C felony is punishable by imprisonment of up to five years and a fine of up to $10,000. RCW 9A.20.020(1)(c).

The question is whether Washington's criminal prohibition of promoting a suicide attempt, defined as knowingly causing or aiding another person to attempt suicide, violates the constitutional substantive due process or equal protection rights of mentally competent, terminally ill adults to commit physician-assisted suicide. The district court held the Washington statute unconstitutional and I would reverse.

To succeed in arguing that a statute violates substantive due process, the party challenging the statute must show either: (1) that the statute violates a fundamental right and is not narrowly tailored to serve a compelling state interest, or (2) that the statute violates an ordinary, nonfundamental, liberty interest and does not rationally advance some legitimate governmental purpose. *Reno v. Flores*, 507 U.S. 292, 301–306, 113 S.Ct. 1439, 1447–1449, 123 L.Ed.2d 1 (1993). I would hold that the mentally competent, terminally ill adults do not have a fundamental right to physician-assisted suicide, but I would hold that they do have an ordinary, nonfundamental, liberty interest in doing so. I would further hold that RCW 9A.36.060 rationally advances four legitimate governmental purposes: preserving life, protecting the interests of innocent third parties, preventing suicide and maintaining the ethical integrity of the medical profession. Because RCW 9A.36.060 rationally advances these four legitimate governmental purposes, it does not violate plaintiffs' constitutional substantive due process rights.

Likewise, I would hold that RCW 9A.36.060 does not violate plaintiffs' constitutional equal protection rights. Plaintiffs are not similarly situated to patients who wish to refuse or withdraw life-sustaining medical treatment, so an equal protection analysis is not even appropriate. If it were appropriate, I would hold that RCW 9A.36.060 rationally advances four legitimate legislative goals and does not violate plaintiffs' constitutional equal protection rights.

## I

It is imperative that I make clear what I mean by physician-assisted suicide. The process should be distinguished definitionally from both euthanasia and the withdrawal or refusal of life-sustaining treatment.

Euthanasia occurs when the physician actually administers the agent which causes death. An example is when a physician injects the patient with a poisonous substance. A gray area between euthanasia and bona fide treatment arises when, for example, a physician administers ever-increasing doses of palliative pain-killing medication, and those doses eventually reach toxic levels.

Life-sustaining treatment is defined in Washington as "any medical means that uses mechanical or other artificial means, including artificially provided nutrition and hydration, to sustain, restore, or replace a vital function, which, when applied to a qualified patient, would serve only to prolong the process of dying. [It does not include treatment] deemed necessary solely to alleviate pain." RCW 70.122.020(5). A patient has a nonfundamental constitutionally protected liberty-based right to refuse or withdraw life-sustaining treatment, including respirators and artificial nutrition and hydration. *See Cruzan v. Director, Missouri Dep't of Health*, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). In Washington, that right is also explicitly guaranteed by the Natural Death Act, RCW 70.122.010 *et seq.*

Physician-assisted suicide encompasses the situation where a physician makes available to a patient the means for that patient intentionally to cause his or her own death. For example, physician-assisted suicide would be the proper description of a process in which a physician, with the intent to assist a patient to commit suicide, prescribes medication which, when taken by the patient in sufficient potency and quantity, is lethal. The prescription may be part of a bona fide treatment, or it may be specifically prescribed as a means by which the patient commits suicide.

In all three sorts of cases, euthanasia, withdrawal of life-sustaining treatment, and physician-assisted suicide, there is a decision that other factors outweigh the patient's continuing to live. Plaintiffs ask us to blur the line between withdrawal of life-sustaining treatment and physician-assisted suicide. At the same time, some proponents of physician-assisted suicide would maintain a conceptual distinction between physician-assisted suicide and euthanasia. Associating physician-assisted suicide with a relatively accepted procedure and dissociating it from an unpalatable one are rhetorically powerful devices, but run counter to U.S. Supreme Court precedent,[1] Washington State statutory law,[2] medical ethics guidelines of the American Medical Association and the American College of Physicians,[3] and legal reasoning.[4]

The proper place to draw the line is between withdrawing life-sustaining treatment (which is based on the right to be free from unwanted intrusion) and physician-assisted suicide and euthanasia (which implicate the assistance of others in controlling the timing and manner of death). The former is constitutionally protected (under *Cruzan*); the latter are not.

---

1. *Cruzan v. Director, Mo. Dep't of Health*, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (assuming the existence of a constitutional right to be free from unwanted life-sustaining medical treatment, but implying the constitutionality of prohibitions of assisted suicide).

2. *Compare* RCW 9A.36.060 (prohibiting the promotion of a suicide attempt) *with* RCW 70.122.010 *et seq.* (authorizing people to give directives to withhold or withdraw life-sustaining medical treatment).

3. American Medical Association, *Code of Medical Ethics and Current Opinions of the Council on Ethical and Judicial Affairs* 2.20 (withholding or withdrawing life-sustaining medical treatment),

2.21 (euthanasia), 2.211 (physician-assisted suicide). *See also* American College of Physicians, *Ethics Manual*, 117 *Annals of Internal Medicine* (Dec. 1992) (reprinted in Codes of Professional Responsibility 237, 252 (Rena A. Gorlin, ed., 3d. ed. 1994)).

4. *See, e.g.* Yale Kamisar, "Against Assisted Suicide—Even a Very Limited Form," 72 **U.Det.Mercy L.Rev.** 735, 757 (1995) ("I share the view of the New York State Task Force on Life and the Law that it is 'this right against intrusion—not a general right to control the timing and manner of death—that forms the basis of the constitutional right to refuse life-sustaining treatment.'").

## II

There are several jurisdictional and prudential concerns which I consider before addressing the merits of this appeal.

### A. Procedural posture

This is an interlocutory appeal from the district court's grant of partial summary judgment in favor of plaintiff patients and physicians, insofar as the physicians represent the interests of their patients. The partial summary judgment has been certified as final pursuant to Fed.R.Civ.P. 54(b). Plaintiff Compassion in Dying is not a party to this appeal; neither are plaintiff physicians, insofar as they represent their own interests.

Three groups, representing four sets of interests, filed this action in the U.S. District Court for the Western District of Washington, seeking a declaration that RCW 9A.36.060 violates the Due Process and Equal Protection Clauses of the United States Constitution. The groups also sought to enjoin the State of Washington from enforcing the statute.

The first plaintiff is Compassion in Dying, a Washington nonprofit corporation organized to assist mentally competent, terminally ill patients in committing suicide by providing them information, counselling and emotional support. The second group of plaintiffs consisted of three mentally competent, terminally ill patients, litigating under pseudonyms: Jane Roe, John Doe, and James Poe. All three are now dead. The third group consists of four physicians licensed by the State of Washington to practice medicine and surgery (Drs. Glucksberg, Preston, Halperin, and Shalit), representing their own interests and those of their patients. *Compassion in Dying v. Washington,* 850 F.Supp. 1454, 1457–1458 (W.D.Wash. 1994).

Defendants in this action are the State of Washington ("the State") and Christine Gregoire, the Attorney General of Washington. In suits against the State, the Attorney General is designated by statute as the person to receive service of the summons and complaint and to appear and act as counsel for the State. RCW 4.92.020, 4.92.030.

On cross-motions for summary judgment, the district court granted only the motions of the patients and of the physicians "insofar as the physicians purport to raise claims on behalf of their terminally ill patients." *Compassion in Dying,* 850 F.Supp. at 1457. It denied the motions of Compassion in Dying, the physicians on behalf of themselves, and the State. The district court also declined to enjoin the State from enforcing the statute. The district court found that the statute violated the patients' equal protection and due process rights.

The State appealed, and a panel of this court filed an opinion reversing the district court. *Compassion in Dying,* 49 F.3d 586 (9th Cir.1995). A majority of the active judges of this court voted to grant a rehearing en banc. *Compassion in Dying,* 62 F.3d 299 (9th Cir.1995).

The district court's grant of summary judgment is reviewed de novo. *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir. 1995). There are no factual issues in dispute; the only issues are constitutional.

### B. Mootness

Because the plaintiff patients have all died, the case is now moot as to them. The only remaining plaintiffs who were parties to the partial summary judgment are the plaintiff physicians, insofar as they represent the interests of their patients.

### C. Standing

"[T]o satisfy the 'case' or 'controversy' requirement of Article III of the United States Constitution, a plaintiff must allege a present or immediate injury in fact which is fairly traceable to the challenged action and is likely to be redressed by a favorable court decision." *Board of Natural Resources v. Brown,* 992 F.2d 937, 945 (9th Cir.1993). The plaintiff physicians assert a sufficient injury in fact to satisfy Article III's standing requirements. *See Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (liquor store owner had standing to challenge restriction on selling beer with 3.2% alcohol

content to 18–20 year-old males). The physicians' injury is fairly traceable to the challenged statute, and the relief sought will redress their harm.

When one party asserts the rights of another party, there is also a prudential component to standing. This prudential component consists of three factors: "the relationship of the litigant to the person whose rights are being asserted; the ability of the person to advance his own rights; and the impact of the litigation on third party interests." *Caplin & Drysdale Chartered v. United States,* 491 U.S. 617, 623 n. 3, 109 S.Ct. 2646, 2651 n. 3, 105 L.Ed.2d 528 (1989). In the abortion context, physicians may assert the rights of their patients. *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). The same reasoning, regarding *jus tertii* standing based on the physician-patient relationship, applies in this case. In *Quill v. Koppell,* 870 F.Supp. 78 (S.D.N.Y.1994),[5] a case similar to this one, the district court for the Southern District of New York held that physician plaintiffs do have standing to represent the interests of their patients, apparently on the theory that the physicians are in a special relationship with their patients in respects relevant to the alleged right. *Id.* at 82.

### III

Plaintiffs' challenge to the Washington statute is "as applied." Challenges to a statute may either be facial or as applied. Justice Scalia concisely summarizes the operation of facial and as applied challenges:

Statutes are ordinarily challenged, and their constitutionality evaluated, "as applied"—that is, the plaintiff contends that the application of the statute in the particular context in which he has acted, or in which he proposes to act, would be unconstitutional. The practical effect of holding a statute unconstitutional "as applied" is to prevent its future application in a similar context but not to render it utterly inoperative. To achieve the latter result, the plaintiff must succeed in challenging the

statute "on its face." Our traditional rule has been, however, that a facial challenge must be rejected unless there exists *no set of circumstances* in which the statute can constitutionally be applied. See, *e.g., United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987).

*Ada v. Guam Society of Obstetricians and Gynecologists,* 506 U.S. 1011, 1012, 113 S.Ct. 633, 634, 121 L.Ed.2d 564 (1992) (Scalia, J., dissenting from denial of certiorari). *See also, e.g., Frazier v. Heebe,* 482 U.S. 641, 643, 107 S.Ct. 2607, 2610, 96 L.Ed.2d 557 (1986) (petition alleged unconstitutionality of a regulation on its face and as applied); *United States v. James Daniel Good Real Property,* 510 U.S. 43, ——, 114 S.Ct. 492, 513, 126 L.Ed.2d 490 (1993) (O'Connor, J., concurring in part, dissenting in part) (characterizing the constitutional challenge in that case as "as applied").

The district court characterizes plaintiffs' challenge as "facial." *Compassion in Dying,* 850 F.Supp. at 1459. The district court's characterization is apparently due to the fact that the action is a preenforcement review seeking a declaratory judgment. It has not yet been "applied" to the plaintiffs, in the sense that no party to this action has been prosecuted. This is an incorrect usage of the "facial" and "as applied" distinction.

In *Salerno,* the Supreme Court described what is necessary to succeed in a facial constitutional challenge to a statute:

A facial challenge to a statute is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid. The fact that the [statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an "overbreadth" doctrine outside the limited context of the First Amendment.

481 U.S. at 745, 107 S.Ct. at 2100.

Plaintiffs here do not challenge the applicability and constitutionality of the statute

---

**5.** The appeal in this case was heard on September 1, 1995 under the name *Quill v. Vacco,* 80 F.3d 716 (2d Cir.1996).

to, for example, prison inmates who incite their coprisoners to suicide. Rather, as the district court states, "Plaintiffs challenge the statute only insofar as it bans physician-assisted suicide by mentally competent, terminally ill adults who knowingly and voluntarily choose to hasten their death." *Compassion in Dying*, 850 F.Supp. at 1456. Because plaintiffs have made no attempt to demonstrate that there is *no* set of circumstances under which the statute would be valid, their challenge cannot be facial under *Salerno*.

Analyzing RCW 9A.36.060, the district court concludes "that the *Casey* 'undue burden' standard, set forth by the Supreme Court five years after *Salerno*, controls in this case." *Compassion in Dying*, 850 F.Supp. at 1462 (citing *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 907–910, 112 S.Ct. 2791, 2836–2837, 120 L.Ed.2d 674 (1992) ("*Casey*")). The district court relies on two Court of Appeals cases and a concurrence by Justice O'Connor to support the proposition that *Casey* and *Salerno* conflict with each other. *Id.* at 1463. All of the cases cited by the district court deal with the abortion context.

To date, the Supreme Court has not extended *Casey*'s undue burden test beyond abortion cases. *See Planned Parenthood of Southeastern Pennsylvania v. Casey*, 510 U.S. 43, ——, 114 S.Ct. 909, 911, 127 L.Ed.2d 352 (1994) (Souter, J., in chambers) (describing the undue burden test as "the standard for assessing constitutionality of abortion regulation") ("*Casey II*"). The language of *Casey* supports the proposition that the undue burden test is unique to the abortion right and derived from the right itself. As restated by *Casey*, the essence of the abortion right is "the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State." *Casey*, 505 U.S. at 846, 112 S.Ct. at 2804.

Since *Casey*, the Court has continued to expressly rely on *Salerno* for facial challenges in non-abortion contexts. *E.g., Anderson v. Edwards*, —— U.S. ——, —— – —— n. 6, 115 S.Ct. 1291, 1298–1299 n. 6, 131 L.Ed.2d 178 (1995); *Reno v. Flores*, 507 U.S. at 301, 113 S.Ct. at 1446.

Applying the *Salerno* analysis to RCW 9A.36.060, the group affected by the statute consists of all people who attempt suicide with someone else's assistance or encouragement. This includes prisoners encouraged by their cellmates, depressed teenagers in suicide pacts, ailing persons of advanced age assisted by their spouses, *and* mentally competent terminally ill adults seeking the assistance of a physician in committing suicide. The group allegedly enjoying constitutional protection consists only of mentally competent, terminally ill adults seeking the assistance of a physician in committing suicide. The entire group affected by the statute is not a subset of those claiming constitutional protection; rather, only a portion of the group affected by the statute overlaps with the group claiming constitutional protection. The inquiry in *Salerno* for the permissibility of a facial challenge is what proportion of the instances of application of the statute will impede constitutional rights. If the answer in the *Salerno* inquiry is less than 100%, then a facial challenge is impermissible.

The challenge of RCW 9A.36.060 cannot be a facial challenge. It is an "as applied" challenge. Because the challenge is "as applied," the fact that there has been no violation of the statute or threatened prosecution for a violation of the statute implicates straightforward ripeness concerns.

## IV

The doctrine of ripeness contains two criteria: (1) hardship to parties in delaying resolution of the issues; (2) fitness of issues for judicial resolution. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). The legal issues are fit for judicial resolution. Waiting for further factual development would require someone to attempt physician-assisted suicide, and for that person's physician to face reasonably foreseeable prosecution under the statute. This is a ripe and justiciable controversy.

It has been suggested that *Poe v. Ullman*, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989

(1961) might control the ripeness inquiry in this case. *Poe* does not apply here. In *Poe*, the Supreme Court held unripe a challenge by a physician and patients to a Connecticut statute prohibiting the use of contraceptive devices and the giving of medical advice about the use of such devices. The statute had been on the books since 1879, but had been enforced only once in the ensuing eight decades—and that case was a test case in 1940 that was ultimately dismissed. Additionally, contraceptives were "commonly and notoriously" sold in drug stores in Connecticut. Accordingly, the Supreme Court determined that there had been an "undeviating policy of nullification by Connecticut of its anti-contraceptive laws." *Poe*, 367 U.S. at 502, 81 S.Ct. at 1755. It added, " 'Deeply embedded traditional ways of carrying out state policy . . .'—or not carrying it out—'are often tougher and truer law than the dead words of the written text.' " *Id.* (citation omitted). The Court concluded that there was no "realistic fear of prosecution" and therefore no justiciable controversy ripe for adjudication. *Poe*, 367 U.S. at 508, 81 S.Ct. at 1758.

Though the history of RCW 9A.36.060 bears some similarities to the statute in *Poe*, the cases may be readily distinguished. In *Poe*, the statute had been on the books for a very long time, and it had never been enforced. And there was more than just a pattern of nonenforcement; the statute was openly and notoriously violated on a regular basis. RCW 9A.36.060 has similarly been on

the books, in one form or another, since 1854. But it has been enforced. *E.g., State v. Jamison*, 94 Wash.2d 663, 619 P.2d 352 (1980). Further, the factual circumstances in this case are different. First, there is no evidence that the Washington statute is at all "commonly and notoriously" flouted, particularly in the narrow circumstances of physician-assisted suicide for the mentally competent and terminally ill. Second, the issue of physician-assisted suicide as a plausible medical alternative is relatively new. Only since Dr. Kevorkian started assisting patients to commit suicide in Michigan in 1990 has there been significant public and legal attention to the possible differences between physician-assisted suicide and ordinary cases of aiding and abetting suicide. Research indicates at least a dozen prosecutions in states other than Washington of suicide-assisters since 1961.[6] Additionally, there have been a number of murder prosecutions of people who were more actively involved in helping others end their lives (i.e. these defendants actually pulled the trigger or committed similar active steps to cause death).[7]

A limited reading of *Poe* is consistent with intervening Supreme Court precedent. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302, 99 S.Ct. 2301, 2310–11, 60 L.Ed.2d 895 (1979) ("when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative a plaintiff need not 'first expose himself to actual arrest or prosecution to be

---

**6.** Research reveals that suicide-assisters were sometimes charged with involuntary manslaughter, or even murder, rather than with assisting suicide. All the cited cases involve the prosecution of someone else when the decedent actually caused his or her own death. *City of Akron v. Head*, 73 Ohio Misc.2d 67, 657 N.E.2d 1389 (Ohio Mun.1995); *People v. Kevorkian*, 447 Mich. 436, 527 N.W.2d 714 (1994), *cert. denied,* ——— U.S. ———, 115 S.Ct. 1795, 131 L.Ed.2d 723 (1995) (holding that Dr. Kevorkian may be prosecuted either under a Michigan statute—held to be constitutional—or under the common-law felony of assisting suicide); *People v. Duffy*, 185 A.D.2d 371, 586 N.Y.S.2d 150 (N.Y.App.Div. 1992); *State v. Bauer*, 471 N.W.2d 363 (Minn. App.1991); *People v. Cleaves*, 229 Cal.App.3d 367, 280 Cal.Rptr. 146 (Cal.App.1991); *Hinson v. State*, 18 Ark.App. 14, 709 S.W.2d 106 (1986); *Chanslor v. State*, 697 S.W.2d 393 (Tex.Cr.App.

1985); *People v. Campbell*, 124 Mich.App. 333, 335 N.W.2d 27 (1983); *State v. Marti*, 290 N.W.2d 570 (Iowa 1980); *State v. Bier*, 181 Mont. 27, 591 P.2d 1115 (1979); *Commonwealth v. Swartzentruver*, 256 Pa.Super. 546, 389 A.2d 181 (Pa.Super.Ct.1978); *Persampieri v. Commonwealth*, 343 Mass. 19, 175 N.E.2d 387 (1961).

**7.** *Edinburgh v. State*, 896 P.2d 1176 (Okla.Crim. App.1995); *State v. Sexson*, 117 N.M. 113, 869 P.2d 301 (N.M.App.), *cert. denied,* 117 N.M. 215, 870 P.2d 753 (N.M.1994); *Gentry v. State*, 625 N.E.2d 1268 (Ind.App.1993); *Goodin v. State*, 726 S.W.2d 956 (Tex.App.1987); *People v. Thomas C.*, 183 Cal.App.3d 786, 228 Cal.Rptr. 430 (Cal.App.1986); *Forden v. Joseph G.*, 34 Cal.3d 429, 194 Cal.Rptr. 163, 667 P.2d 1176 (Cal. 1983); *State v. Fuller*, 203 Neb. 233, 278 N.W.2d 756 (1979).

entitled to challenge [the] statute'" (citation omitted)).

We have construed *Poe* narrowly as well. *San Francisco County Democratic Central Committee v. Eu,* 826 F.2d 814, 821 (9th Cir.1987), *aff'd,* 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989) (justiciable controversy exists over constitutionality of never-enforced statute where there is no record that the statute has been commonly and notoriously violated).

In short, there are no jurisdictional or prudential concerns which foreclose consideration of the constitutional issues presented by the parties to this appeal.

## V

I turn now to an historical account of the role of suicide and assisted suicide in the traditions and consciences of our forbears. Thomas Marzen *et al.* (Marzen) devote over eighty pages to a survey of the attitudes of the "Western Tradition" to suicide. Thomas Marzen *et al.,* "Suicide: A Constitutional Right?" 24 **Duq.L.Rev.** 1, 17–100. The "Western Tradition" has some of its roots in the laws and philosophy of Judeo–Christian groups; however, I am concerned here with the underlying moral and philosophical arguments, and their impact on the historical development of attitudes about suicide.

Here I recount and supplement salient portions of Marzen's account.

Marzen finds only eight instances of suicide in the Old Testament, including the Apocrypha. Seven of the eight instances were cases of ignoble death; the only exception is Samson's destruction of the Philistine temple. Marzen at 18. Marzen speculates that "[t]he infrequency of suicide among the Hebrews ... was most probably due to their religious creed's positive emphasis on the value of life and the special providence of God." Marzen at 20.

In Plato's philosophy, the ultimate good, aspiration to the realm of the gods and the Forms, is attainable only upon death. However, that death should not be hastened by suicide. Marzen at 21. As Socrates explained, "[I]t probably seems strange to you that it should not be right for those to whom

death would be an advantage to benefit themselves ... [but] we men are put in a sort of guard post, from which one must not release oneself or run away." Plato, *Phaedo* 62a–62b (in Edith Hamilton and Hungtington Cairns, eds., *Plato: The Collected Dialogues* 44–45, 1987). Plato views suicide as a breach of the relationship between the individual, the state, and the universe. "[W]hen suicide is a rational and deliberate choice, it is deemed to be a flagrant act of contempt for the state and an abandonment of duty to society and the divine order." Marzen at 23–24.

Aristotle echoed Plato's sentiments against suicide:

> To kill oneself to escape from poverty or love or anything else that is distressing is not courageous but rather the act of a coward, because it shows weakness of character to run away from hardships, and the suicide endures death not because it is a fine thing to do but in order to escape from suffering.

Marzen at 24 (quoting Aristotle, *Ethics* Bk. III, ch. 7 (J. Thompson, trans., 1977)).

By contrast, the Stoics endorsed suicide. As Marzen states, "the inevitability of death is the ultimate challenge to liberty ... [and one must] 'make death [one's] own in order to be free from it.'" Marzen at 25.

Roman law forbade suicide, and introduced the penalty of forfeiture of one's goods and property. Marzen at 26.

Between the decline of the Roman Empire and the rise of the Common Law, ecclesiastical law was a dominant force in the English legal order. *See* Sir Frederick Pollock and Frederic William Maitland, *The History of English Law,* vol. 1, pp. 1–20 (1968).

St. Augustine opposed suicide as violative of the sixth commandment ("Thou shalt not kill.") Marzen at 27. In his *Summa Theologica,* St. Thomas Aquinas stated that

> it is unlawful to kill oneself for three reasons[:] ... [first], suicide is contrary to the inclination of nature, and to charity whereby every man should love himself[;] ... [second], every man is part of the community, ... [and] by killing himself he injures

the community[;] ... [third], because life is God's gift to man, ... whoever takes his own life, sins against God.

St. Thomas Aquinas, *Summa Theologica*, II–II, q. 64, art. 5, (Fathers of the English Dominican Province, eds., vol. 2, pp. 1465 *et seq.*, 1947). Martin Luther and John Calvin also opposed suicide. Marzen at 31.

In the mid-thirteenth century, Henry de Bracton wrote that a felon committing suicide to escape punishment forfeited all his real property and movable goods, but a person committing suicide "in weariness of life or because he is unwilling to endure further bodily pain ... may have a successor [of his real property], but his movable goods are confiscated." 2 *Bracton on the Laws of England* 424 (fol. 150) (G. Woodbine ed., S. Thorne trans. 1968). "The principle that suicide of a sane person, for whatever reason, was a punishable felony was thus introduced into English common law." Marzen at 59. In 1644, Sir Edward Coke published his *Third Institute*, in which he treated suicide by a sane person as a form of murder. Marzen at 60–61.

In 1765, Sir William Blackstone condemned suicide in his *Commentaries on the Laws of England:*

[T]he suicide is guilty of a double offence; one spiritual, in invading the prerogative of the Almighty, and rushing into his immediate presence uncalled for; the other temporal, against the king, who hath an interest in the preservation of all his subjects; the law has therefore ranked this among the highest crimes, making it a peculiar species of felony, a felony committed on one's self.

William Blackstone, 4 *Commentaries* ch. 14, *189.

Among the philosophers who influenced America's founders, John Locke opposed suicide as against natural law and the principle of self-preservation. Marzen at 42.

The American colonies in the seventeenth century generally adopted the English common law criminal prohibitions of suicide. Marzen at 63–66. However, in 1701, William Penn abolished the criminal penalty of forfeiture for suicide, and most of the rest of the colonies (later states) followed suit by the end of the eighteenth century. Marzen at 65–68. Most states have adopted the English common law, to the extent that it does not conflict with state or federal statutory or constitutional requirements. Washington did so in 1862.[8]

Thomas Jefferson opposed criminal prohibitions of suicide, presaging the sentiments of the drafters of the Model Penal Code:

Men are too much attached to this life to exhibit frequent instances of depriving themselves of it. At any rate, the quasi-punishment of confiscation will not prevent it. For if one can be found who can calmly determine to renounce life, who is so weary of his existence here as rather to make experiment of what is beyond the grave, can we suppose him, in such a state of mind, susceptible to influence from the losses to his family by confiscation? That men in general disapprove of this severity is apparent from the constant practice of juries finding the suicide in a state of insanity; because they have no other way of saving the forfeiture.

Marzen at 45 (quoting Thomas Jefferson, 6 *The Papers of Thomas Jefferson* 155 (J.P. Boyd ed. 1952)).

By the turn of the nineteenth century, criminal penalties for suicide appear to have been abandoned in the United States. But the reason for doing so was not a recognition of the supremacy of individual autonomy; rather, it was the desire not to penalize the decedent's family combined with a recognition of the limited deterrent effect of criminal penalties for suicide.

As the nineteenth century progressed, states began to enact criminal prohibitions on assisting suicide. Marzen at 71–74. By 1868, when the Fourteenth Amendment was

---

8. Washington Laws, 1862, p. 83, § 1 provide: "[T]he common law of England, so far as it is not repugnant to, or inconsistent with the constitution and laws of the United States and the organic act, and laws of Washington territory, shall be the rule of decision in all the courts of this territory." This statute was amended to its current form by Washington Laws, 1891, ch. 17, § 1. It is now codified at RCW 4.04.010.

ratified, twenty-one of the thirty-seven states prohibited assisted suicide by either statute or common law. Marzen at 75. Within the first year of becoming a Territory, Washington enacted a prohibition of assisted suicide.[9] Thirty-six states and territories currently have statutes imposing criminal sanctions for aiding, assisting, causing, or promoting suicide.[10] Three additional states and the District of Columbia do not impose explicit criminal sanctions on assisted suicide, but nonetheless condemn assisted suicide in statutes allowing withdrawal of medical treatment.[11] Three other states have definitions of criminally negligent homicide that are sufficiently broad to encompass aiding, assisting, causing or promoting suicide.[12] An additional four states impose criminal penalties under case law.[13] In total, forty-four states, the District of Columbia and two territories prohibit or condemn assisted suicide.

The trend toward repeal of criminal sanctions against suicide, while still regarding suicide as an indicium of mental illness, and continued prohibition of aiding or assisting suicide, has produced what appears to be a modern consensus on the subject. The modern consensus consists of an overall disapproval of suicide which is manifested through (1) not criminally punishing suicide itself,[14] but instead treating it as a medical or psychological problem; [15] (2) allowing the state to intervene to prevent someone from committing suicide; and (3) enacting criminal statutes prohibiting the aiding or assisting of suicide.

## VI

Plaintiffs allege that RCW 9A.36.060 violates their substantive due process rights under the Fourteenth Amendment of the United States Constitution. They argue that physician-assisted suicide fits within the broad description of the liberty aspect of the substantive due process right set forth in *Casey:*

9. "Every person deliberately assisting another in the commission of self-murder, shall be deemed guilty of manslaughter." Terr.Laws 1854, p. 78, § 17 (1st Sess.1854).

10. ALASKA STAT. § 11.41.120 (1989); ARIZ. REV.STAT.ANN. § 13–1103 (1989); ARK.CODE ANN. § 5–10–104 (Michie 1987); CAL.PENAL CODE § 401 (Westlaw 1996); COLO.REV.STAT. § 18–3–104(1)(b) (Westlaw 1996); CONN.GEN. STAT. §§ 53a–54a, –56 (Westlaw 1996); DEL. CODE.ANN. tit. 11 §§ 632, 645 (1987 & Supp. 1990); FLA.STAT.ANN. § 782.08 (West 1986); GA.CODE ANN. § 16–5–5 (Westlaw 1996); HAW.REV.STAT. § 707–702 (Westlaw 1996); ILL.REV.STAT. ch. 720, ¶ 5/12–31 (Westlaw 1996); IND.CODE §§ 35–42–1–2, –2.5 (Westlaw 1996); KAN.STAT.ANN. § 21–3406 (1971); KY. REV.STAT. § 216.302 et seq. (Westlaw 1996); ME.REV.STAT.ANN. tit. 17–A, § 204 (West 1965); MICH.COMP.LAWS § 752.1027 (Westlaw 1996); MINN.STAT.ANN. § 609.215 (West 1987 & Supp.1993); MISS.CODE § 97–3–49 (Westlaw 1996); MO.REV.STAT. § 565.023(1)(2) (Westlaw 1996); MONT.CODE ANN. § 45–5–105 (Westlaw 1996); NEB.REV.STAT. § 28–307 (1989); N.H.REV.STAT.ANN. § 630:4 (1986); N.J.STAT.ANN. § 2C:11–6 (West 1982); N.M.STAT.ANN. § 30–2–4 (Michie 1984); N.Y.PENAL LAW §§ 120.30, 120.35, 125.15(3), 125.25(1)(b) (McKinney 1987); N.D.CENT. CODE § 12.1–16–04 (Supp.1991); OKLA.STAT. ANN., tit. 21, §§ 813 et seq. (West 1983); OR. REV.STAT. § 163.125(1)(b) (1991); 18 PA. CONS.STAT.ANN. § 2505 (1983 & Supp.1992); P.R.LAWS ANN. tit. 33, § 4009 (1983); S.D.CO-

DIFIED LAWS ANN. § 22–16–37 (1988); TENN. CODE ANN. § 39–13–216 (Westlaw 1996); TEX.PENAL CODE ANN. § 22.08 (West 1989); V.I.CODE ANN. tit. 14, § 2141 (1964); WASH. REV.CODE.ANN. § 9A.36.060 (West 1988); WIS.STAT.ANN. § 940.12 (West 1982).

11. D.C.CODE ANN. § 6–2428 (Westlaw 1996); IDAHO CODE § 39–152 (Westlaw 1996); NEV. REV.STAT. § 449.670 (Westlaw 1996); W.VA. CODE § 16–30–8(a) (Westlaw 1996).

12. ALA.CODE § 13A–6–1 (Westlaw 1996); IOWA CODE § 707.5 (Westlaw 1996); WYO. STAT. § 6–2–107 (Westlaw 1996).

13. *Commonwealth v. Mink*, 123 Mass. 422, 428–29 (Mass.1877); *Blackburn v. State*, 23 Ohio St. 146, 163 (Ohio 1872); *State v. Jones*, 86 S.C. 17, 67 S.E. 160, 165 (S.C.1910); *State v. Willis*, 255 N.C. 473, 121 S.E.2d 854 (1961).

14. Research indicates that the last prosecution in the U.S. for attempted suicide probably occurred in 1961. The North Carolina Supreme Court relied on the English common law to determine that attempted suicide was punishable as a misdemeanor. *State v. Willis*, 255 N.C. 473, 121 S.E.2d 854 (1961).

15. Washington subscribes to this view, and provides that attempts or threats to commit suicide can constitute a "likelihood of serious harm" to oneself sufficient to justify commitment. *See* RCW 71.05.020(3), RCW 71.05.240.

These matters, including the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life.

*Casey,* 505 U.S. at 851, 112 S.Ct. at 2807.

Specifically, plaintiffs allege that mentally competent, terminally ill adults have a constitutionally protected liberty interest in committing physician-assisted suicide. The district court also addresses the issue in those terms. This narrow formulation follows the teaching of the Supreme Court in *Cruzan,* which says, "in deciding 'a question of such magnitude and importance ... it is the [better] part of wisdom not to attempt, by any general statement, to cover every possible phase of the subject.'" *Cruzan,* 497 U.S. at 278, 110 S.Ct. at 2851. *See also Reno v. Flores,* 507 U.S. at 302, 113 S.Ct. at 1447 ("'Substantive due process' analysis must begin with a careful description of the asserted right, for '[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.'").

I would hold that mentally competent, terminally ill adults do not have a fundamental right to commit physician-assisted suicide. The Supreme Court has repeatedly indicated an unwillingness to expand the list of rights deemed fundamental. Physician-assisted suicide is not currently on that list. To be fundamental, a liberty interest must be central to personal autonomy or deeply rooted in history. The district court relies on language in *Casey*'s plurality opinion to hold that substantive due process protects a wide range of autonomy-based liberty interests, including physician-assisted suicide. Such a reading of *Casey* is permissible, provided it is clearly understood that the liberty interests so protected are not fundamental. *Casey*'s reaffirmation of the abortion right is best understood as a decision that relies heavily on *stare decisis;* the abortion right, uniquely protected under the undue burden standard, is *sui generis.* The second test for determining the existence of fundamental rights, whether the interest is rooted in the nation's history, similarly militates against a fundamental right to physician-assisted suicide.

I would hold that mentally competent, terminally ill adults do have an autonomy-based, nonfundamental liberty interest in committing physician-assisted suicide.

## A. No new fundamental rights

While the list of fundamental rights has not been definitively closed to expansion, the Court has indicated an unwillingness to find new penumbral, privacy-type fundamental rights. In *Reno v. Flores,* 507 U.S. 292, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993), the Court refuses to expand the list of fundamental rights to include a right of juveniles to be released into a noncustodial setting. *Reno* states:

> We are unaware ... that any court—aside from the courts below—has ever held that [the asserted fundamental right exists]. The mere novelty of such a claim is reason enough to doubt that "substantive due process" sustains it; the alleged right certainly cannot be considered "'so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Salerno, supra,* 481 U.S., at 751, 107 S.Ct., at 2103 (quoting *Snyder v. Massachusetts,* 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934)).

507 U.S. at 303, 113 S.Ct. at 1447. *See also Bowers v. Hardwick,* 478 U.S. 186, 190, 106 S.Ct. 2841, 2843, 92 L.Ed.2d 140 (1986) ("[T]here should be ... great resistance to expand the substantive reach of [the due process clauses of the Fifth and Fourteenth Amendments], particularly if it requires redefining the category of rights deemed fundamental.").

*Bowers* clearly identifies its liberty inquiries as fundamental, and states the two tests as follows:

> In *Palko v. Connecticut,* 302 U.S. 319, 325, 326 [58 S.Ct. 149, 152, 82 L.Ed. 288] (1937), it was said that this category [of rights which qualify for heightened judicial protection] includes those fundamental liberties that are "implicit in the concept of

ordered liberty," such that "neither liberty nor justice would exist if [they] were sacrificed." A different description of fundamental liberties appeared in *Moore v. East Cleveland*, 431 U.S. 494, 503 [97 S.Ct. 1932, 1937, 52 L.Ed.2d 531] (1977) (opinion of Powell, J.), where they are characterized as those liberties that are "deeply rooted in this Nation's history and tradition." *Bowers*, 478 U.S. at 191–192, 106 S.Ct. at 2844.

These tests are distinct from the broader nonfundamental liberty inquiry of *Casey*. The sweeping description of liberty in *Casey* is never characterized as "fundamental" under the Constitution; rather, its wide purview covers all liberty protected by the Fourteenth Amendment, nonfundamental as well as fundamental.

There is no fundamental liberty interest in physician-assisted suicide. First, as discussed above in Part V, there is no history or tradition supporting any form of suicide. Second, however compelling the suicidal wishes of terminally ill patients are regarded, it cannot honestly be said that neither liberty nor justice will exist if access to physician-assisted suicide is proscribed.

### B. The abortion right's strength rests on stare decisis

The *Casey* plurality states repeatedly that it is the combined force of *stare decisis* and liberty that protects a woman's right to abortion. *Casey*, 505 U.S. at 845, 853, 112 S.Ct. at 2804, 2808. This implies that liberty alone would be insufficient to support a new fundamental right to abortion.

The plurality never characterizes the abortion right as fundamental. This omission is significant, given the plurality's broad characterization of the liberty interest, as well as its use of the undue burden test in lieu of the strict scrutiny ordinarily applied to fundamental rights. The four-Justice dissent goes farther, stating that it would hold the abortion right to be nonfundamental:

> We are now of the view that, in terming this right fundamental, the Court in *Roe* read the earlier opinions upon which it based its decision much too broadly. Un-

like marriage, procreation and contraception, abortion "involves the purposeful termination of human life." The abortion decision must therefore "be recognized as *sui generis*, different in kind from the others that the Court has protected under the rubric of personal or family privacy and autonomy."

*Casey*, 505 U.S. at 951–52, 112 S.Ct. at 2859 (Rehnquist, C.J., concurring in the judgment in part and dissenting in part) (citations omitted). Central to the dissent's reason for wanting to call the abortion right nonfundamental is the fact that it involves the purposeful termination of human life. Abortion is *sui generis*, and the courts are on notice that these four Justices will not find fundamental any other asserted right that involves the purposeful termination of human life.

The other main end-of-life case, *Cruzan*, presumes a nonfundamental liberty interest in refusing unwanted medical treatment. This interest was subjected to ordinary balancing against the state interests, rather than strict scrutiny. *Cruzan*, 497 U.S. 261, 110 S.Ct. 2841.

These cases, combined with the Supreme Court's disinclination to find new fundamental rights, compel the conclusion that a liberty interest in physician-assisted suicide, if one exists, is nonfundamental.

### C. The history test does not support a liberty interest in physician-assisted suicide

In a recent English case, Lord Hoffman succinctly articulated the misperception upon which a history-based right to suicide is premised: "Suicide is no longer a crime, but its decriminalization was a recognition that the principle of self-determination should in that case prevail over the sanctity of life." *Airedale N.H.S. Trust v. Bland (C.A.)*, 2 W.L.R. 316, 351–352 (1993).

Yale Kamisar harshly criticizes this misperception:

> [T]he decriminalization of both suicide and attempted suicide did not come about because suicide was deemed a "human right" or even because it was no longer considered reprehensible. These changes oc-

curred, rather, because punishment was seen as unfair to innocent relatives of the suicide and because those who committed or attempted to commit the act were thought to be prompted by mental illness. Yale Kamisar, "Are Laws Against Assisted Suicide Unconstitutional?" 23 **Hastings Center Report** 32 (5/93) (citing "the most comprehensive and most heavily documented law review article ever written on the subject," Thomas Marzen et al., "Suicide: A Constitutional Right?" 24 **Duq.L.Rev.** 1, 68–100 (1985)). Kamisar also quotes the comments to the Model Penal Code, which explain the elimination of criminal sanctions for suicide: "There is a certain moral extravagance in imposing criminal punishment on a person who has sought his own self-destruction ... and who more properly requires medical or psychiatric attention." Kamisar, *id.*

As I discussed above in Part V, suicide and assisted suicide are clearly not "deeply rooted in this Nation's history and tradition." *Bowers,* 478 U.S. at 192, 106 S.Ct. at 2844. Nor are suicide or assisted suicide rooted in the English Common Law as adopted by the states, or in the legal and philosophical order underlying the English Common Law.

**D. The autonomy test supports a limited liberty interest in physician-assisted suicide**

The district court's starting point for the autonomy inquiry is the now-famous assertion in *Casey* that "[a]t the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State." *Casey,* 505 U.S. at 851, 112 S.Ct. at 2807. Application of this statement in the adjudication of substantive due process claims is a matter of "reasoned judgment." *Casey,* 505 U.S. at 849, 112 S.Ct. at 2806. This throws courts into the wide-open realm of pure moral reasoning about liberty. As a practical matter, such unfettered theoretical musing could not plausibly form the basis of a constitutional fundamental rights jurisprudence. This is borne out

by *Casey*'s notable omission to mention "fundamental" rights. *Casey* should therefore be read as describing more general, nonfundamental liberty.

There is scant guidance in the quoted passage from *Casey* as to what may constitute a nonfundamental liberty interest. Taken out of context, the "right to define one's own concept of existence" is so broad and melodramatic as to seem almost comical in its rhetorical flourish. But the preceding sentence in *Casey* provides a more somber and usable definition of liberty. Personal decisions which "involv[e] the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment." *Casey,* 505 U.S. at 851, 112 S.Ct. at 2807.

As plaintiffs and amicus Ten Surviving Family Members in Support of Physician–Assisted "Suicide" assert, a terminally ill person is dying, not eventually as all humans do, but imminently. Often, the decline to death is not only painful, but debilitating and demoralizing. Ideally, terminally ill people will be surrounded by caring, supportive family members, doctors, and friends, who will be able to alleviate the pain and the low morale. But ultimately, many of those who are terminally ill will face a choice of whether to continue the slow decline to death, or instead to truncate their lives.

The Hemlock Society's how-to suicide book, *Final Exit* illustrates that there are many feasible methods of ending one's life. But many of the choices are not terribly dignified. *Casey* says that liberty protects not only choices that are personal, intimate and central to autonomy, but also that are central to personal dignity. Suicide by physician-prescribed medication is seen by some as an inherently more dignified way to hasten an imminent and inevitable death than other methods in common usage.

To the extent that *Casey* defines the outer limits of the Constitution's nonfundamental liberty right, it can plausibly be said to include decisions about the manner and timing of one's death.

## VII

Whatever test is ultimately used to evaluate the constitutionality of RCW 9A.36.060, the plaintiffs' liberty interest must be compared against the state interests underlying the statute.

The State asserts three interests: (1) preventing suicide, (2) protecting vulnerable individuals from abuse or undue influence and (3) preserving and protecting the lives of its people. It asserts that the interest in preventing suicide applies equally to all the state's citizens; the State does not evaluate the quality of life among its citizenry, and preserve and protect only those whose lives are deemed "worth living."

Washington courts recognize four state interests common to end-of-life cases: (1) the preservation of life, (2) the protection of the interests of innocent third parties, (3) the prevention of suicide, and (4) the maintenance of the ethical integrity of the medical profession. *In re Guardianship of Grant,* 109 Wash.2d 545, 747 P.2d 445, 451 (Wash. 1987); *In re Colyer,* 99 Wash.2d 114, 660 P.2d 738, 743 (Wash.1983). The Supreme Court has also recognized all four of these state interests. *Cruzan,* 497 U.S. at 271, 110 S.Ct. at 2847.

The four governmental interests recognized by Washington courts and endorsed by the Supreme Court are all very strong, and apply with undiminished vigor to justify RCW 9A.36.060's prohibition of physician-assisted suicide for mentally competent, terminally ill adults. Any one of these interests would be sufficient to support this application of the statute under a rational relationship test. Were it necessary for me to do so, I would even be inclined to hold that the cumulative force of all four governmental interests is sufficient to enable this application of the statute to withstand strict scrutiny.

### A. The preservation of life

This interest has been addressed extensively in the cases involving withdrawal of nutrition and hydration. In particular, *Grant* and *Colyer* describe the contours of Washington's interest in the preservation of life. The *Colyer* court held that the interest "weakens ... in situations where continued treatment serves only to prolong a life inflicted with an incurable condition." *Colyer,* 660 P.2d at 743. The *Grant* court held the interest "weaken[s] considerably ... if treatment will merely postpone death for a person with a terminal and incurable condition." *Grant,* 747 P.2d at 451.

It may be tempting to extrapolate from these cases a principle that terminally ill patients seeking to commit physician-assisted suicide fall within the zone where the state's interest in preserving life is weakened. Such an extrapolation would be improper. The state's interest is weakened only where continued medical treatment would do nothing more than postpone death. This is the holding of both *Colyer* and *Grant,* and it matches the line drawn in Part I of this opinion, between discontinuing medical treatment on one hand, and physician-assisted suicide and euthanasia on the other hand. As applied to terminally ill adults seeking physician-assisted suicide, the state's interest in preserving life remains at full strength.

The state's interest in preserving life is equally strong when applied to terminally ill patients seeking to commit assisted suicide as it is when applied to the general populace. The analogy to abortion is a rough one: in the abortion context, the Supreme Court tells us that the state's interests in fetal life are weaker before viability than they are once the fetus becomes viable. *See Casey,* 505 U.S. at 845, 112 S.Ct. at 2804. A state's interest in preserving human life is stronger when applied to viable beings than it is when applied to nonviable beings. Like a first-trimester fetus, a person kept alive by life-sustaining treatment is essentially nonviable. A terminally ill patient seeking to commit physician-assisted suicide, by contrast, is essentially viable. The patient may be inexorably approaching the line of nonviability. But the patient is still on the viable side of that line, and consequently enjoys the full protection of the state's interest in preserving life.

### B. The protection of the interests of innocent third parties

The question of physician-assisted suicide raises many issues involving the interests of

innocent third parties. Constitutional protection for a right to assisted suicide might spawn pressure on the elderly and infirm—but still happily alive—to "die and get out of the way."[16] Also at risk are the poor and minorities, who have been shown to suffer more pain (i.e. they receive less treatment for their pain) than other groups. *See* Yale Kamisar, "Against Assisted Suicide—Even a Very Limited Form," 72 **U.Det.Mercy L.Rev.** 735, 737–739 (1995). Further, like the elderly and infirm, they, as well as the handicapped, are at risk of being unwanted and subjected to pressure to choose physician-assisted suicide rather than continued treatment. Kamisar quotes the New York State Task Force on Life and the Law:

[I]t must be recognized that assisted suicide and euthanasia will be practiced through the prism of social inequality and prejudice that characterizes the delivery of services in all segments of society, including health care. Those who will be most vulnerable to abuse, error, or indifference are the poor, minorities, and those who are least educated and least empowered. This risk does not reflect a judgment that physicians are more prejudiced or influenced by race and class than the rest of society—only that they are not exempt from the prejudices manifest in other areas of our collective life.

. . . . .

[Many patients] in large, overburdened facilities serving the urban and rural poor ... will not have the benefit of skilled pain management and comfort care. Indeed, a recent study found that patients treated for cancer at centers that care predominantly for minority individuals were three times more likely to receive inadequate therapy to relieve pain. Many patients will also lack access to psychiatric services. Furthermore, for most patients who are terminally or severely ill, routine psychiat-

ric consultation would be inadequate to diagnose reliably whether the patient is suffering from depression.

Kamisar, *Id.* at 738 (quoting The New York State Task Force on Life and the Law, *When Death is Sought: Assisted Suicide and Euthanasia in the Medical Context* at 125, 143 (1994)). Pain and suffering are directly related to the prevalence of requests for assisted suicide. Kamisar reports that

Although pain is notoriously undertreated in this country, "according to experts in the field of pain control, almost all terminally ill patients can experience adequate relief with currently available treatments." Thus, ... suicidal ideation and suicide requests "commonly ... dissolve with adequate control of pain and other symptoms."

*Id.* (quoting Judith Ahronheim & Doron Weber, *Final Passages: Positive Choices For the Dying and Their Loved Ones* 102 (1992); Kathleen Foley, "The Relationship of Pain and Symptom Management to Patient Requests for Physician–Assisted Suicide," **J. Pain & Symptom Management** 289, 290 (1991)). Kamisar repeatedly suggests the explanation for inadequate control of pain: lack of universal access to adequate medical care. *Id.* at 738, 744 n. 43. People request physician-assisted suicide because they are in pain or are otherwise suffering. If their suffering is alleviated, they will likely withdraw their requests for physician-assisted suicide. We the courts are asked, in a nation of inadequate and unequal access to medical care for the alleviation of pain and suffering, to create a constitutional right to physician-assisted suicide. Surely this is a case of misplaced priorities.

Plaintiffs suggest that adequate procedural safeguards can be implemented to protect the interests of innocent third parties. This assertion is refuted by the experience of The Netherlands, where physician-assisted suicide and euthanasia are nominally legal.[17] At

---

**16.** A recent computer search revealed 83 news stories with this phrase, including the famous 1984 statement by Colorado Governor Lamm.

**17.** Physician-assisted suicide and euthanasia are prohibited by the Penal Code of the Netherlands, art. 293–294. *See* John Keown, "Euthanasia in The Netherlands: Sliding Down the Slippery

Slope?" 9 **Notre Dame J.Law, Ethics & Pub. Pol.** 407, 409–410 (1995). The courts have allowed physicians who participate in euthanasia to go unpunished since 1973. Nederlandse Jurisprudentie (1973), no. 183, District Court of Leeuwarden, February 21, 1973; trans., Walter Lagerway, 3 **Issues in Law and Med.** 429, 439–442 (1988).

the outset, The Netherlands had guidelines: the patient must be incurably ill, the patient's suffering must be subjectively unbearable, the request for termination should be in writing, and there should be adequate consultation with other physicians before euthanasia was carried out. Lagerway at 439.

In 1991, the Dutch Government released a report on the practice of euthanasia and physician-assisted suicide in The Netherlands. Commissie Onderzoek Medische Praktijk Inzake Euthanasie, *Medische Beslissingen Rond Het Levenseinde* (1991) (the "Remmelink Report"). According to the Remmelink Report, 2.1% of all deaths in The Netherlands are due to physician-assisted suicide or euthanasia. Another 7% are due to the alleviation of pain or symptoms where the physician had the explicit (total or partial) purpose of shortening life. In 1990: 2300 people were euthanized upon request, 400 died as a result of physician-assisted suicide, 1000 died from involuntary euthanasia (patients were killed without their knowledge or consent), and 8100 died as a result of doctors deliberately giving them overdoses of pain medication (again, 61% of this category were killed without their knowledge or consent).[18]

Critics of this data would respond that the Dutch experiment has focused mainly on euthanasia, rather than physician-assisted suicide. But even proponents of assisted suicide have begun to abandon the distinction between physician-assisted suicide and euthanasia:

> To confine legalized physician-assisted death to assisted suicide unfairly discriminates against patients with unbelievable suffering who resolve to end their lives but are physically unable to do so. The method chosen is less important than the careful assessment that precedes assisted death.

Franklin G. Miller et al., "Sounding Board: Regulating Physician–Assisted Death," 331 **New England J. Med.** 119, 120 (1994). Likewise, the AMA Code of Ethics § 2.211 uses identical language to condemn both euthanasia and physician-assisted suicide.

The poor, the elderly, the disabled and minorities are all at risk from undue pressure to commit physician-assisted suicide, either through direct pressure or through inadequate treatment of their pain and suffering. They cannot be adequately protected by procedural safeguards, if the Dutch experience is any indication. The only way to achieve adequate protection for these groups is to maintain a bright-line rule against physician-assisted suicide.

But it is not only people at the margins who are imperilled by the threat of a constitutional right to physician-assisted suicide. Such a right could disrupt the established legal order of wills, trusts, life insurance, annuities, pensions, and other estate planning tools employed by many Americans. Many life insurance policies have suicide clauses in them, which negate the insurer's liability if the insured commits suicide. Many states have statutes like Washington's Slayer's Act, which preclude participants in the unlawful killing of another person from acquiring property or receiving benefits as the result of the death.[19] A sampling of cases demonstrates that these and related concerns are real. In *People v. Matlock*, 51 Cal.2d 682, 336 P.2d 505 (Cal.1959) (In Bank) and *Gospodareck v. State*, 666 So.2d 835 (Ala. Cr.App.1993), the defendants were tried for killing people who had hired or requested to be killed because they wanted to die, but did not want to void their life insurance by committing suicide. In *Keddie v. Delaware Violent Crimes Compensation Board*, 1991 WL 215655 (Del.Super.1991), Ms. Keddie was denied compensation under the Compensation for Innocent Victims of Crime Act for her husband's suicide. He committed suicide at the encouragement of Anthony Sabbato, who was convicted of promoting a suicide. The court reasoned that Ms. Keddie's husband was not an innocent victim of crime, insofar as he contributed to his own death. In *Holmes v. Morgan*, 135 Or.App. 617, 899

---

**18.** Keown, *supra* note 17, at 419.

**19.** *See* RCW 11.84.010 *et seq.* The applicability of this statute to cases of assisted suicide has not yet been decided in Washington courts. However, RCW 11.84.900 provides: "This chapter … shall be construed broadly to effect the policy of this state that no person shall be allowed to profit by his own wrong, wherever committed."

P.2d 738 (Or.App.1995), a distraught young man changed the named beneficiary on his life insurance policy from his parents to a friend, who may have assisted him in a suicide attempt. He later committed suicide without assistance. The Oregon Court of Appeals held that the friend could receive the policy proceeds. Finally, in *Wilmington Trust Co. v. Clark*, 289 Md. 313, 424 A.2d 744 (Md.1981), the Maryland Supreme Court considered whether a woman could bring a contract or tort action against her former husband's estate, on the ground that his suicide deprived her of alimony.

The interests of many innocent third parties are implicated by a putative right to physician-assisted suicide. Most obviously, the poor, minorities and the disabled are at risk of suffering undue indifference or pressure to commit physician-assisted suicide. Less obviously, a right to physician-assisted suicide could severely disrupt the economic interests of the relatives, partners and associates of those who commit physician-assisted suicide.

### C. The prevention of suicide

The state interest in preventing suicide runs directly contrary to any claimed right to physician-assisted suicide. It is a longstanding interest. In Washington, committing or attempting suicide was punishable as a crime at least from 1909 to 1976. The 1976 repeal arguably represents a recognition that suicide is not a criminal problem, but rather one of mental and public health.[20] Suicide is a leading cause of death in Washington for all age groups, 15–54. Washington State Dep't of Health, *Washington State Annual Summary of Vital Statistics 1989* 38–39 (1990). Suicide is the cause of 1.8% of *all* deaths in Washington. *Id.* at 37. Aiding suicide has been codified as a crime in Washington law since 1854, and continues to the present, in RCW 9A.36.060.

Plaintiffs imply that the prevention of suicide is merely a derivative of the state's general interest in protecting life. Even if this were the entire substance of the state

interest in preventing suicide, the state's interest in preserving life remains at full strength in the case of terminally ill patients seeking to commit physician-assisted suicide.

However, the history of state regulation of suicide and the modern consensus on the regulation of suicide indicates that the state's interest in preventing suicide goes deeper than just keeping people alive. The state recognizes suicide as a manifestation of medical and psychological anguish; people with suicidal tendencies are suffering. The state's interest is in addressing and, where possible, relieving that suffering.

Plaintiffs make a compelling argument that in some cases of terminally ill patients, the suffering is due not to physical pain or to psychological illness, but to the knowledge that their terminal illness will slowly dissolve their physical and mental faculties, stripping them of dignity in their last days. But also compelling are the data indicating that a high percentage of persons withdraw their suicide requests once they receive adequate treatment for depression, pain, and the like. *See, e.g.,* Kamisar, 72 **U.Det.Mercy L.Rev.** at 744.

The state's interest in preventing suicide is distinct from its interest in preserving life, and it does not diminish with the onset and advancement of terminal illness.

### D. The maintenance of the ethical integrity of the medical profession

It is sanctionable unprofessional medical conduct in Washington to "possess[ ], use, prescri[be] for use, or distribut[e] ... controlled substances or legend drugs in any way other than for legitimate or therapeutic purposes ..." RCW 18.130.180(6). Furthermore, "[t]he use of a nontraditional treatment by itself shall not constitute unprofessional conduct, provided that it does not result in injury to a patient or create an unreasonable risk that a patient may be harmed." RCW 18.130.180(4). These statutory provisions demonstrate that, in addition to the prohibitions of RCW 9A.36.060, physicians are subject to professional sanctions

---

**20.** A review of the legislative history and the state archives reveals that the repeal was enacted

without comment from the legislature.

for prescribing drugs to their patients in order to assist those patients to commit suicide.

While not legally binding, the AMA Code of Ethics provides clear guidance on the current position of medical ethicists. Section 2.211 of the American Medical Association's *Code of Medical Ethics and Current Opinions of the Council on Ethical and Judicial Affairs* ("AMA Code of Ethics") prohibits physician participation in physician assisted suicide. In virtually identical language to its condemnation of euthanasia, section 2.211 provides:

> Physician assisted suicide occurs when a physician facilitates a patient's death by providing the necessary means and/or information to enable the patient to perform the life-ending act (e.g. the physician provides sleeping pills and information about the lethal dose, while aware that the patient may commit suicide).

> It is understandable, though tragic, that some patients in extreme duress—such as those suffering from a terminal, painful, debilitating illness—may come to decide that death is preferable to life. However, allowing physicians to participate in assisted suicide would cause more harm than good. Physician assisted suicide is fundamentally incompatible with the physician's role as healer, would be difficult or impossible to control, and would pose serious societal risks.

> Instead of participating in assisted suicide, physicians must aggressively respond to the needs of patients at the end of life. Patients should not be abandoned once it is determined that cure is impossible. Patients near the end of life must continue to receive emotional support, comfort care, adequate pain control, respect for patient autonomy, and good communication.

Because it is contrary to Washington statutory law, reinforced by the AMA Code of Ethics, it would violate the state's interest in maintaining the ethical integrity of the medical profession to allow physicians to participate in physician assisted suicide.

## VIII

In reviewing a statute's constitutionality under the substantive due process clause, courts should apply one of two tests. If the right asserted is fundamental, the statute is subjected to strict scrutiny, under which it must be narrowly tailored to serve a compelling state interest. If the liberty interest is not fundamental, the statute is subjected only to the "unexacting" inquiry of whether the statute rationally advances some legitimate governmental purpose. *Reno v. Flores*, 507 U.S. at 301–306, 113 S.Ct. at 1447–1449.

Because I would hold that the liberty interest of mentally competent, terminally ill adults in committing physician-assisted suicide is not a fundamental right, I would use the latter test, which has sometimes been called the rational relationship test.

The nonfundamental liberty interest at stake here is the right of mentally competent, terminally ill adults to commit physician-assisted suicide. This interest is rooted in the liberty to make intensely private choices that are central to personal dignity and autonomy. The exercise of this nonfundamental liberty interest is barred in Washington by RCW 9A.36.060, which states that promoting a suicide attempt is a criminal offense. The Washington statute rationally advances four legitimate state interests: the preservation of life, the protection of the interests of innocent third parties, the prevention of suicide, and the maintenance of the ethical integrity of the medical profession. Under the rational relationship test, RCW 9A.36.060 is valid.[21]

---

21. The Supreme Court has occasionally appeared to employ a straight balancing test instead of the strict scrutiny-versus-rational relationship dichotomy. *E.g., Cruzan*, 497 U.S. at 278–279, 110 S.Ct. at 2851–2852 ("whether [the individual's] constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests").

Even under such a balancing test, I would hold that the state's four interests—in preserving life, protecting the interests of innocent third parties, preventing suicide, and maintaining the ethical integrity of the medical profession—outweigh the plaintiffs' autonomy-based liberty interest in committing physician-assisted suicide.

## IX

The district court also holds that the Washington statute violates the Equal Protection Clause. Its analysis is based upon two premises, both of which are incorrect, and fall together. First, it assumes that *Cruzan*-type patients are similarly situated to the patients in this case. Second, it holds that the differentiation between these types of patients is subject to, and does not withstand, strict scrutiny. *Compassion in Dying,* 850 F.Supp. at 1466.

*Cruzan*-type patients are being subjected to unwanted lifesaving medical treatment, from which they have a constitutionally protected right to be free. The patients in this case, though also terminally ill, are not seeking any such freedom from treatment. Rather, they are seeking medical assistance in ending their lives. The district court rejected arguments that the distinction between the two groups is one between "natural" and "artificial" deaths. There are dozens of ways that the two groups of patients could be distinguished or associated, not the least of which is the dramatic difference in the nature of their constitutional rights. One group has not just an interest but a right to be free from unwanted medical treatment. The other group has an interest, but not a protected right, in committing physician-assisted suicide. Washington statutes clearly distinguish the two groups, as does the AMA Code of Ethics. They are not similarly situated, and are therefore not subject to an equal protection analysis.

Even though the physician plaintiffs argue that the two groups are similarly situated, the patients in this case are neither a suspect classification nor holders of fundamental rights. The patients' position is entitled to no more than rational basis review. Strict scrutiny is only used where people are categorized into suspect classifications (e.g., race) or suffer the infringement of a constitutionally protected fundamental right. "[T]he pertinent inquiry is whether the [classification] advances legitimate legislative goals in a rational fashion. The Court has said that, although this rational basis standard is 'not a toothless one,' it does not allow us to substitute our notions of good public policy."

*Schweiker v. Wilson,* 450 U.S. 221, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981). *See also New York City Transit Auth. v. Beazer,* 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979); *Kadrmas v. Dickinson Public Schools,* 487 U.S. 450, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988). The state's interests in protecting life, preventing suicide, protecting the interests of third parties, and preserving the ethical integrity of the medical profession are strong, perhaps even compelling. Even if the two groups—patients refusing unwanted medical treatment and mentally competent terminally ill adults seeking to commit physician-assisted suicide—were similarly situated, the distinction between them rests solidly on a rational basis and is constitutionally valid under the Equal Protection Clause.

## X

The issue of whether mentally competent, terminally ill adults have a constitutionally protected right to commit physician-assisted suicide is one of the most difficult, divisive and heart-wrenching issues facing the courts today. The correlative issue of whether terminally ill loved ones ought to be allowed to commit assisted suicide is likewise one of the most difficult, divisive and heart-wrenching issues facing American society. The former is a constitutional issue for the courts; the latter is a moral question for society as a whole.

The two issues are not the same. The latter requires us—all of us, not just judges—to engage in a soul-searching dialogue about our collective morals. Given the tremendous advances in twentieth-century medical technology and public health, it is now possible to live much longer than at any time in recorded history. We have controlled most of the swift and merciful diseases that caused most deaths in the past. In their place are a host of diseases that cause a slow deterioration of the human condition: cancer, Alzheimer's disease, and AIDS are but a few. This change has forced us to step back and reexamine the historic presumption that all human lives are equally and intrinsically valuable. Viewed most charitably, this reexamination may be interpreted as our struggle with the question whether we as a society are willing to excuse the terminally ill for deciding that their lives

are no longer worth living. Viewed less charitably, the reexamination may be interpreted as a mere rationalization for housecleaning, cost-cutting and burden-shifting—a way to get rid of those whose lives we deem worthless. Whether the charitable or uncharitable characterization ultimately prevails is a question that must be resolved by the people through deliberative decisionmaking in the voting booth, as in Washington in 1991, California in 1992 and Oregon in 1994, or in the legislatures, as recently undertaken in Michigan and New York. This issue we, the courts, need not—and should not—decide.

Instead, we should restrict our decision to the former issue: whether mentally competent, terminally ill adults have a constitutionally protected liberty interest in committing physician-assisted suicide. This is the first federal appellate case in our nation's history to address the issue of physician-assisted suicide. To declare a constitutional right to physician-assisted suicide would be to impose upon the nation a repeal of local laws. Such a declaration would also usurp states' rights to regulate and further the practice of medicine, insofar as a right to physician-assisted suicide flies in the face of well-established state laws governing the medical profession. Finally, the rationales under which we are asked to create this right fail adequately to distinguish physician-assisted suicide as a unique category. If physician-assisted suicide for mentally competent, terminally ill adults is made a constitutional right, voluntary euthanasia for weaker patients, unable to self-terminate, will soon follow. After voluntary euthanasia, it is but a short step to a "substituted judgment" or "best interests" analysis for terminally ill patients who have not yet expressed their constitutionally sanctioned desire to be dispatched from this world. This is the sure and inevitable path, as the Dutch experience has amply demonstrated. It is not a path I would start down.

I would hold that the four state interests discussed above are sufficiently strong to sustain the constitutionality of RCW 9A.36.060 as applied to plaintiffs' asserted liberty interest.

I dissent.

**FERNANDEZ, Circuit Judge, dissenting:**

I join in Judge Beezer's dissenting opinion with one caveat. Nothing in his opinion, or in that of the majority, convinces me that there is any constitutional right whatever to commit suicide. In my view, no one has an even nonfundamental *constitutional right* to become what our legal ancestors pithily denominated a *felo de se*. *See e.g.*, Sir Edward Coke, *Institutes of the Laws of England*, 3d Institute, 54 (Brooke ed. 1797) (1644); 1 Sir Matthew Hale, *Pleas of the Crown* 411 (Nutt ed. 1736) (1680); 4 Sir William Blackstone, *Commentaries on the Laws of England* 189 (15th ed. 1809) (1765). The arguments for and against suicide raise an issue which would elicit competing responses from even our most well trained moral philosophers. Like so many other issues, it is one "for the people to decide." *Guadalupe Org., Inc. v. Tempe Elementary Sch. Dist. No. 3*, 587 F.2d 1022, 1027 (9th Cir.1978). Our Constitution leaves it to them; it is they and their representatives who must grapple with the riddle and solve it.

**KLEINFELD, Circuit Judge, dissenting:**

I join in Judge Beezer's dissenting opinion, with two qualifications.

First, I doubt that there is a constitutional right to commit suicide. "[N]o 'substantive due process' claim can be maintained unless the claimant demonstrates that the state has deprived him of a right historically and traditionally protected against state interference." *Cruzan v. Director, Missouri Dep't of Health*, 497 U.S. 261, 294, 110 S.Ct. 2841, 2860, 111 L.Ed.2d 224 (1990) (Scalia, J. concurring). Suicide has not been traditionally or historically protected as a right:

> American law has always accorded the State the power to prevent, by force if necessary, suicide—including suicide by refusing to take appropriate measures necessary to preserve one's life; the point at which life becomes "worthless," and the point at which the means necessary to preserve it become "extraordinary" or "inappropriate" are neither set forth in the Constitution nor known to the nine Justices of this Court any better than they are known to nine people picked at random

from the Kansas City telephone directory; ... It is quite impossible (because the Constitution says nothing about the matter) that [Missouri's] citizens will decide upon a line less lawful than the one we would choose; and it is unlikely (because we know no more about "life-and-death" than they do) that they will decide upon a line less reasonable.

*Cruzan,* 497 U.S. at 293, 110 S.Ct. at 2859 (Scalia, J. concurring).

That a question is important does not imply that it is constitutional. The Founding Fathers did not establish the United States as a democratic republic so that elected officials would decide trivia, while all great questions would be decided by the judiciary. The majority treats the remark in *Planned Parenthood v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), about "the most intimate and personal choices a person may make ... the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life," *id.* at 851, 112 S.Ct. at 2807, as a basis for constitutionalizing any really important personal decision. That an issue is important does not mean that the people, through their democratically elected representatives, do not have the power to decide it. One might suppose that the general rule in a democratic republic would be the opposite, with a few exceptions. Judge Beezer's view, that the statement is made in the *sui generis* context of abortion law, is sounder than the majority's. There is a difficulty with expanding the quoted language from *Casey* beyond abortion, in the face of *Bowers v. Hardwick,* 478 U.S. 186, 190–93, 106 S.Ct. 2841, 2844–45, 92 L.Ed.2d 140 (1986), and we lack authority to overrule that decision of a higher court.

We do not need, however, to decide whether suicide is a constitutionally protected right. As Judge Beezer explains, even if it is, the State of Washington has a rational basis for preventing assisted suicide. It is not necessary to agree with Judge Beezer, that there is a nonfundamental constitutionally protected right to commit suicide, or with Judge Fernandez, that there is not. Either way, the district court erred, for the reasons stated by Judge Beezer.

Second, the majority says there is "little, if any, difference for constitutional or ethical purposes" between providing pain killing medication for the purpose of relieving pain, knowing that it will at some dosage cause death, and providing medication for the sole purpose of causing death. I would go further than Judge Beezer's characterization of this as a "gray area." I think the majority's proposition is exactly wrong. When General Eisenhower ordered American soldiers onto the beaches of Normandy, he knew that he was sending many American soldiers to certain death, despite his best efforts to minimize casualties. His purpose, though, was to liberate the beaches, liberate France, and liberate Europe from the Nazis. The majority's theory of ethics would imply that this purpose was legally and ethically indistinguishable from a purpose of killing American soldiers. Knowledge of an undesired consequence does not imply that the actor intends that consequence. A physician who administers pain medication with the purpose of relieving pain, doing his best to avert death, is no murderer, despite his knowledge that as the necessary dosage rises, it will produce the undesired consequence of death.

Justice Holmes was the leading advocate of his time for the general proposition that "[a]cts should be judged by their tendency under the known circumstances, not by the actual intent which accompanies them." Holmes, *The Common Law* 54 (Harvard Univ. Press 1967) (1881). When applying this general principle to a specific case, however, Holmes qualified it, conceding that "when words are used exactly, a deed is not done with intent to produce a consequence unless that consequence is the aim of the deed." *Abrams v. United States,* 250 U.S. 616, 627, 40 S.Ct. 17, 21, 63 L.Ed. 1173 (1919) (Holmes J. dissenting). There is no novelty to the distinction between intended purpose and foreseen but undesired consequence. "It is deliberate purpose that constitutes wickedness and criminal guilt, and such names as 'outrage' and 'theft' imply deliberate purpose as well as the mere action." Aristotle, *Rhetoric,* book I, chap. 13, at 79 (Roberts trans. 1954). Jurors can no longer be instructed that "the law presumes that a person intends the ordinary consequences of his voluntary acts," in a case requiring purposeful conduct, because the instruction presumes away the prosecution's burden of proving criminal in-

tent. *Sandstrom v. Montana*, 442 U.S. 510, 513, 99 S.Ct. 2450, 2453, 61 L.Ed.2d 39 (1979).

It is very difficult to judge what ought to be allowed in the care of terminally ill patients. The Constitution does not speak to the issue. People of varying views, including people with terrible illnesses and their relatives, physicians, and clergy, can, through democratic institutions, obtain enlightened compromises of the complex and conflicting considerations. They can do so at least as well as we judges can, and nothing in the Constitution prevents them from making the law.